**<u>Exhibit B</u>**

**Bench Ruling**

1
UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

2

.   Chapter 11
3
IN RE:                            .
.   Case No. 20-12522 (JTD)
4
MALLINCKRODT PLC, *et al.*,       .
.
5
.   Courtroom No. 5
6
.   824 North Market Street
.   Wilmington, Delaware 19801
7
.
Debtors.    .   Monday, December 6, 2021
8
. . . . . . . . . . . . . . . .   9:30 A.M.

9
TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOHN T. DORSEY
10
UNITED STATES BANKRUPTCY JUDGE

11
**TRIAL PHASE II (DAY #1)**

12
<u>APPEARANCES</u>:

13
For the Debtors:         Michael Merchant, Esquire
14
RICHARDS LAYTON & FINGER P.A.
Rodney Square
15
1000 North King Street
Wilmington, Delaware 19801
16
- and -
17

18
Betsy Marks, Esquire
Christopher Harris, Esquire
19
LATHAM & WATKINS LLP
1271 Avenue of the Americas
20
New York, New York 10020

21
Audio Operator:          Jermaine Cooper, ECRO

22
Transcription Company:   Reliable
1007 N. Orange Street
23
Wilmington, Delaware 19801
(302)654-8080
24
Email:  gmatthews@reliable-co.com

25
Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
 1   APPEARANCES (Cont'd):

 2   For Acthar Plaintiffs:    Donald Haviland, Esquire
                               HAVILAND HUGHES
 3                             112 Haddontowne Court, Suite 202
                               Cherry Hill, New Jersey 08034
 4
 5   For the U.S. Trustee:     Richard Schepacarter, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
 6                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 7                             Lockbox 35
                               Wilmington, Delaware 19801
 8
     For the Opioid            Mitchell Hurley, Esquire
 9   Creditors Committee:      AKIN GUMP STRAUSS HAUER & FELD LLP
                               One Bryant Park
10                             Bank of America Tower
                               New York, New York 10036
11
     For the Governmental      Philip Bentley, Esquire
12   Plaintiff Ad Hoc          KRAMER LEVIN NAFTALIS & FRANKEL LLP
     Committee:                1177 6th Avenue
13                             New York, New York 10036

14                             - and -

15
                               Steven Pohl, Esquire
16                             BROWN RUDNICK LLP
                               One Financial Center
17                             Boston, Massachusetts 02111

18
     For Canadian Elevator     Laurence May, Esquire
19   Industry Pension Trust:   EISEMAN LEVINE LEHRHAUPT
                                 & KAKOYIANNIS, P.C.
20                             805 Third Avenue, 10th Floor
                               New York, New York 10022
21
     For Johnson & Johnson:    Evan Jones, Esquire
22                             O'MELVENY & MYERS LLP
                               400 South Hope Street, 18th Floor
23                             Los Angeles, California 90071

24

25
```

1  <u>MATTERS GOING FORWARD</u>:

2  1. Administrative Claims Asserted by Acthar Insurance
   Claimants.

3

4       **Court's Ruling:  6**

5  <u>CONFIRMATION HEARING PHASE II</u>:

6              <u>DEBTORS' AND SUPPORTING PARTY WITNESSES</u>

7  **STEVEN WELCH**

8       Direct Examination by Ms. Marks              56

9       Cross Examination by Mr. Schepacarter        147

10      Cross Examination by Mr. May                 163

11      Cross Examination by Mr. Haviland            194

12

13

14
   <u>EXHIBITS</u>:                            <u>ID</u>    <u>Rec'd</u>
15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commence at 9:35 a.m.)

 2              THE COURT:  Good morning.  This is Judge Dorsey.

 3   We're on the record in Mallinckrodt PLC, Case Number 20-

 4   12522.

 5              I was surprised to see that, over the weekend, a

 6   number of filings came in, which I have not reviewed.  I

 7   thought, at the end of the day -- I thought, on Thursday, I

 8   was told -- or whenever it was last week, at the last hearing

 9   -- that all the motions in limine had been resolved, and

10   that's why we didn't have a hearing on Friday.  What

11   happened?

12              MR. MERCHANT:  Your Honor, Michael Merchant of

13   Richards, Layton & Finger on behalf of the debtors.

14              Just to clarify, there were a number of motions in

15   limine that were filed back prior to the start of phase one.

16   Those were the motions that we referenced on Thursday.

17              In connection with phase two, I think a number of

18   motions in limine were filed in accordance with the phase two

19   pretrial order at the beginning of last week.  And actually,

20   the objection deadline on those motions was Friday at 6 p.m.

21   So I apologize for the timing on delivering those to

22   chambers, but that's why things were filed after hours on

23   Friday and showed up on an amended agenda that was filed over

24   the weekend.

25              Well, I hope no one is expecting me to rule on
```

1  those today because I haven't even read those papers.  I

2  spent the weekend working on my ruling on the admin claims,

3  so ...

4              What's the expectation for today?

5              MR. MERCHANT:  Your Honor, I think -- well,

6  obviously, we'll defer to whatever the Court wants to do.

7  But I see Mr. Harris is on, he's planning to handle -- at

8  least from the debtors' perspective, I think we were hoping

9  that they would go forward, you know, maybe in the afternoon

10 today.  But I'll defer to Mr. Harris.

11             THE COURT:  Mr. Harris?

12             MR. HARRIS:  Thank you, Your Honor.

13             Yes, there were a number of motions in limine

14 filed where the response deadline was Friday night.  The

15 parties are prepared to argue them, but that's obviously not

16 useful to Your Honor, if you haven't reviewed them.  So we'll

17 do whatever is helpful.  If you think you would have a chance

18 to review them and we can have argument this afternoon, that

19 would be our preference, but we don't want to pressure the

20 Court.  Obviously, we could argue them tomorrow.

21             Another alternative is, this afternoon, we could

22 start with our first witness Mr. Welch, and when his

23 testimony concludes, including cross-examination, tomorrow,

24 we could have argument then.

25             But maybe it would make sense to hear Your Honor's

1  ruling and take a break and allow you time to consider what

2  would be helpful to you after that ruling and let us know

3  when you would like us to argue the motions.

4                THE COURT:  All right.  We'll proceed that way for

5  now and see where we are.

6                So, with that, I will jump right into the bench

7  ruling.

8                So I do intend to follow this up with a written

9  opinion, so this is subject to potential minor revisions.

10 It's certainly not going to change the outcome.  So the

11 parties should be prepared that, at some point, hopefully in

12 the near future, I will issue a written ruling consistent

13 with what I am about to give.

14               I'm also not going to pinpoint cites to the record

15 in my bench ruling, but they will appear in the written

16 opinion.

17               So, with that, let's go ahead and begin.

18               The price of prescription drugs in the United

19 States has generated a great deal of attention from

20 government officials, the media, and parties who must pay

21 what they consider to be unreasonably high prices for

22 medications.  At times, these high prices lead to litigation

23 against drug manufacturers.  Debtors, who produce one of the

24 most expensive drugs in the U.S., are one of those

25 manufacturers.

1          Prior to filing for bankruptcy protection, debtors

2     have been sued by numerous parties over the price of their

3     drug HP Acthar Gel or Acthar.

4          Acthar was first approved for use in the United

5     States nearly 60 years ago.  Until 2003, Acthar sold for less

6     than $1,000 per vial.  By 2019, it was selling for nearly

7     $40,000 per vial.

8          Certain third-party payers, who I refer to in this

9     proceeding as the "Acthar insurance claimants" or "AICs,"

10    sued debtors pre-petition and filed proofs of claim for pre-

11    petition purchases of Acthar, as well as proofs of claim for

12    administrative expenses based on post-petition purchases.

13    Debtors objected to the administrative expense claim.

14    Following denial of debtors' motion for summary judgment, I

15    concluded a two -- I conducted a two-week bench trial to

16    determine the validity of the AICs' administrative claims.

17         Charging a high price for a prescription drug is

18    not, in and of itself, illegal.  The United States provides

19    limited controls over the pricing of drugs.  And generally

20    speaking, a manufacturer is free to charge whatever price it

21    thinks the market will bear.  In order to prevail on their

22    claims, therefore, the AICs needed to prove that the debtors'

23    ability to charge a super-competitive price resulted from

24    some other illegal activity.  The AICs, therefore, claim that

25    the price of Acthar was unreasonably high because the debtors

1  -- because of the debtors' anti-competitive conduct in

2  violation of the Sherman act and their illegal payments to

3  certain charities and doctors in violation of the RICO Act,

4  among others, in order to boost sales of Acthar.

5       Having reviewed the extensive evidence submitted

6  at trial, I conclude that the AICs have failed to meet their

7  burden of proof on either of these allegations; therefore,

8  for the reasons I will explain, the debtor's objections to

9  the administrative claims are sustained.

10      I'll begin with the facts.  The facts that are

11  relevant to the two types of claims at issue are somewhat

12  unrelated.  To avoid the confusion that would create from

13  jumping back and forth, I will discuss all of the facts

14  relevant to the antitrust claims first, give my rulings on

15  those claims, and then discussing the facts and law relevant

16  to the RICO claims.

17      The antitrust claims here revolve around two

18  drugs:  Acthar and Synacthen.

19      The first, Acthar, is a drug manufactured and sole

20  by the debtors.  Acthar is a nationally derived, long-acting,

21  complex mix of peptides that includes the full natural human

22  ACTH 1 through 39 amino acid chain, along with additional

23  peptides.  It was approved for sale in the United States by

24  the FDA in 1952 and is currently approved to treat 19

25  conditions or indications.

1    For one of these conditions, infantile spasms or

2  "IS," Acthar is a first-line treatment, meaning it is

3  typically the first drug prescribed to treat the condition.

4  For all other indications, it is a second-line or later

5  treatment, meaning it is not the first drug prescribed to

6  treat a condition.

7    Acthar is not covered by a patent, but its

8  manufacturing process is a trade secret.  There is no generic

9  or non-brand-name version of Acthar, but there are synthetic

10  ACTH products.  Synthetic ACTH contain 24 of the 39 amino

11  acids found in naturally occurring ACTH.  Some of the

12  synthetic ACTH products are short-acting, not long-lasting --

13  not long-acting like Acthar, and are approved only for

14  diagnostic use, not therapeutic use, meaning they are

15  approved for use in diagnosing a condition, but not treating

16  it.  Cosyntropin is an example of a short-acting synthetic

17  ACTH that is on the market for diagnostic purposes.

18    While several long-acting Synacthen ACTH products

19  have been developed, none have been approved for use in the

20  United States.  One such product, the other drug at the

21  center of this case, is a drug called "Synacthen Depot,"

22  which, for ease of reference, I will refer to as "Synacthen."

23  The active ingredient in Synacthen and other long-acting

24  synthetic ACTH products is simply synthetic ACTH 1 through

25  24, also known as Cosyntropin or Tetracosactide.

1            Synacthen is approved for sale in over 40

2   countries to treat several conditions, many of the same ones

3   for which Acthar is used, but is not approved in the United

4   States.  Synacthen has no patent or trademark or trade secret

5   protection.

6            Acthar was owned by Sanofi, now Aventis, until it

7   was purchased by Questcor Pharmaceuticals, Inc. in 2001.

8   Questcor was struggling to make a profit from its sales of

9   Acthar.  Then, in 2003, Acthar received orphan drug

10  designation for infantile spasms, though it was not yet

11  approved for that condition.  With that designation, and

12  following a change in leadership in 2007, Questcor

13  implemented a new aggressive pricing strategy for Acthar, and

14  the price went from $902 per vial in 2003 -- or excuse me --

15  $902 per vial, and had been in 2003, to over $23,000.

16           In October 2010, Acthar was approved to treat

17  infantile spasms and obtained orphan drug exclusivity for

18  that condition through 2017.  Questcor continued to increase

19  the price of Acthar until 2012, when the price reached

20  $28,686.

21           In the years leading up to 2013, Questcor had been

22  monitoring Synacthen, which was then held by Novartis, as a

23  potential competitor to Acthar.  Novartis held global rights

24  for Synacthen, but never developed it for sale in the United

25  States, determining that it would be too time-consuming and

 1   costly to do so.  It decided, instead, to auction off the

 2   U.S. rights to Synacthen.

 3            When Questcor learned that Novartis was shopping

 4   the U.S. rights to Synacthen, it acted quickly to bid on

 5   those rights.  Questcor outbid the competing bidder Retrophin

 6   and Marathon, and secured the license for $135 million, $300

 7   million with the annual milestone payments included.  The

 8   license provided Questcor with the Synacthen formulation,

 9   trademark, post-marketing safety data, manufacturing knowhow,

10   and toxicology studies.

11            Although Questcor's agreement with Novartis

12   included mechanisms to ensure that Questcor pursued FDA

13   approved and commercialized Synacthen upon approval, the

14   acquisition, being one by a competitor, of a potentially

15   competing product drew the attention of the Federal Trade

16   Commission.

17            Only a month after the Synacthen acquisition, the

18   FTC opened an investigation to determine whether the

19   acquisition may substantially lessen competition and thereby

20   violate federal antitrust laws.  The FTC action was resolved

21   a few years later.  But because it is important to understand

22   the events in the order in which they happened, I'll come

23   back to that shortly.

24            Around the same time that Questcor acquired the

25   Synacthen license, the debtors had also begun to conduct

1   diligence regarding the potential acquisition of Questcor.

2   In November 2013, Mallinckrodt's investment banker Barclays

3   delivered its preliminary assessment of Questcor to

4   Mallinckrodt's management.  The Barclays report highlighted

5   Acthar as Questcor's, quote, "key product," and noted that,

6   upon acquiring Acthar, Questcor had increased its

7   manufacturing capacity and increased the price from $1,650 a

8   vial to $28,686 per vial.  It also noted that, quote:

9           "Acthar is not protected by any patents, but

10  multiple barriers to entry related to formulation,

11  manufacturing, and regulatory make generic synthetics

12  competition less likely."

13          The Barclay's presentation also discussed

14  Questcor's recent acquisition of Synacthen, noting that there

15  were, quote:

16          "-- immaterial U.S. sales and long-protected time

17  line to U.S. launch."

18          It went on to list the Synacthen acquisition as

19  one of the barriers to entry for Acthar competition,

20  describing Synacthen as, quote, "Questcor's main source of

21  potential competition."

22          The Barclays presentation listed the Synacthen

23  acquisition as one of the -- one of two defensive moves

24  recently made by Questcor, along with Questcor's acquisition

25  of BioVectra, Questcor's manufacturing partner, for the

1  active ingredient in Acthar.  As Barclays explained, the

2  BioVectra acquisition, quote:

3          "-- secured key manufacturing process trade

4  secrets relating to Acthar."

5          The presentation went on to describe the Synacthen

6  acquisition as, quote:

7          "A defensive move to acquire a potential future

8  competitor."

9          And noted that it, quote:

10         "-- removes the overhang of potential franchise

11  erosion due to future competition."

12         The debtors' internal due diligence came to

13  similar conclusions about Questcor, describing Acthar as a,

14  quote, "protected franchise," due to the complicated

15  formulation, manufacturing, and regulatory requirements, and

16  suggesting that Questcor had, quote, "walled off possible

17  weakness by acquiring Synacthen."

18         Mallinckrodt's internal diligence presentations

19  also stated that Synacthen acquisition could, quote, "control

20  introduction of Synacthen into the U.S. market," and assumed

21  that Acthar would, quote:

22         "-- face no competitive threat in the future from

23  synthetic ACTH under any forecast scenario."

24         Mallinckrodt's diligence into Questcor also

25  highlighted legal actions and governmental investigations

1  against Questcor, which included the FTC probe and

2  investigations by the U.S. Attorney's Offices for

3  Pennsylvania and New York, as well as the SEC, regarding

4  Questcor's promotional practices related to Acthar with

5  potential fines ranging in the hundreds of millions of

6  dollars.

7           Mallinckrodt's audit committee characterized the

8  FTC probe as, quote, "medium risk to achievement of deal

9  value."  With these risks in mind, the debtors' board voted

10  to proceed with the acquisition and the transaction closed on

11  August -- in August of 2014, in a deal worth approximately

12  $5.8 billion.  Thus, by the end of 2014, Mallinckrodt owned

13  both Acthar and the U.S. rights to Synacthen.

14           Since Questcor's agreement with Novartis required

15  it to try to use commercially reasonable efforts to develop

16  and commercialize Synacthen and included milestone deadlines

17  for doing so, it had begun working on developing Synacthen

18  promptly after the acquisition.

19           Questcor quickly discovered that they had got less

20  than they bargained for from Novartis.  Among other things,

21  Questcor learned that there were problems with both

22  Synacthen's drug substance, a drug's active pharmaceutical

23  ingredient, and manufacturing that would need to be resolved

24  before any effort to obtain FDA approval could begin.

25           When the debtors acquires Questcor just a few

1   months later, they found themselves in the position of having
2   to find a new manufacturer for Synacthen, a process which was
3   delayed by the then current manufacturer's slow release of
4   the necessary records.  While they were able to secure a new
5   manufacturer by June of 2014, it was not until October 2015
6   that a manufacturer was able to produce an initial
7   engineering batch, and not until February 2016 that it was
8   able to produce batches for use in clinical trials.

9            In the meantime, the debtors needed to determine
10  which indications or medical conditions they would use --
11  they would pursue for Synacthen.  With the knowledge that
12  Synacthen's approval for any indication for which Acthar was
13  already approved would significantly affect Acthar's sales,
14  the debtors pursued multiple options, all of which would
15  extend Acthar's life cycle.

16           In several internal emails, the debtors' employees
17  expressed concern about bringing Synacthen to market for any
18  indication.  In February 2016, Josh Schafer, the debtors'
19  Chief Strategy Officer, prepared a report entitled "Synacthen
20  Scenarios and Assumptions," in which it is assumed that
21  Synacthen would gain greater than 50 percent of IS patient
22  share.  The report further calculated the cash impact of a
23  Synacthen launch, including that a difference of just 2 years
24  would result in a benefit to Mallinckrodt of potentially
25  hundreds of millions of dollars.

1          The debtors ultimately decided to pursue approval

2     for a disease called Duchenne's muscular dystrophy or "DMD,"

3     a decision that Mallinckrodt's Chief Scientific Officer Dr.

4     Romano, testified was driven by several factors:

5          Clinically, the debtors decided on DMD because it

6     was a disease affecting adolescent boys for which there were

7     currently few treatment options.  And because the data

8     regarding the ways in which Synacthen worked on the body

9     suggested that the Synacthen might be particularly effective.

10          But the debtors also chose DMD because they

11     believed that they could get orphan drug status for

12     Synacthen, if it were approved, for this indication, which

13     would give the debtors exclusivity for several years and

14     enable them to price Synacthen at a higher level, roughly

15     $300,000 per year.

16          Debtors knew that obtaining approval of Synacthen

17     for DMD had a low probability of success, about 15 percent.

18     But as Dr. Romano and other's testified, the probability of

19     FDA approval of any drug is relatively low.

20          While working to get Synacthen approved to treat

21     DMD, the debtors were also conducting clinical research and

22     market studies to understand the difference between Acthar

23     and Synacthen, with a goal of helping both physicians and

24     their own commercial team understand the distinctions between

25     the parties.

1    Some of the market research that the debtors had

2 conducted showed that physicians believed Synacthen and

3 Acthar to be clinically similar; and, therefore, if the

4 debtors failed to differentiate the two products, Acthar

5 sales might quickly decline in favor of Synacthen sales.

6 Accordingly, the debtors undertook a full scrub of data to

7 remove any use of Synacthen data in reference to Acthar.

8    During the same time that the debtors were working

9 on getting Synacthen approved for treatment for DMD, the

10 losing bidders of the Novartis license, Retrophin and

11 Marathon, also began to work on getting a synthetic ACTH

12 product to market.  The debtors' possession of the rights to

13 Synacthen did not prevent others from developing a competing

14 long-acting synthetic ACTH formulation.  There was no IP

15 protection for Synacthen and its active ingredient was

16 relatively easy to reproduce.

17    Retrophin launched its developmental efforts

18 immediately after losing its bid for Synacthen.  On June

19 13th, 2013, following its failed auction bid, Retrophin's CEO

20 observed that losing the auction was a blessing in disguise,

21 stating, quote:

22    "Synacthen was off patent.  The API, or active

23 pharmaceutical ingredient, is readily available.  We can

24 secure API, formulate the product, file for orphan status,

25 run the trial we intend to run, all without Novartis.  We

1  might even save time, given Novartis is still updating their

2  CMC and their fill finish plan is not FDA approved."

3          By December 2014, Retrophin was able to formulate

4  its own synthetic ACTH product and manufactured, quote,

5  "proofs of concept" batches.  It sought FDA approval of this

6  product for use in treating infantile spasms and nephrotic

7  syndrome.  However, Retrophin abandoned the project at the

8  clinical trial stage.

9          Marathon, likewise, began working on a synthetic

10  ACTH shortly after it lost the Novartis bid, a project that

11  was later sold to West Pharmaceuticals.  West, also seeking

12  approval of its product for treat -- was also seeking

13  approval of its product for treatment of infantile spasms.

14          These last few events, the development and

15  manufacturing efforts of the debtors, Retrophin and Marathon

16  and West, all took place in the three years after Questcor

17  acquired the Synacthen license in 2013.

18          As I mentioned earlier, shortly after the

19  transaction closed, the FTC launched an investigation into

20  whether the acquisition of Synacthen -- of the Synacthen

21  license violated antitrust laws.  As the events I just

22  discussed unfolded, the FTC continued its investigation and,

23  in 2017, the parties reached a settlement.

24          In addition to the one-hundred-million-dollar --

25  in addition to a one-hundred-million-dollar fine, the

1    settlement required the debtors to:

2              One, sub-license certain of the rights to

3    Synacthen to a third party, royalty-free and with an

4    indefinite term, to develop Synacthen and seek approval for

5    use in treating infantile spasms and nephrotic syndrome.

6              Two, provide the sub-licensee with all rights and

7    information it received under the license with Novartis, as

8    well as debtors' improvements upon those assets.

9              Three, fulfill contractual obligations to pay

10   Novartis.

11             And four, file annual reports with the FTC.

12             The FTC approved Marathon and later West as the

13   sub-licensee.  So, although Marathon and West had already

14   begun working on a synthetic ACTH, by 2017, it received all

15   of the Synacthen assets that the debtors had received from

16   Novartis.  West ultimately sought FDA approval for its

17   synthetic ACTH product Cosyntropin for a diagnostic

18   indication, using what was referred to as a "505(b)(2)

19   application."

20             A 505(b)(2) application is a somewhat abbreviated

21   route to obtaining drug approval by the FDA because it allows

22   an applicant to rely on the data of an already approved

23   product, if it can establish that its product and the already

24   approved product are similar enough that new data is not

25   necessary.  Establishing this connection between the new drug

1   and the already approved drug is referred to as a "bridge."

2        West, using both its own data and the data it

3   received from the debtors, tried to get approval for its drug

4   Cosyntropin.  But following feedback from the FDA regarding

5   the difficulty it would likely encounter in establishing a

6   bridge, West ultimately decided to abandon its attempts to

7   bring a synthetic ACTH product to market.

8        The debtors, however, were continuing their

9   efforts to get Synacthen approved, working through the

10  various stages of clinical trials.  It was then that they

11  began to encounter more difficulties.

12       First, the FDA approved a new drug for DMD, which

13  was priced significantly lower that Synacthen's anticipated

14  price.  This drastically changed the economics of the

15  Synacthen project for the debtors, and they decided to write

16  off the value of Synacthen entirely.

17       The debtors continued to work on getting Synacthen

18  approved for DMD for another year, since they had committed

19  to the DMD patients and medical community to use best efforts

20  to complete the studies.  But they encountered what they

21  viewed as -- what they viewed to be insurmountable problems

22  in enrolling patients for the necessary clinical trials.

23  Accordingly, in December of 2019, debtors abandoned the

24  project.

25       As Dr. Romano testified, there were multiple

1   considerations, including commercial, regulatory, legal, and

2   practical ones, that informed the debtors' decision not to do

3   anything further with Synacthen at this point in time.

4            There were also financial concerns.  Management

5   was informed by Hilary Muldoon, debtors' head of competitive

6   intelligence, that, quote:

7            "A potential launch of Synacthen in any

8   therapeutic indication would have a negative impact on

9   Acthar's business."

10           Following a decision to cease development of

11  Synacthen, on July 14th, 2020, the debtors notified Novartis

12  that they were unilaterally and permanent and suspending all

13  remaining rights to develop Synacthen.  At this point in

14  time, no one -- at this point in time, no one is pursuing the

15  development or marketing of Synacthen or any synthetic ACTH

16  drug.

17           However, there is one company, ANI

18  Pharmaceuticals, Inc., that was working on reviving a

19  previously approved, but lapsed non-synthetic, natural ACTH

20  product.  On November 1, 2021, ANI obtained FDA approval for

21  its product Purified Cortrophin Gel for the treatment of

22  acute exacerbations of multiple sclerosis, rheumatoid

23  arthritis, and nephrotic syndrome.  ANI's product is expected

24  to hit the market in 2022 and will compete with Acthar.

25           Over the years, the debtors considered making

1  changes to Acthar's pricing structure multiple times.  In

2  early 2020, following the entry of a six-hundred-and-fifty-

3  million-dollar judgment against the debtors by a D.C. Court

4  on claims made by the Centers for Medicare and Medicaid

5  Services, or "CMS," regarding rebates owed to the Federal

6  Government due to increases in Acthar's prices and the

7  continued negative publicity surrounding Acthar, debtors

8  again revisited the idea of changing Acthar's pricing

9  structure.

10       Hugh O'Neill sent a -- on April 20th -- on April

11  30th, 2020, Hugh O'Neill sent and email attaching a

12  presentation called "Acthar Pricing Assessment," in which the

13  debtors weighed the financial realities of the company

14  against the ability to shed the negative impact that the

15  pricing of Acthar has had on their corporate reputation.  The

16  presentation concluded that, quote:

17       "There is no scenario where a price reset results

18  in a better financial outcome for the brand.  The tradeoff

19  will come down to a choice between reduction of future risk

20  and optimizing short-term financial results."

21       As Mr. Schafer, the debtors' Chief Strategy

22  Officer, explained in May of 2020, Acthar appears more,

23  quote, "cash cow" than, quote:

24       "-- star.  And we need to evaluate whether to

25  divest or manage for cash.  However, our ability to transact

1   any reasonable value is dependent on cleaning Acthar of its

2   liabilities."

3           Ultimately, the debtors decided not to change the

4   price of Acthar.

5           So, turning to the antitrust claims.  The AICs

6   assert administrative expense claims based on alleged

7   antitrust violations by the debtors under Section 1 and

8   Section 2 of the Sherman Act during the post-petition period.

9   In connection with debtors' motion for summary judgment, I

10  concluded that there were material issues of fact regarding

11  whether debtors' conduct, either pre-petition or post-

12  petition, constituted illegal conduct under the Sherman Act

13  that allowed the debtors to maintain a monopoly, giving

14  debtors the ability to charge a super-competitive price post-

15  petition.

16          Section 1 of the Sherman Act prohibits entering

17  into agreements that unreasonably restrain trade.  An

18  "unreasonable restraint" is one that inhibits competition in

19  the relevant markets.  Lifewatch Services v. Highmark, 902

20  F.3d 323, at 335 (3d Cir. 2018).

21          Section 2 of the Sherman Act prohibits the

22  unlawful monopolization of trade.  To establish a claim under

23  Section 2, a plaintiff must prove that the defendant

24  possesses monopoly power in the relevant market and that the

25  defendant willfully acquired or maintained that power through

1    exclusionary conduct.  Broadcom Corp. v. Qualcomm, Inc., 501

2    F.3d 297, 307 to 308 (3d Cir. 2007).

3            In the Third Circuit, a private plaintiff seeking

4    to establish a claim for damages under either Section 1 or

5    Section 2 of the Sherman Act must first establish that it has

6    antitrust standing.  City of Pittsburgh v. West Penn Power

7    Company, 147 F.3d 256, at 264 (3d Cir. 1998), where the Court

8    said, quote:

9            "The question of standing is a threshold inquiry

10   in all actions."

11           See also In Re Wellbutrin XL Antitrust Litigation,

12   868 F.3d 132 (3d Cir. 2017).

13           Antitrust standing requires that the plaintiff

14   prove that an antitrust injury was suffered by the plaintiff

15   and that the plaintiff is the appropriate plaintiff to bring

16   the antitrust case.  Associated General Contractors of

17   California, Inc. v. California State Council of Carpenters,

18   459 U.S. 519, Footnote 31 (1983).

19           Thus, the debtors argue the AICs had to prove

20   that, but for Questcor's acquisition of the Synacthen

21   license, the FDA would have approved Synacthen for sale in

22   the United States, which would have created competition for

23   Acthar in the market.

24           The AICs argue that the debtors apply the wrong

25   standard for establishing antitrust standing or what they

1  refer to as "causation."  They assert that I should apply the

2  standard outlined in Novell, Inc. v. Microsoft Corporation,

3  699 F.Supp. 2d 730, at 748 (D. Md. 2010), that, quote:

4          "To satisfy the causation requirement, a plaintiff

5  needs only show that the conduct at issue 'contributed

6  significantly to a defendant's continued monopoly power.'"

7          Thus, the AICs argue that they only needed to

8  present evidence that it was probable that a competitor armed

9  with the Synacthen license would have obtained FDA approval

10 absent debtors' conduct.

11         The AICs' reliance on Novell is misplaced.  As the

12 Novell Court recognized, the, quote, "contributed

13 significantly" standard is derived from the Federal Circuit's

14 decision in United States v. Microsoft, 253 F.3d 54, at 80

15 (D.C. Cir. 2001).

16         The Federal Circuit specifically stated in its

17 ruling that the, quote, "contributed significantly to

18 standard" applied in, quote:

19         "-- equitable enforcement actions, as opposed to

20 actions for money damages."

21         Therefore, I will apply the standard articulated

22 by the Third Circuit in the City of Pittsburgh and

23 Wellbutrin.

24         In determining antitrust standing, the Third

25 Circuit incorporated several factors set forth by the Supreme

1  Court in Associated General Contractors of California.  Those

2  factors were organized into the following multi-factor

3  balancing test by the Court -- by the Circuit in In Re Lower

4  Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144, at

5  1165 through 66 (3d Cir. 1993):

6       One, the causal connection between the antitrust

7  violation and harm to the plaintiff -- excuse me -- and the

8  intent by the defendant to cause that harm.

9       Two, whether the plaintiff's alleged injury is of

10  the type for which the antitrust laws were intended to

11  prevent.

12       Three, the directness of the injury.

13       Four, the existence of more direct victims.

14       And five, the potential for duplicative recovery

15  or complex apportionment of damages.

16       Therefore, antitrust standing involves a two-part

17  inquiry:  One, whether the plaintiff experienced an antitrust

18  injury; and, two, whether the plaintiff is the proper

19  plaintiff to bring the suit.

20       In an antitrust case, where the plaintiff is

21  seeking damages, an antitrust injury is a necessary element

22  of an antitrust claim.  See In Re Wellbutrin, 686 F.3d 132.

23  Quote:

24       "Antitrust standing is more properly viewed as an

25  element of an antitrust claim."

1        Because I find that the AICs failed to carry their

2    burden of proving a but for connection between the debtors'

3    conduct and their alleged injury, I do not need to address

4    the remaining standing issues.  See City of Pittsburgh.  If

5    antitrust injury is not found, further inquiry is

6    unnecessary.

7        Debtors rely on City of Pittsburgh to argue that

8    an antitrust standing does not exist when a plaintiff's

9    grievance is caused by a regulatory scheme and not the

10   defendant's actions.  In the City of Pittsburgh the City

11   alleged an antitrust injury based on two power companies

12   entering into a pre-merger agreement whereby one power

13   company pulled its application to expand its services to

14   additional zones in Pittsburgh.  The City argued that the

15   agreement lessened competition and raised prices.

16       The court reasoned that the antitrust injury was

17   too speculative as the lack of competition was due to a

18   regulatory scheme and the City was merely "foisting its

19   version of what might have been on the court under the rubric

20   of antitrust injury"; at 267.  The court also concluded that

21   there was a lack of facts regarding the likelihood that a

22   regulatory authority would have granted the withdrawing power

23   company the approval it had requested.

24       Debtors contend that City of Pittsburgh is

25   dispositive because the court rejected antitrust claims for

1    lack of antitrust injury where "the presence of a regulatory

2    scheme and the need for approval serves to cut the causal

3    chain and converts what might have been deemed an antitrust

4    injury in a free market into only a speculative exercise";

5    147 F.3d at 267 to 68.

6            If no antitrust injury exists it is unknown

7    whether the regulatory authority would have granted a

8    competitor approval because it never applied -- let me try

9    that again.  If no antitrust injury exist where it is unknown

10   whether the regulatory authority would have granted an

11   approval because it never applied, then surely there can be

12   no injury in a case where a competitor sought approval and

13   was denied.

14           The AIC has argued that the City of Pittsburgh is

15   inapposite because the court made clear that the ruling was

16   specific to an error of regulated electric utility

17   monopolies.  At least one decision from the District of

18   Delaware concluded that City of Pittsburgh did not apply in

19   the context of a case involving the intersection of the

20   Sherman Act and the Hatch-Waxman Act; In Re Metroprolol

21   Succinate antitrust litigation 210 U.S. District Lexus 36303

22   at 21, District of Delaware April 13th, 2010.

23           However, that decision was prior to the Third

24   Circuit's decision in Wellbutrin where the court recognized

25   that "In the City of Pittsburgh we said that no antitrust

1  standing exists when a plaintiff's grievance is caused by a

2  regulatory scheme rather than by defendant's actions."  I

3  conclude that the Wellbutrin court recognized the continuing

4  validity of City of Pittsburgh and at least one court has

5  recognized that Metroprolol decision was superseded by

6  Wellbutrin; see United Food & Commercial Workers Union Local

7  1776, 296 F.Supp.3d 1142 at 1197, Northern District of

8  California 2017 noting that Metroprolol's rejection of the

9  concept of certain regulatory requirements could be the cause

10  of antitrust injury instead of the defendant's conduct was

11  superseded by Wellbutrin in the Nexium decisions.

12      In Wellbutrin the appellants claim that the absence of

13  certain reversed settlement agreements in the absence of

14  certain -- excuse me, in Wellbutrin the appellants claimed

15  that absent certain reverse settlement agreements Anchen

16  Pharmaceuticals would have launched a generic drug to compete

17  with the defendant's drug.  The court stated that the

18  appellants had to show that the harm, increased drug prices

19  for Wellbutrin XL, was caused by that settlement.

20      The court ultimately rejected appellants argument

21  because it did not account for a regulatory or legislative

22  bar holding that plaintiff's -- excuse me, appellants

23  antitrust claims failed because the defendants' actions were

24  not the actual cause of the appellant's alleged injury; 165

25  through 66.  Moreover, the court concluded that the

1   appellants must produce evidence that it is more likely than

2   not that Anchen Pharmaceuticals would have obtained a

3   license; evidence showing that another manufacturer may have

4   obtained a license fails to meet this burden; 167.

5        In Meijer, Inc., v. Biovail, 553 F.3d 857, a 2008

6   decision from the Court of Appeals for the District of

7   Columbia, the court recognized the need for an antitrust

8   plaintiff to prove that the defendant's conduct caused the

9   alleged antitrust injury in the context of a regulatory

10  scheme. The court concluded "A would be purchaser suing an

11  incumbent monopolist for excluding a potential competitor,

12  from which it might have bought a product at a lower price,

13  must prove the excluded firm was willing and able to supply

14  it but for the incumbent firm's exclusionary conduct."

15       The AIC's assert that they have met this burden of

16  proof.  I disagree. The debtors presented evidence at trial

17  to the expert testimony of Doctors' Williams and Trish, as

18  well as the testimony of Mallinckrodt's executives that FDA

19  regulatory requirements created significant barriers to the

20  entry of Synacthen or any other long acting synthetic ACTH

21  drug into the market.  Those regulatory barriers broke the

22  chain of causation and the AIC's were unable to prove that

23  the harm experienced was connected to the debtor's

24  anticompetitive conduct.  Moreover, the AIC's own expert, Dr.

25  Rheinstein, who also described the rigorous FDA approval

1   process, concluded that he could only opine that Synacthen

2   could have been approved for diagnostic use and not that it

3   would have been approved because there are always other

4   considerations including whether the development of synthetic

5   ACHT would make business sense.  I find this to be

6   persuasive.

7          In addition to the persuasive testimony by the

8   debtor's experts and the FDA regulatory -- that the FDA

9   regulatory process was the cause of the inability of either

10  the debtors or a potential competitor in developing Synacthen

11  or another long acting synthetic ACHT product the debtors

12  also presented evidence at trial of real world experience to

13  refute the AIC's allegations.

14         Several witnesses testified that debtor's

15  ownership of the US rights to Synacthen did not prevent

16  others from developing a competing long acting synthetic ACHT

17  product.  There was no protection for Synacthen and it was

18  relatively easy to reproduce.  Indeed, at least two other

19  companies and the debtor attempted and failed to gain

20  approval for a long acting synthetic ACHT drug.  For example,

21  Retrophin, as previously discussed, one of the original

22  bidders for the Synacthen license was unable to gain FDA

23  approval for its own long acting synthetic ACHT product for

24  infantile spasms and nephrotic syndrome and, thus, abandoned

25  their efforts.

1           In addition, Marathon and, later, West, which

2    received the Synacthen assets from Mallinckrodt as part of

3    the 2017 FTC settlement, was unable to use those assets to

4    get its own synthetic long acting ACHT product approved.  The

5    sublicense allowed West to develop Synacthen for treatment of

6    infantile spasms and nephrotic syndrome.  West's president

7    testified that none of the information obtained regarding

8    Synacthen was "adequately supportive to be meaningfully

9    additive."

10           Accordingly, I find that the AIC's have failed to

11   present sufficient evidence to support a conclusion that but

12   for the debtor's acquisition of the Synacthen assets a

13   competitor wouldn't have been able to either -- would have

14   been -- a competitor would have developed either Synacthen or

15   another long acting synthetic ACHT product that could have

16   competed against Acthar.  Having failed to prove a causal

17   connection between the debtor's alleged illegal conduct and

18   their damages the AIC's have failed to establish requisite

19   standing to maintain the claim under the Sherman Act and,

20   accordingly, an administrative claim under the bankruptcy

21   code.

22           Because the AIC's lack standing it is not

23   necessary to address the other antitrust elements including

24   damages.

25           With regard to the AIC state law antitrust claims,

1   in their administrative claim the AIC's alleged that the

2   debtor's conduct also violated numerous state laws including

3   California's Cartwright Act.  The AIC's, however, failed to

4   connect any evidence admitted at trial to the alleged state

5   causes of action; therefore, I conclude that the AIC's have

6   abandoned those claims.  See West v. Gregoire, 336 P.3d at

7   113, Washington Court of Appeals, "When a party asserts a

8   claim in pleading but does not press the claim in any way or

9   present evidence to support it the party abandons that

10  claim."  Also, Harbison v. Little, 723 F.Supp.2d 1032, 1038

11  Middle District of Tennessee, "If a plaintiff fails to

12  include arguments regarding a claim in a post-trial brief the

13  court is justified in finding that the plaintiff's had

14  abandoned the claim."

15          Let me take a second before I go to RICO.  My

16  voice is starting to give out.

17      (Pause)

18          THE COURT:  I don't know how Judge Drain talked

19  for six and a half hours in a confirmation hearing.

20          I will now turn to the RICO claims.  As I

21  mentioned at the beginning of my ruling, in fact, relevant to

22  the RICO claims they are largely unrelated to those that are

23  relevant to the antitrust claims.  With the price of Acthar

24  steadily increasing Questcor developed relationships with

25  certain non-profit organizations who provide copay assistance

1  to patients who cannot afford their copays.  As Kathleen

2  Breton, the debtor's senior director of patient services and

3  reimbursement, testified "For most Medicare patients Acthar

4  copays are in the thousands of dollars, and most Medicare

5  patients end up requiring some form of financial assistance

6  to pay for Acthar."

7        In 2013 Questcor had been working with an entity

8  called the Chronic Disease Fund or CDF, a non-profit

9  organization that provides copay assistance for patients who

10  cannot afford the full copay their insurers require for

11  particular drugs.  In December of 2013, in response to

12  negative media attention regarding CDF's relationship with

13  Questcor, CDF's president resigned and the entire board was

14  replaced.  CDF closed the funds that covered Acthar as non-

15  compliant with its new policies.

16        When CDF closed its fund Questcor moved its

17  donations to two other foundations, the Caring Voice

18  Coalition, CVC, and The Assistance Fund, TAF.  By the end of

19  2015 CVC also terminated its relationship with Questcor also

20  because of negative media attention.  Questcor, by now

21  Mallinckrodt, continued its relationship with TAF with whom

22  it worked from 2014 until December of 2020.  The debtor's

23  donations were allocated across funds for multiple diseases.

24  Before the debtors started donating to TAF, TAF did not cover

25  copays for Acthar.  Internal emails that the debtors showed

1   that the company was aware that their donations to TAF

2   increased Acthar sales.

3            In August of 2015 emails from the debtors --

4   excuse me, in an August 25th email from the debtors, an

5   employees acknowledged that Mallinckrodt's relationship with

6   TAF, or more specifically its donations to TAF,

7   "significantly increased sales of Acthar."  From 2014 to 2017

8   the general manager of the Acthar business determined how

9   much to donate to TAF; however, in 2017, following an

10  industry wide investigation into 501(c)(3) foundations that

11  provided copay support and the services of a -- and service

12  of a civil investigative demand on the debtors by the U.S.

13  attorney's office for the District of Massachusetts debtors

14  began to implement new policies and procedures regarding

15  their relationship with copay assistance funds.

16           They first transferred responsibility for the

17  relationships with these funds from their commercial

18  department to their government affairs department.  In 2018

19  the government of affairs department then implemented a

20  detailed standard operating procedure, SOP, that considered

21  the guidelines used by the U.S. Department of Health & Human

22  Services Office of Inspector General, the OIG, regarding how

23  manufacturers can make donations to funds without violating

24  the anti-kickback statute.

25           The debtors' U.S. general counsel, Mark Tindell,

1   testified that the debtor's agreement with TAF expressly

2   incorporated the debtor's SOP and included firewalls to

3   insure that the commercial business have no contact with

4   anyone at TAF.  Donation requests from TAF to the debtors

5   were unsolicited and due diligence was conducted to determine

6   that the funds at TAF, to which the debtor's donations were

7   allocated, were "defined by reference to widely recognized

8   clinical standards without limitation to symptoms, severity

9   of symptoms, or disease stages, and in a manner that were

10  open to a broad range of products as the OIG guidance

11  required."

12          Debtors directed TAF to limit -- debtors directed

13  TAF to limit the amount of information and data provided to

14  them to ensure that they could not correlate their

15  contributions to the amount of copay assistance provided to

16  Acthar patients.  While the debtors established a patient

17  foundation charitable contributions committee to oversee and

18  approve TAF donations it does not appear that the committee

19  operated in any formal capacity.  As Mr. Tindell, the debtors

20  U.S. general counsel, testified the committee did not hold

21  formal meetings, keep minutes, or have bylaws and they

22  communicated largely by email.

23          Between 2014 and 2020 the debtors donated over $20

24  million to TAF. Over the years the debtors have discussed

25  ceasing donations to TAF, but observed that doing so "would

1  have a negative impact on tens of millions of dollars per

2  year on Acthar net sales."  Ultimately, the debtors decided

3  to stop donations beginning in 2021 because of "concerns

4  about potential legal exposure of continuing to make the

5  donations."

6           While the debtors did cease donations they saw "an

7  uptick in the number of patients that they sent to their free

8  goods program because the funding wasn't available at the

9  assistance fund anymore."  During this time debtors also

10 worked to increase their efforts to market Acthar by hosting

11 speaker programs to educate healthcare professionals about

12 Acthar.  The goal of these programs was to increase sales of

13 Acthar.

14          Like the copay fund contributions the debtors also

15 have policies in place regarding their speaker program to

16 prevent abuse.  Those policies require, among other things,

17 that speakers have a contract in place and are paid fair

18 market value for their services that speaking, training

19 meetings and programs be held in educational appropriate

20 venues, that all meals provided in conjunction with such

21 programs are modest and for a legitimate purpose and that the

22 debtors publish information about the payments they have made

23 to physicians annually.

24          The debtors use a third-party speaker program

25 management firm, Viva, to manage logistics and provide

1    debtors with reports regarding compliance with their

2    policies.  Where there is non-compliance alleged it is

3    investigated and corrective action is taken where necessary.

4    During the relevant time for this case, which is the post-

5    petition period, the debtors paid approximately $1.75 million

6    to physicians for at least 443 speaker events, and there are

7    ongoing investigations into the debtor's payments to

8    healthcare professionals in at least two states.

9         Turning to the law.  In the pretrial brief

10   claimants argue that the debtors violated the RICO Act

11   through the anti-kickback statute, false claims act, mail

12   fraud, wire fraud, and the travel act.  The claimants contend

13   that the debtors violated these federal statutes in two ways:

14        First, the debtors provided unlawful copay

15   subsidies through donations to charitable foundations that

16   provided copay assistance to eligible patients.

17        Second, the claimants allege that the debtors paid

18   healthcare professional through speaker fees and other

19   methods to persuade them to prescribe more Acthar.  I will

20   address each theory in turn.

21        First, the RICO standard of review.  To establish

22   RICO liability the plaintiff must show (I) conduct; (II) of

23   an enterprise; (III) through a pattern; (IV) of racketeering

24   activity plus (V) an injury to business or property; Reyes v.

25   NetDeposit LLC, 802 F.3d 469, 483 Third Circuit (2015).  RICO

1  defines racketeering activity as one of an enumerated list of

2  different state and federal offenses also known as

3  predicates.  These predicates include any act indictable

4  under specific federal statutes as well as crimes chargeable

5  under state law, and any offense involving bankruptcy or

6  securities fraud, or drug related activities that is

7  punishable under federal law; RJR Nabisco, 136 Supreme Court

8  at 2096.  The plaintiffs must show that defendants committed

9  a RICO predicate act; otherwise, the plaintiff's RICO claims

10 fail; Heinemeyer v. Township of Scotch Plains, 198 F.

11 Appendix 254, 256, Third Circuit (2006).

12         Title 18, U.S. Code Section 1964(c) provides a

13 private right of action for "any person injured in his

14 business or property by reason of a predicate offense,"

15 Kenney v. American Board of Internal Medicine, 847 F.

16 Appendix 137 at 146, Third Circuit (2021) the plaintiff must

17 "state an injury to business or property and that a RICO

18 predicate offense not only was the but for cause of injury,

19 but was the approximate cause as well."  That is Kenney 847

20 at 146, Third Circuit.

21         Approximate cause requires "some direct

22 relationship between the injury asserted and the injurious

23 conduct alleged."  That is the Reyes v. NetDeposit case at

24 483.  Therefore, the claimants had to prove that the debtors

25 committed a predicate act and one of those predicate acts

1  caused a direct injury to their business dealings.  Based on

2  their two theories the claimants had to prove that either the

3  foundation copay subsidy payments or the debtors' physician

4  payments were not only the but for cause of the injuries, but

5  also the proximate cause of their injuries.

6  Addressing the first argument the claimants allege

7  that the debtors' systematic course of conduct in donating

8  millions of dollars to copay assistance funds was for the

9  purpose of increasing the sales of Acthar.  Thus, the debtors

10  violated the RICO Act when they made these payments post-

11  petition.  To prove this claim the claimants had to

12  demonstrate (I) debtors made post-petition contributions that

13  violated the anti-kickback statute; (II) debtors committed

14  mail or wire fraud by providing false certifications of

15  compliance with specific fraudulent intent; and (III) the

16  purported violation caused injury to the claimants business

17  or property during the post-petition period.

18  First the anti-kickback statute.  To violate the

19  anti-kickback statute a person or entity must "knowingly or

20  willfully offer to pay any remuneration to any person, to

21  induce such person, to refer to an individual to a person for

22  the furnishing of any item or service for which payment may

23  be made in whole or in part under the federal healthcare

24  program."  That is the United States Ex Rel Greenfield v.

25  Medco Health Solutions, 880 F.3d 89 at 94 through 95, Third

1  Circuit (2018).

2          In their copay subsidy theory the claimants allege

3  that the debtors violated the anti-kickback statute because

4  their intent on making the charitable donations was to induce

5  more Acthar prescriptions for Medicare beneficiaries. The

6  claimants state that debtors only stopped donating millions

7  of dollars to TAF at the end of 2020 because of concerns of

8  potential legal exposure of continuing to make those

9  donations.  Regarding the anti-kickback statue I find

10 claimants did not meet their burden.

11          First, the claimants presented no evidence at

12 trial that any post-petition contribution by the debtors that

13 were unlawful. The evidence shows that the debtors

14 contributed contributions were allocated to TAF disease funds

15 that were independent, bonafide, charitable assistance

16 programs.  While the claimants state that the debtors'

17 compliance programs were window dressing, to add a hint of

18 legitimacy, there was no evidence establishing that the

19 debtors failed to follow their policies or the law during the

20 post-petition period.  In fact, the evidence at trial

21 demonstrated the opposite.

22          In one example the claimants asserted, in their

23 pretrial brief, that the debtors government affairs

24 department did not conduct any diligence on the TAF

25 relationship at the time when the transition from commercial.

1   Instead, the evidence showed that the team conducted

2   diligence over 10 months after the initial transition and

3   before making its first recommendation to donate to TAF.

4   Just because the debtors money flowed to TAF and was

5   distributed to Acthar related disease state funds -- just

6   because the debtors money flowed to TAF and was distributed

7   to Acthar related disease funds in the post-petition period

8   does not mean that the debtors' contributions were illegal.

9           Pharmaceutical companies under OIG guidance are

10  allowed to make contributions to 501(c)(3) charitable

11  foundations.  Claimants had to demonstrate that the debtors'

12  contributions were in some way unlawful.  From 2018 to 2020

13  Mallinckrodt donated $56.9 million total to TAF.  The total

14  amount of assistance TAF provided to Acthar patients was

15  $39.7 million.  TAF allocated the debtors contributions to

16  various other disease funds including Juvenile Arthritis Fund

17  and provided no assistance to Acthar patients -- that

18  provided no assistance to Acthar patients.  A fund for

19  multiple sclerosis that used only 1.3 percent of total

20  donations for Acthar.

21          Looking at all the funds in TAF that allocated the

22  debtors donations, Acthar was the subject of only 3.8 percent

23  of claims for assistance and only 16.7 percent of the

24  assistance.  Providing no evidence to contradict this the

25  claimants failed to prove the debtors' contributions were

1  unlawful.

2          Second, to prevail on their copay subsidy theory

3  the claimants needed to prove the debtors committed mail or

4  water fraud by providing false certifications of compliance

5  with specific fraudulent intent; United States v. Adelphi,

6  392 F.3d 580 at 590, Third Circuit (2004).  However, the

7  claimants provided no evidence and did not attempt to show

8  that the debtors provided false certifications of compliance

9  and acted with the requisite specific intent to defraud the

10 claimants into covering Acthar prescriptions.

11          Finally, the claimants failed to established that

12 the alleged RICO predicate acts were the but for cause of the

13 alleged injury as required by the Third Circuit; see Anderson

14 v. Ayling, 396 F.3d 265 at 269, Third Circuit (2000).  To

15 establish the but for cause the claimants had to identify

16 specific prescriptions that they would not have reimbursed

17 but for the alleged fraudulent scheme.  Instead, the

18 claimant's expert did not even try to specify which

19 prescriptions were aligned with Mallinckrodt's donations to

20 TAF and failed to specify which prescriptions were associated

21 with any illegal contributions.

22          The claimants failed to provide evidence that any

23 one prescription -- that even one prescription was the result

24 of Mallinckrodt's TAF donations. The claimants did not meet

25 their burden of establishing that the debtors violated the

1    federal RICO statute through their donations to charitable

2    foundations.

3              Turning to the debtors interactions with

4    physicians.  Addressing their second argument the claimants

5    also alleged that the debtors violated the RICO Act by paying

6    physician through speaker programs.  The claimants asserts

7    that the debtors paid remunerations to prescribing physicians

8    who induced them to prescribe Acthar and encourage other

9    physicians to do the same; thereby, the claimants contend

10   that the debtors violated the anti-kickback statute, the

11   false claims act, the federal travel act, as well as state

12   bribery laws through these payments.

13             As discussed before, for me to find an anti-

14   kickback statute violation a person or entity must "knowingly

15   and willfully offer or pay any remuneration to any person to

16   induce such person to refer an individual to a person for

17   furnishing or any item or service of which payment may be

18   made in whole or in part under the federal healthcare

19   program."  The false claim act also imposes "liability on any

20   person who knowingly prevents or causes to be presented a

21   false or fraudulent claim for payment of approval or

22   knowingly makes use or causes to be made or used a false

23   record or statement of material to a false or fraudulent

24   claim."

25             In addition, the travel act prohibits using

1   interstate travel, mail or facilities with intent to carry

2   out unlawful activities or with intent to distribute the

3   proceeds of any unlawful activity; United States v. Ferraro,

4   866 F.3d 107 at 113, Third Circuit (2017).

5          The claimants accuse the debtors of violating a

6   multitude of state bribery laws without specifying which

7   states they claim that the kickback scheme to the doctors who

8   loan foundation payments constituted bribes.  Claimants had

9   to offer evidence that showed the debtors speaker programs

10  specifically departed from the "common practice" and (I)

11  violated federal and state law, in other words committed a

12  predicate act; (II) that the debtors had the necessary

13  (inaudible) and; (III) debtors speaker programs were the but

14  for approximate cause of their injuries.  I will address each

15  requirement in turn.

16         Predicate acts. During the post-petition period

17  the debtors paid over $1.7 million to physicians for at least

18  443 speaker events as part of their speaker's bureau programs

19  -- excuse me one second.

20      (Pause)

21         THE COURT:  All right, let me start over on the

22  predicate acts.  During the post-petition period the debtors

23  paid over $1.7 million to physicians for at least 443 speaker

24  events as part of their speaker bureaus program.  Like many

25  other specialty pharmaceutical companies in the field the

1  debtors host these speaker programs to educate healthcare

2  professionals about specific drugs, in this case Acthar.

3       Despite over 440 programs the claimants could not

4  point to a single example of a post-petition physician

5  payment that qualified as a remuneration and exchange for

6  prescribing a drug for which reimbursement under a federal

7  healthcare program is available in violation of Section 1320.

8       In their pretrial brief the claimants pointed to

9  documents described a particular physician, pulmonologist A,

10  and his prescribing behavior, but claimants did not question

11  any witnesses at trial about this physician or those

12  documents.  The claimants pointed to ongoing investigation

13  into the debtor's payments to healthcare providers by the

14  U.S. Attorney Offices for the Middle District of Florida and

15  the Eastern District of Pennsylvania, and that the debtors

16  have not changed their policies in response to those

17  investigations.

18       The claimants also made vague references to issues

19  with debtors' speakers programs and certain things that were

20  flagged as violate of the debtors policies, but do not

21  explain how such incidents would support a finding that the

22  debtors violated the law.  If anything, they support the

23  conclusion that the debtors' policies were effective by

24  ensuring the incidents were brought to the intention of and

25  resolved by the debtors' compliance department.

1          Here, I conclude that the claimants, again, did

2    not meet their burden of proof.  The debtors chose speakers

3    who were experts in the relevant therapeutic areas or have

4    significant experience prescribing Acthar to speak about the

5    drugs, and they paid fair market value to the speakers and

6    prohibited conducting any type of "return on investment"

7    analysis about the prescribing habits of physicians engaged

8    as speakers.

9          In addition, they monitored their speaker programs

10   closely to prevent abuse and the compliance team used a

11   third-party to manage logistics including planning events

12   consistent with debtors' policies, insuring that speakers'

13   compensation was at fair market value enforcing dozens of

14   other rules related to the programs and providing detailed

15   real time quarterly and yearly compliance reports.  Those

16   reports indicated that the debtors fully complied with their

17   policies and did not knowingly or willfully induce physicians

18   to prescribe more Acthar prescriptions.

19         The claimants failed to show any violation of

20   federal or state law and lacked the predicate act requirement

21   under the RICO Act.  The claimants also had to prove debtors

22   acted with specific intent that their speaker programs would

23   induce their speakers to provide more Acthar, yet the

24   claimants failed to offer any evidence showing the necessary

25   slander.

1          Throughout the post-petition period the debtors

2  had a compliance program and they consistently re-evaluated

3  its policies to update those regarding interactions with

4  physicians to fit within the latest legal and regulatory

5  guidance.  There is simply nothing in the evidence that would

6  support the conclusion that the debtors knowingly and

7  willingly tried to induce their speakers to prescribe more

8  Acthar in violation of the law.

9          Finally, under the physician speaker program

10 theory the claimants had to show that the speaker's programs

11 were the but for and proximate cause of their alleged

12 injuries. Notably, mere correlation does not demonstrate

13 causation under RICO; Sergeants Benevolent Association Health

14 and Welfare Fund v. Sanofi-Aventis, LLP, 806 F.3d 71 at 92,

15 Second Circuit (2015).

16         Claimants attempt to establish the required but

17 for causation by showing that after the speaker programs

18 began there was an increase in demand for Acthar.  This is

19 insufficient.  To explain the correlation between the

20 increased prescriptions and the ramp-up to the speaker

21 program the debtors expert, Dr. Jenna, testified that

22 physicians who prescribe Acthar more frequently tend to be

23 more familiar with it and the relevant therapeutic areas;

24 therefore, they are more qualified to speak about it.

25         Despite the fact that 94 percent of the physicians

1   who wrote prescriptions for Acthar post-petition were not

2   speakers during that period.  Going further, Dr. Jenna based

3   his physician level analysis and determined that -- Dr.

4   Jenna, going further, based on his physician level analysis

5   determined that there was no imperial evidence that

6   Mallinckrodt's speaker program caused more doctors or

7   speakers to increase prescribing Acthar in the post-petition

8   period or before.

9          In fact, physicians tended to prescribe slightly

10  fewer vials of Acthar per month after receiving their first

11  speaker payments.  Even one of the claimant's witnesses,

12  Christopher Reagan, acknowledged that Humana could not

13  establish "an inappropriate relationship" between debtors and

14  a physician through information on speaker fees and

15  prescribing rates alone. The claimants failed to address this

16  correlation in their argument and could not provide any

17  evidence showing how the debtors' speaker programs were the

18  but for cause of their alleged injuries.

19         In addition to the but for cause the claimants had

20  to show that the debtors speaker programs were the proximate

21  cause of their alleged injuries, "When a court evaluates a

22  RICO claim for proximate causation the central question it

23  must ask is whether the alleged violation led directly to the

24  plaintiffs injuries."; Anza vs. Ideal Steel Supply Corp., 547

25  U.S. 451, 461 (2006).  Therefore, even if the speakers

1   programs sought to illegally induce additional prescriptions

2   the claimants had to show that those RICO violations directly

3   led to more physicians prescribing Acthar to the detriment of

4   the claimants and that the doctors did not act independently.

5   In this case the claimants, again, failed to offer any

6   evidence that a physician prescribed Acthar against their

7   better judgement.  Dr. Jenna credibly testified that all

8   claimants have strict prior authorization requirements for

9   Acthar.  The claimants' witness, Mr. Reagan, also admitted

10  that he had no knowledge of "any instances of misconduct

11  related to prescriber kickbacks from Acthar in the post-

12  petition window."

13          Mr. Reagan further testified that Humana never

14  took any measure to stop covering Acthar prescriptions made

15  by paid speakers despite having the information of which

16  physicians participated in the debtors' speaker program and

17  acknowledging the audit capabilities to address any concerns.

18  He stated at trial the claimants had the ability and leverage

19  to prevent their own alleged injuries by stopping coverage of

20  Acthar prescriptions they believe to be fraudulently induced.

21  They had the opportunity to audit any provider they had

22  concerned about.  The claimants never utilized these

23  abilities despite the power to do so.  Therefore, I find the

24  claimants' alleged injury was not caused by the debtor's

25  conflict.  The claimants' physician theory of RICO must also

1    fail.

2             Like the antitrust claims based on state law

3    because the AIC's did not present any evidence at trial

4    regarding their additional state law claims or brief them in

5    their post-trial briefing I find that they have been

6    abandoned.  In conclusion I find that the AIC's have not met

7    their burden with respect to any of their claims.  For that

8    reason their motion for an order allowing administrative

9    expense is denied and debtors' objection is sustained.

10            As I said, I will be issuing a written opinion

11   consistent with this bench ruling and we will enter an

12   appropriate order at that time.  Just in time because my

13   voice is about to give out completely.

14            All right.  So with that is there anything we can

15   do now before we take a break to allow me time to review what

16   was filed last night?

17            MR. HARRIS:  Your Honor, this is --

18            THE COURT:  Go ahead, Mr. Harris.

19            MR. HARRIS:  I'm just trying to make sure there is

20   not an echo going on.  Can you hear me all right, Your Honor?

21            THE COURT:  I'm getting a little bit of feedback,

22   but I can hear you.

23            MR. HARRIS:  Thank you, Your Honor.  The one thing

24   we could do is go forward with the testimony of Steve Welch.

25   We would need a short break just to situate him in a witness

1  room and have the exhibits ready.  We could do that after

2  lunch or we could do that before, if Your Honor would prefer.

3  I'm sure you'd like a break now.

4       The other thing I would add is there are, you

5  know, a number of motions *in limine* that are before Your

6  Honor, some are getting resolved.  I think they could all be

7  reasonably adjourned until tomorrow at a time convenient for

8  the Court, to give you more time.

9       There is one of them, however, that if it was at

10  all possible the debtors would like to have heard today and

11  that is Agenda Item 11, which is our objection to the six

12  additional Mallinckrodt witnesses the Ad Hoc Acthar Group

13  would like to call.  And I flag that one only because it

14  would -- if the motion is denied, we will have to prepare

15  those six witnesses to trial -- for trial.  If there was one

16  that Your Honor would have time to review the pleadings and

17  be prepared to hear today, that would be the one we would,

18  you know, suggest should be heard today, the others could

19  certainly be heard tomorrow.  And we could go forward with

20  Mr. Welch's testimony, you know, regardless, whenever is best

21  for the Court.

22       THE COURT:  All right.  Is there any motions

23  relating to Mr. Welch's testimony?

24       MR. HARRIS:  There are not, Your Honor.

25       THE COURT:  All right, then let's go ahead and

1  let's break now.  We'll break until 11:00, and then we'll

2  come back and I'll hear from Mr. Welch.  And then, over the

3  lunch break, I'll review what was filed yesterday and we'll

4  see what we can deal with on the motions when we come back in

5  the afternoon.  How long do you anticipate Mr. Welch's

6  testimony to be?

7          MR. HARRIS:  His direct will be several hours, and

8  then I expect -- several parties have indicated they will

9  cross-examine him.  So I would assume his testimony will go

10 over until tomorrow regardless of when we speak -- or when we

11 start, sorry.

12         THE COURT:  All right.  Mr. Pohl?

13         MR. POHL:  Your Honor, this could actually wait

14 until lunch, but I want to make sure you don't review

15 something you don't need to.  I'm speaking from Brown Rudnick

16 on behalf of the government *ad hoc* group.  We filed a motion

17 to quash a subpoena for trial testimony of Joe Rice, and we

18 were informed this morning by the Ad Hoc Acthar Group that

19 they are withdrawing their request for Mr. Rice's testimony.

20 So, unless someone on this call says otherwise, that motion

21 can be taken off the calendar and the agenda completely.

22         THE COURT:  All right.  Thank you, Mr. Pohl, I

23 appreciate that.

24         All right.  Well, let's break until 11:00, then

25 we'll put on Mr. Welch.  It's likely I will -- I'd rather try

1  to get through Mr. Welch today, if possible.  So we may just

2  push through with him and we'll deal with whatever motions *in*

3  *limine* remain tomorrow morning.

4         MR. HARRIS:  Your Honor, would it be possible to

5  start at 11:15?  I just heard getting the exhibits and things

6  loaded onto a laptop for him, so he has everyone's exhibits

7  available, may take a little more time.  So, if that would be

8  acceptable, if we could begin then?

9         THE COURT:  That's fine.  So we'll recess until

10  11:15.  Hopefully, my voice will recover by then.

11         MR. HARRIS:  And, Your Honor, thank you and your

12  chambers for dealing with such an enormous issue on such an

13  expedited basis.  The debtors and the parties all enormously

14  appreciate it.

15         THE COURT:  No problem.

16         All right, thank you all.  We'll adjourn until

17  1:15.  Thank you.

18       (Recess taken at 10:45 a.m.)

19       (Proceedings resumed at 11:16 a.m.)

20         THE COURT:  All right, we're back on the record.

21         Just as a reminder for everybody, during

22  testimony, I only want to see the witness and the attorneys

23  asking questions.  Everybody else should keep your cameras

24  off and you should definitely keep your microphones off.

25  And, as usual, anyone who interrupts the proceedings because

 1  their microphone is not off will be removed and not allowed

 2  back in for the rest of the day.  So keep that in mind.

 3           All right, with that -- I know that's not Mr.

 4  Harris.

 5           MS. MARKS:  Good morning, Your Honor, Betsy Marks.

 6  I am sitting in the same chair that Mr. Harris was, if it

 7  would be possible to change my name to Betsy Marks.

 8           THE COURT:  We'll take care of that for you.

 9           MS. MARKS:  Thank you.

10           THE COURT:  All right.  Are you ready to call your

11  next witness, Ms. Marks?

12           MS. MARKS:  We are, Your Honor.

13           THE COURT:  All right.  Go ahead.

14           MS. MARKS:  Thank you, Your Honor.  The debtors'

15  first witness for Phase 2 will be Mr. Stephen Welch.

16           THE COURT:  All right.  Mr. Welch, please raise

17  your right hand.  I lost you, Mr. Welch.  Somehow Ms. Marks

18  got --

19           THE WITNESS:  Can you hear me, Your Honor?

20           THE COURT:  Hold on one second, Mr. Welch.

21  Somehow Ms. Marks got highlighted here.  Let me move -- there

22  we go, okay.

23           All right, Mr. Welch, please raise your right

24  hand.  State your full name for the record and spell your

25  last name.

1           THE WITNESS:  Stephen Welch, W-e-l-c-h.

2                STEPHEN WELCH, WITNESS, AFFIRMED

3           THE COURT:  Thank you.

4                     DIRECT EXAMINATION

5    BY MS. MARKS:

6    Q     Mr. Welch, where are you physically located right now?

7    A     I am in debtors' counsel's office, Latham & Watkins, in

8    Manhattan.

9    Q     Is anyone else in the room with you?

10   A     No.

11   Q     And what materials do you have in front of you?

12   A     So I have a console that just operates the camera and

13   allows me to mute, so there's nothing on the console in front

14   of me.  There's a laptop beside me that has, I'm told, only

15   the case exhibits, and there are binders behind me which have

16   select case exhibits.  I have no other materials or

17   electronic devices in the room with me.

18   Q     Mr. Welch, will you be testifying as to the general

19   background of the plan settlements; the plan; the

20   requirements of plan confirmation; and the release,

21   exculpation, and injunction provisions of the plan today?

22   A     Yes, I will be.

23   Q     And since the Court is already familiar with you from

24   your prior testimony, we won't go over your background, but

25   just briefly, could you please describe your current role and

1  responsibilities?

2  A      Certainly.  I serve as chief transformation officer on

3  behalf of all the debtors in these Chapter 11 cases, I've

4  held that role and responsibility since the fall of 2019.  I

5  also serve as chief financial officer for the specialty

6  generic segment.

7       In my capacity as chief transformation officer, I've

8  had the day-to-day responsibilities for overseeing non

9  (indiscernible) restructuring efforts, both working with

10 advisers and internal teams.

11 Q      And, in your role as chief transformation officer, have

12 you been involved in all major decisions the company has made

13 about the restructuring?

14 A      Yes, I have been.  I've been involved in all of the

15 negotiations and various settlements, sometimes directly,

16 sometimes more behind the scenes, but involved on a daily

17 basis with all case matters.

18 Q      And I'd like to first go over some background.  What

19 generally caused Mallinckrodt to file for Chapter 11?

20 A      So the debtors filed for Chapter 11 protection to

21 resolve enterprise-threatening litigation in the face of

22 near-term debt maturities.  And I'll give some background

23 here because these are complex cases and so the reasons for

24 the Chapter 11 filing were also complex.

25       We had announced in December 2018 plans to spin off our

58

1  specialty generic segment, following years of planning for a

2  separation of specialty generics and specialty brands.  At

3  that time, the opioid litigation was in a relatively early

4  stage, cases were trickling in, but we believed based on our

5  corporate structure that was manageable.

6      As we entered into 2019 and some of the first trials

7  were held not involving Mallinckrodt, the financing for our

8  spinoffs started to dissipate on us.  And, as a result of

9  that and in conjunction with the litigation, we were advised

10 by the firm that we had retained to write solvency opinions

11 for both the SpinCo and the RemainCo, which is a requirement

12 in a spinoff, that they would be unable to provide solvency

13 opinions because we had not been able to ascertain and

14 provide a number for the contingent opioid liability, that

15 they would not be able to provide a solvency opinion for

16 SpinCo but, importantly, neither would they be able to

17 provide a solvency opinion for RemainCo, the business that

18 would be left over.  And so that raised significant concerns

19 about our ability to manage our significant debt load.

20     So in the summer of 2019, specifically, in mid-July,

21 our board of directors met and decided to suspend the spinoff

22 and instead pivot to exploring whether Chapter 11 could be a

23 means to satisfy our opioid litigation allegations;

24 specifically, a channeling injunction was deemed to be very

25 desirable as a way to deal with it once and for all.

1    We had no deal at that time and with respect to in the

2  opioid cases.  And so at first it was conceived that this

3  could be a free-fall situation and that we would try to

4  cordon it off to just the specialty generic entities as

5  filers, and we called that Project Balboa.  And then there

6  was a significant breakthrough in September of 2019 when we

7  were able to reach a settlement with the plaintiffs'

8  executive committee in the federal multi-district litigation

9  on the opioid liability.  That was of two counties, but it

10  also got the ball rolling for settlement discussions with

11  various governmental entities around our opioid liability.

12    And, shortly thereafter -- well, we began intense

13  efforts with representatives from the opioid claimants to

14  come up with a construct for a surgical filing under Project

15  Balboa that would have involved only the specialty generics

16  debtors, but then --

17    MR. HAVILAND:  Excuse me, Your Honor, this is Don

18  Haviland.  I don't want to break up the narrative, but it is

19  a narrative question.  I think at some point if we could get

20  a little break in the story, I'm happy to have it

21  facilitated, but as we go through tranches, just because I'm

22  concerned about hearsay and some objections we may want to

23  interpose.  So the holistic testimony is helpful, but at some

24  point I'd just like to have a question.  Thank you.

25    THE COURT:  Well, I think it was appropriate kind

1    of background information, I don't see any issue at this

2    point, but certainly, Ms. Marks, you do need to make it a

3    question-and-answer process.

4           MS. MARKS:  Understood, Your Honor.

5    BY MS. MARKS:

6    Q    Mr. Welch, if you were at a good stopping spot, we can

7    go into some more specific questions.

8    A    Certainly.

9    Q    And so to paraphrase -- that was a lengthy answer, but

10   to paraphrase, were the two primary reasons for the

11   bankruptcy filing the wave of opioid litigations and the

12   company's debt structure?

13   A    If I had continued with my answer, I was going to talk

14   about what happened in March of 2020 when the Acthar

15   governmental litigation really became a significant issue and

16   we pivoted to planning for a HoldCo bankruptcy, we called

17   that Project Creed.

18          And the use of boxing titles and references for the

19   project actually became apropos because it's not a single

20   thing that led to Mallinckrodt filing for Chapter 11, it was

21   a combination of things.  It was the opioid litigation, it

22   was the significant debt on our balance sheet, and then it

23   was the roughly 25 public and private Acthar actions and

24   investigations that were pending, most notably the CMS

25   decision in March of 2020 that took us into the HoldCo

1    filing.

2    Q     Okay.  So we'll get into some of these topics in more

3    detail but, to start, let's talk a little more about the

4    opioid litigations.  What generally were the opioid

5    litigations against the company?

6    A     So the opioid litigations, which numbered approximately

7    3,000 cases by the time we filed our petition in October

8    2020, asserted a variety of claims against the debtors;

9    public nuisance, issues with the marketing of opioids, the

10   distribution of opioids, a variety of claims brought in both

11   federal and state courts.

12   Q     And are you familiar with these litigations?

13   A     Yes, I am.

14   Q     How did you become familiar with them?

15   A     So I certainly had been briefed by Ropes & Gray very

16   early in the litigation process.  It was something that we

17   were mindful of when we were planning to spin off and

18   thinking through how the contingent liability might be

19   considered with respect to our spinoff, and so I've been

20   aware of the litigation that has been pending for some time.

21   I've reviewed many of the complaints, not all of them because

22   they are so voluminous in nature.

23   Q     Did the debtors believe that the opioid litigations

24   posed a threat to the ongoing viability of the business?

25   A     We did.  And we heard in this case that the opioid

1  claimants alleged potentially trillions of dollars of

2  damages, and we also heard very early in this case from the

3  OCC that there were questions as to whether Mallinckrodt was

4  even insolvent when it spun off from Covidien due to the

5  opioid litigation.  So these are deep-rooted issues in

6  Mallinckrodt's history and as, you know, the largest producer

7  of generic opioids, certainly we believed that it was

8  enterprise-threatening litigation.

9  Q     Did the company also believe, though, that it had

10 meritorious defenses to these litigations?

11 A     We did and we do.  We believe that we have operated the

12 opioid business within the bounds of the law; that we are

13 mindful of the responsibilities that come from a controlled

14 substances business; we are highly regulated by both the FDA

15 and the DEA; and we believe that we do have defenses, but the

16 sheer scope of the litigation, the costs of defending against

17 the litigation, the hazards of litigation, all kind of put us

18 in a position where Chapter 11 was viewed as an appropriate

19 means of resolving the allegations.

20 Q     What were the costs in defending these litigations?

21 A     So, by the time we filed our Chapter 11 case, we had

22 already incurred over $100 million in defense costs and those

23 costs were mounting.  We were -- our run rate was over a

24 million dollars a week and, as more cases were added, that

25 was only increasing.  And the settlements that we had

1    achieved in the early fall of 2019, it was $30 million to

2    settle -- and that was cash and free product combined -- to

3    resolve just two counties.  And I think I testified early in

4    this case that the extrapolation of that would have resulted

5    in a liability in excess of $30 billion to the company.

6    Q       Does the debtors' plan of reorganization include a

7    settlement of the opioid claims?

8    A       Yes, it does.

9    Q       Were you involved in the negotiations to reach that

10   settlement?

11   A       Yes, I was, and I engaged with the representatives for

12   the Governmental Ad Hoc Group that was early on negotiating

13   that with their advisers on the financial background and the

14   history of the company.

15   Q       And was an opioid settlement initially reached even

16   before the company filed for Chapter 11?

17   A       Yes.  We announced in February 2020 that we had

18   achieved a settlement of the opioid liability that would have

19   avoided the parent company needing to file.  So we had

20   developed a structure that satisfied our objective of Project

21   Balboa, which was to avoid entangling our debt and preserve

22   value for equity holders.

23   Q       And I'll refer to this as the original opioid

24   settlement, was there government support for the original

25   opioid settlement?

1  A     There was really unprecedented support for it.  We had

2  over 40 states and territorial attorneys general signed on to

3  it and that support only grew as the year progressed, and we

4  had significantly more support when we filed for Chapter 11

5  in October of 2020.

6  Q     What consideration did Mallinckrodt agree to provide

7  under the original opioid settlement?

8  A     It was $1.6 billion of structured cash payments and

9  warrants to acquire approximately 19.99 percent of the

10 interest in Mallinckrodt PLC.  There was a view that the

11 opioid overhang had suppressed the value of Mallinckrodt as a

12 publicly-traded security and the plaintiffs wanted to enjoy

13 in the appreciation of the stock that would -- that was

14 expected to result from resolution of the overhang.

15 Q     And what consideration did Mallinckrodt receive under

16 the original opioid settlement?

17 A     So, under the original opioid settlement, all of the

18 liabilities would have been channeled to one or more opioid

19 trusts, and so it was a way to effectively deal once and for

20 all with that litigation.

21 Q     And earlier in your testimony I heard the term

22 "surgical filing" and "Balboa."  What did you mean by those?

23 A     By surgical filing, I just meant that not all entities

24 within the debtors' corporate structure would file, it was

25 intended that only the specialty generics entities that

1   actually manufactured, distributed, and sold opioids would be

2   within the filing parameter.  This is similar to an approach

3   that Johnson & Johnson is currently taking with respect to

4   its talc liabilities.  We believed that that was an effective

5   way to keep the parent company -- which was named in over 90

6   percent of the opioid cases, so it required a settlement to

7   achieve a surgical filing -- and preserve equity value and to

8   keep our debt structure out of the Chapter 11 fight.

9   Q    And at the time that the company reached the original

10  opioid settlement was it understood that the company would be

11  doing a surgical Chapter 11 filing?

12  A    Yes, that was part of the publicly-announced settlement

13  structure in February of 2020.

14  Q    Did the debtors consider trying to preserve shareholder

15  value when they were contemplating this surgical filing?

16  A    That was one of the primary objectives for Project

17  Balboa was how to keep the opioid liability from destroying

18  all equity value, so yes.

19  Q    Do you believe that the original opioid settlement was

20  fair and reasonable?

21  A    Yes, I do.

22  Q    And why do you believe that, why do you believe it was

23  in the best interests of the debtors' estates?

24  A    Yes.  Again, the risks of the litigation were

25  significant given the claims being alleged.  The settlements

1   that had ensued with other companies are all in the billions

2   of dollars.  We've seen significant judgments against various

3   defendants in the opioid supply chain.  And this was an

4   effective way to provide value to those claimants without

5   having those claimants attach to all of the value that

6   Mallinckrodt had to offer, which was what they believed

7   ultimately that they were entitled to.  So this was a hard-

8   fought negotiation to get to a number that would allow

9   Mallinckrodt to continue and have value for shareholders.

10  Q     In your initial answer, you referred to a channeling

11  injunction; what is your understanding of what the channeling

12  injunction would accomplish?

13  A     So the channeling injunction, as I understand it, is a

14  mechanism by which not only the current 3,000 cases that were

15  stayed as a result of our filing, but future litigations that

16  could be brought with respect to the, you know, pre-effective

17  period or prepetition period, however it's written up, that

18  all of those cases would ultimately be channeled to the trust

19  where those claims could be evaluated and adjudicated and

20  recovery could be made.  So it was an effective way for us to

21  settle comprehensively the alleged opioid liabilities of the

22  debtors.

23  Q     And would the channeling injunction also include future

24  opioid litigation that might be brought post-emergence?

25  A     Yes, and that was one of the reasons why Chapter 11 was

 1  viewed as really the only mechanism for Mallinckrodt to

 2  implement a global opioid settlement.

 3  Q      And what are the benefits to Mallinckrodt of staying or

 4  enjoining these opioid claims through this trust and the

 5  channeling injunction?

 6  A      But for the trust structure, additional litigation

 7  could mount, the proverbial race to the courthouse would be

 8  back on.  The channeling injunction and the settlement

 9  structure provides a way to deal with the opioid litigation

10  comprehensively.

11  Q      And did the original opioid settlement save the company

12  money in terms of administrative expenses that otherwise

13  would have been spent on litigation?

14  A      Yes.  As I testified a moment ago, the litigation costs

15  were rising exponentially, and so the settlement was an

16  effective way to deal with those mounting litigation costs.

17  Q      How did the company's ability to refinance affect the

18  decision to enter into the original opioid settlement?

19  A      As I mentioned in my opening narrative, you know, a

20  solvency opinion-writing firm had told us that they could not

21  give a solvency opinion for the spinning company, and that

22  meant that Mallinckrodt proper, all of Mallinckrodt was in a

23  position where refinancing its debt in the face of such

24  enormous opioid claims could have been very challenging,

25  finding somebody who would have been willing to underwrite

1  that debt at a reasonable interest rate would have been a

2  very difficult challenge for us.

3  Q     Is another reason that the company entered into the

4  original opioid settlement to minimize negative impact on

5  operations and sales?

6  A     Yes.  I think by the time that we entered that

7  settlement the opioid litigation was becoming a significant

8  distraction to the company, the overhang was very

9  significant.  We had seen our share price, you know, decline

10  sharply, talent retention was starting to become an issue.

11  And so we needed to have an affirmative path forward to deal

12  with the situation and the settlement gave us that.

13  Q     So can you just summarize very briefly at a high level

14  what impact all of the opioid litigation had on the company

15  prior to reaching the original opioid settlement?

16  A     A strongly negative impact.  I think that the -- if I

17  was to note one thing, it was the killing of our spinoff.

18  The separation of specialty brands and specialty generics had

19  been kind of the focal strategy of the company for some time

20  to achieve, you know, a better alignment of the businesses

21  and the opioid litigation prevented us from doing that.  At

22  the end of the day, it thwarted our vision for the company.

23  Q     Did the overhang of the opioid litigation impact the

24  company's ability to attract and retain talent?

25  A     I certainly think that we -- our talent pool was

1  diminished as a result of all of the challenges that the

2  company was facing, including the opioid litigation.

3  Q      Could the company have eliminated the exposure of the

4  opioid lawsuits without the original opioid settlement?

5  A      I don't think so.  We viewed a piecemeal settlement

6  defense strategy as ultimately unworkable given the number of

7  cases, the potential damages that could be asserted, even the

8  financial challenges of posting an appeal bond if we lost any

9  of the cases.  And so it wasn't just a question of, well, can

10  we win some, it's like you really need to win them all in

11  order for the company to be viable, and so that was why we

12  viewed the settlement as an attractive resolution for these

13  alleged liabilities.

14  Q      And do you believe, again, that the original opioid

15  settlement was in the best interests of the debtors' estates?

16  A      I do, yes.

17  Q      And, Mr. Welch, are you aware that there was an amended

18  opioid settlement entered into during the bankruptcy case?

19  A      Yes, I'm aware of that amendment.

20  Q      Okay, we'll circle back to that topic a little later,

21  but now let's switch gears and talk about Acthar.

22          Let's talk first, specifically, about the dispute that

23  Mallinckrodt ARD LLC had with CMS regarding the base date

24  AMP.  Are you familiar with this dispute?

25  A      Yes, I am.

1  Q      And how are you familiar with it?

2  A      I remember -- you know, serving as Mark Trudeau's chief

3  of staff, I certainly was in executive committee meetings

4  where the initial correspondence received from CMS that

5  reversed their prior correspondence about the appropriate use

6  of the particular base average manufacturing price, or AMP,

7  where they first suggested in 2016 that the wrong base date

8  AMP was being used in Medicaid rebate calculations and, at

9  that point in time and forward, I was aware of the

10 controversy as it developed.

11 Q      And what happened next?

12 A      So, just to give a little background, in 2013,

13 Questcor, which was the predecessor of Mallinckrodt ARD LLC,

14 began using a base date average manufacturer price that

15 corresponded to a new NDA that Questcor had received for

16 Acthar related to infantile spasms, and in two instances CMS,

17 which was the regulating body for the Medicaid program, had

18 indicated that the use of that new base date AMP was

19 appropriate.

20         In 2016, CMS reversed its position on that and in

21 correspondence to the company suggested that the wrong base

22 date AMP was being used.  We did not believe that that notice

23 was administratively appropriate, nor did we believe that the

24 factual basis of that notice was corrected.

25         In 2019, though, CMS upped the stakes and suggested

71

1    that, if within 14 days we didn't revert to the old base date

2    AMP and rerun the rebate calculations, that we would be

3    deemed to be out of compliance with CMS's requirements, and

4    that would have had a significant negative impact on the

5    company.

6    Q    What action did ARD take in response to receiving this

7    information?

8    A    Sure.  So Mallinckrodt ARD filed for a declaratory

9    judgment in the district court in DC, alleging that CMS did

10    not have the -- or, you know, its assertions were not correct

11    with respect to the base date AMP, and we believed that we

12    put on a strong case there.

13    Q    Was Mallinckrodt ARD LLC the only plaintiff in that

14    case?

15    A    Yes, it was.

16    Q    And when did a decision come down?

17    A    A decision came down in March of 2020, just a few weeks

18    after we had announced the surgical Balboa filing.

19    Q    And what was the Court's decision?

20    A    Much to almost everyone's surprise, the Court ruled

21    against Mallinckrodt ARD, LLC, and, you know, effectively

22    ordered it to rerun the rebate calculations, using the old

23    Bates date AMP.  That had two effects.  One, on a go-forward

24    basis, the infantile spasms business was basically

25    unprofitable based on the revised calculation.

1     And secondly, it created an almost instantaneous near-
2  term obligation to repay approximately $650 million of
3  rebates.  Those amounts would have been billed by the
4  participating states, based on the fresh rebate calculations
5  that Mallinckrodt would have had put in its system.
6  Q    And did the company appeal that decision?
7  A    We did.  We first filed a motion for reconsideration,
8  which was denied and then we filed an appeal.
9  Q    What is the status of the appeal?
10  A    That appeal was stayed.  First, as a result of this
11  case, but then, ultimately, as a result of the settlement
12  with the Acthar issue with the Government.
13  Q    And were there any other lawsuits brought by the
14  Federal Government, pending against the company, related to
15  Acthar, pre-petition?
16  A    There were.  In also, in kind of late March of 2020 or
17  maybe it was early April of 2020, so, roughly, the same time
18  period, the U.S. DOJ up in Massachusetts joined the *qui tam*
19  litigation that had been brought, asserting under very
20  similar facts to the CMS decision, that Mallinckrodt had been
21  knowingly using the wrong Bates date AMP.  The DOJ joined
22  that and asserted treble damages.  So, that was a case that
23  had the potential for a two-billion-dollar liability, which
24  would have dwarfed the 1.6-billion-dollar settlement we had
25  announced just a few weeks earlier.

1  Q     And you get that number by trebling the six-hundred-

2  and-fifty-million-dollar liability that arose from the loss

3  in the CMS lawsuit?

4  A     That's correct.

5  Q     And was the DOJ's lawsuit in the District of

6  Massachusetts also against Mallinckrodt ARD, LLC?

7  A     Yes, it was.

8  Q     Are you aware of whether any other parties or

9  plaintiffs intervened in that action?

10  A     Yes, I believe it was 26 different states, including

11  the District of Columbia that intervened in those cases, with

12  respect to the state claims.

13  Q     As far as you know, did those states file proofs of

14  claim in this Chapter 11?

15  A     They did, but, ultimately, all 50 states filed claims,

16  including the District of Columbia and Puerto Rico.

17  Q     And do you know how much their claims totaled?

18  A     $1.95 billion.  So, the trebling of the rebate damages.

19  Q     Pre-petition, were there any other lawsuits brought by

20  the Federal Government against the company related to Acthar?

21  A     Yes, the DOJ had joined another *qui tam* litigation

22  called the Strump (phonetic) case, which was in the Eastern

23  District of Pennsylvania.  It was along very similar lines.

24  Q     So, it was related to Acthar.

25        Was it based on a different fact pattern?

1  A     It was based on the false claims, you know, the rebate

2  issue, and I believe that there was also a marketing claim in

3  there, as well.

4  Q     And were there other pre-petition actions related to

5  Acthar, brought by private plaintiffs, cities,

6  municipalities?

7  A     There were.  The City of Rockford had filed a complaint

8  and the other parties represented by the Acthar Ad Hoc Group

9  had filed.  There were also securities litigations involving

10 statements by company officials with respect to Acthar that

11 were pending at that time, as well.

12 Q     Pre-petition, did the company engage with the DOJ and

13 with CMS to try to settle the Acthar-related liabilities?

14 A     We did.  So, in the late spring, early summer of 2020,

15 outreach was made to the DOJ to see if there was a pathway to

16 resolving the liability.

17 Q     Were you involved in those negotiations?

18 A     I was never directly at the table with the DOJ, but I

19 was receiving daily updates, along with our other advisors,

20 to those negotiations.

21 Q     And was an agreement eventually reached with the

22 Government?

23 A     Yes, a deal was ultimately reached.

24 Q     Do you remember when that was?

25 A     It was in late summer and it was really important

1  because the amount of that settlement was critical input for

2  the other negotiations that were taking place around the RSA

3  that ultimately became the bedrock of our restructuring

4  effort.

5  Q     Can you tell me a little bit more about the settlement

6  negotiations that led to that agreement?

7  A      Sure.

8              MR. HAVILAND:  Objection.  Just as to the hearsay,

9  to the extent the witness is going to speak about what the

10  Government or any non-Mallinckrodt company executive might

11  say who was not at the table.

12             THE COURT:  Ms. Marks?

13             MS. MARKS:  We can move on.  It's not essential.

14             THE COURT:  All right.

15  BY MS. MARKS:

16  Q     Mr. Welch, could you tell us what specific agreement

17  was reached with the Government at that time?

18  A      So, it was an ability to pay a negotiation.  We

19  provided, and I have direct knowledge of this, we provided

20  voluminous financial information, including information

21  around the opioid settlement to the Government and we

22  ultimately reached agreement for a two hundred-and-sixty-

23  million-dollar settlement that would resolve the federal and

24  state Acthar governmental claims, with respect to the CMS

25  decision, the false claims action brought in Massachusetts,

1   as well as the Eastern District of Pennsylvania Strump case.

2          So, it was a very significant achievement and it was

3   designed, in part, to allow the opioid settlement to exist.

4          So, but for the opioid settlement, presumably, the

5   Government's demand would have been much higher from the

6   company.

7   Q    So, the settlement to settle the CMS lawsuit and both

8   False Claims Act lawsuits in the District of Massachusetts

9   and the Eastern District of Pennsylvania?

10  A    That's correct.  The Government was willing to accept a

11  settlement amount that was significantly less than the

12  judgment it had received in the underlying D.C. case.

13  Q    And did the settlement also settle the states' claims?

14  A    Yes, it did.

15  Q    To what extent was the original opioid settlement a

16  consideration when reaching this, I'll call this the

17  "Government Acthar settlement"?

18  A    It was a strong consideration.  I think, again, the

19  support for the settlement that Mallinckrodt has announced

20  with the opioid claimants was unprecedented at the time.  It

21  still is unprecedented in many respects and I think the DOJ

22  recognized the public interest in sustaining that settlement

23  in light of the Acthar litigation amount, and so that's why

24  we saw a settlement number that made the opioid settlement

25  financially salvageable for the company and allowed a plan to

1    come together.

2    Q     If the company had not entered into the Government

3    Acthar settlement, did the company believe that it might be

4    subject to exclusion from federally funded healthcare

5    programs?

6    A     Yes, the Office of Inspector General, or OIG, for

7    Department of Health and Human Services has statutory

8    authority under the Social Security Act, Section 1128, to --

9    it's a permissive authority -- there's also a mandatory

10   authority -- but a permissive authority to exclude companies

11   from participation in government, Federal Government-funded

12   healthcare programs.  And to the extent that the Government

13   has wielded that authority, that would have been an absolute

14   disaster for Mallinckrodt as a going concern.

15   Q     And why did the company believe, in addition to the

16   words of the statute, that it was potentially subject to

17   exclusion?

18              MR. HAVILAND:  Objection, Your Honor; again,

19   foundation and hearsay to the extent it's communicating

20   information that came from the Government.  The witness was

21   not at the table.

22              THE COURT:  Ms. Marks?

23              MS. MARKS:  I'll move on.

24              THE COURT:  Thank you.

25   BY MS. MARKS:

1    Q      Did the company view, with exclusion from these

2    programs, as an extreme remedy?

3    A      We did, but it was certainly within the Government's

4    power and authority to make that threat and, if desired, to

5    act on that, given their authority under the statute.

6    Q      And given that the company hoped that there was a low

7    risk of exclusion, why enter into the settlement?

8    A      Well, the Government held a six-hundred-and-fifty-

9    million-dollar judgment, so this was not a contingent

10   liability anymore; it was a near-term demand on cash and, you

11   know, if Mallinckrodt was not willing to be a reasonable

12   healthcare participant in these programs, then exclusion

13   could have been appropriate.

14         Acthar derives approximately 70 percent of its revenue

15   from Medicare and Medicaid.  So if Acthar was excluded from

16   the program, we're talking about 20 percent of the company's

17   revenues.  And the authority to exclude is not on an

18   individual-entity basis; it's on a consolidated company

19   basis --

20              MR. HAVILAND:  Your Honor, at this point, I just

21   want to object.  I think there's a lack of foundation for

22   this witness to be opining about the -- I know there's a

23   witness that's coming up on this subject, an expert, but this

24   witness is not qualified to opine on the Government's power

25   to exclude.

```
 1                 THE COURT:  Ms. Marks?

 2                 MS. MARKS:  Your Honor, I'm simply asking

 3    Mr. Welch for his understanding and what the company

 4    believed.  Mr. Welch testified that he's read the statute.

 5    BY MS. MARKS:

 6    Q     And Mr. Welch, can I ask you, you read the statute.  Do

 7    you have a legal background?

 8    A     I do have a legal background, yes.

 9    Q     And have you read statutes and understood them before?

10    A     Yes, my entire career, I've been focused on reading the

11    text of statutes.

12    Q     And --

13                 MR. HAVILAND:  So, Your Honor, that Mr. Welch went

14    to Georgetown, and that's impressive, he has not been

15    disclosed as an expert, did not do an expert report.  There

16    is a witness proffered by the debtors who has done so that's

17    speaking to the subject.  So, his opinion about what the

18    statute means is a legal opinion that he's not qualified to

19    give in this proceeding.

20                 MS. MARKS:  Your Honor, Mr. Welch is testifying as

21    to how he understood the statute.  The company's decision-

22    making process about why they entered into the settlement is

23    relevant and Mr. Welch is able to testify about what the

24    company believed as a reason for why it entered into the

25    settlement.
```

1           THE COURT:  I'll overrule the objection, but I'm

2   not accepting his testimony as opinion testimony.

3           MS. MARKS:  Okay.

4   BY MS. MARKS:

5   Q     Mr. Welch, do you have an understanding of what

6   consequences are for companies who are excluded?

7   A     Well, certainly, there are civil, monetary penalties.

8   But more importantly, many of the debtors' contracts with

9   other participants in the supply chain have express

10  contractual provisions that if there is debarment or

11  exclusion from federal healthcare programs, then those

12  contracts terminate.  And as I just mentioned, the risk of

13  exclusion was not limited to Mallinckrodt ARD, LLC, but

14  entire company.

15          And so, from a Generics perspective, we had lots of

16  conversations around what would be the impact of the generic

17  entities being excluded from those programs and you have a

18  situation where the generic company's products are sold at

19  retailers, Walmart, Walgreens, where the patients that walk

20  in to have their prescriptions filled, you know, the

21  underlying payor, in many cases, is Medicaid, but in many

22  cases, it's not.

23          And if the lead health pharmacy isn't able to provide a

24  Mallinckrodt product to a Medicaid-paying patient, then that

25  creates an issue for the retailer.  Well, they have to stock,

1   you know, in addition to Mallinckrodt's product, other

2   companies' similar products, which just raises the question,

3   well, why would they have two companies' products on their

4   shelf?

5        That's additional work for them and not efficient from

6   a business perspective.  And so, we viewed it as potentially

7   limiting the dosage business of our Generics business if we

8   were excluded from the program, which would have been very

9   detrimental.  The dosage revenues are about half of the

10  Specialty Generics revenues, so roughly $350 million of

11  revenues a year at risk if we were excluded.

12  Q    So, specifically, what financial impact would exclusion

13  of the related entity or affiliates at Mallinckrodt have had

14  on the company's business?

15           MR. HAVILAND:  Your Honor, again, I object.  This

16  is now taking from a position of what the statute means and

17  opining now as to a Generics side of the business where

18  there's no evidence.  The witness hasn't proffered a report

19  on the subject matter, but now is going to give his opinion

20  about a potential impact of something that didn't happen.

21           MS. MARKS:  Your Honor, we're not offering

22  Mr. Welch as an expert.  I'm not seeking to elicit opinion

23  testimony.  Again, this evidence is relevant to why the

24  company entered into the settlement.

25           THE COURT:  I'll overrule the objection.  You can

1  answer, Mr. Welch.

2          THE WITNESS:  Ms. Marks, can you repeat the

3  question?

4          MS. MARKS:  Sure.

5  BY MS. MARKS:

6  Q    Specifically, what financial impact would exclusion of

7  the related entity or affiliates at Mallinckrodt have had on

8  the company's business?

9  A    It would have been an extreme financial impact.  It

10 certainly would thwart our abilities to meet our plan

11 obligations here if we modeled that out.

12 Q    Was the company worried -- and, again, I'm not asking

13 for opinion testimony, I'm just asking for what the company

14 believed -- was the company worried that exclusion could be

15 imposed on an enterprise-wide basis?

16 A    That was a concern, yes.

17 Q    And what impact would that have had?

18 A    I think I just spoke to that or intended to speak to

19 that in terms of if this was beyond Specialty Brands and,

20 specifically, Acthar, then the revenue impact could be much

21 greater than nearly 20 percent of the overall enterprise

22 revenues, which is still a significant number.

23 Q    And even if CMS did not exclude Mallinckrodt from any

24 program, what would the impact on the relationship with CMS

25 had been absent the Government settlement?

1          MR. HAVILAND:  Your Honor, I just have to object,

2    again, for the record, that this witness is not qualified to

3    give that opinion.

4          THE COURT:  Overruled.

5          You can answer, Mr. Welch.

6          THE WITNESS:  Yeah, CMS is not only a payor, but

7    it's also a regulator.  We are a very regulated industry and

8    the Federal Government, even if we hadn't achieved a

9    settlement, they have tools that could have made, you know,

10   Mallinckrodt's life more challenging and even the threat to

11   exclude, you don't want there to be tensions with a primary

12   regulator.  That could have adverse impacts on our business

13   and, certainly, CMS has brought authority to increase

14   auditing and reporting requirements.  The OIG can require a

15   corporate integrity agreement with monitoring provision that

16   could be quite onerous to the debtors.  And so, there were a

17   number of reasons why we believed that we needed to engage

18   with CMS to resolve these issues.

19   BY MS. MARKS:

20   Q     And did this settlement with CMS and the DOJ provide

21   financial certainty to the company?

22   A     It did.  It was critical certainty.  One, as to the

23   amount of actual cash that was going to be on in a near-term

24   basis, devoted to meeting the obligation, specifically.  In

25   the six-hundred-and-fifty-million-dollars, those invoices

1  were starting to trickle in why the time we filed our case in

2  October 2020.  So, the need to have clarity on whether those

3  should be paid or not was pressing.

4       But it was also an important data point for the other

5  negotiations that were ongoing in this case with various case

6  parties and it's very difficult to see how the RSA could have

7  come together if the Acthar settlement amount was unknown.

8  It was a critical data point to know what the company's

9  obligations were going to be.

10  Q    So, in addition to this testimony that you've just

11  given, can you describe, overall, the effect that the

12  settlement had on reducing risk for the company?

13  A    It certainly enabled a resolution with the opioid

14  claimants, with our unsecured bondholders and other parties

15  to enter into a restructuring support agreement, but for the

16  Acthar settlement.  Even though the Government was not a

17  party to the RSA, that settlement and those settlement terms,

18  that was a pillar of the RSA.  It would not have been an

19  achievable work product, I guess I'd call it, if, you know,

20  outside of having that settlement.

21  Q    And do you believe that the Government Acthar

22  settlement was in the best interests of the debtors' estates?

23  A    Yes, I do.

24  Q    And you mention that the Government was not a party to

25  the RSA.  Were the terms of the agreement included in the

1  RSA?

2  A      They were.  They were memorialized in the RSA.

3  Q      And was the final settlement agreement with the

4  Government ultimately filed with the Court in connection with

5  the plan of confirmation?

6  A      Yes, I believe it was filed in August of 2021 as

7  Exhibit Q in our plan supplement.

8  Q      And did reaching a final settlement with the Government

9  on these Acthar claims result in their support of the plan?

10  A      Yes, it did.

11  Q      Can you describe Mallinckrodt's assessment of its

12  financials around March of 2020, when the CMS decision came

13  out.

14          THE COURT:  Ms. Marks, is this is good time for a

15  break?

16          MS. MARKS:  Yes, it is, Your Honor.

17          THE COURT:  I apologize, I need to take a break,

18  and we might as well make it our lunch break.  We'll take a

19  little bit earlier lunch than normal.

20          So, let's recess until 1:00 p.m.  We'll come back

21  and pick up.

22          Mr. Welch, just a reminder, you are not to speak

23  to anyone during the break about your testimony.

24          THE WITNESS:  Understood, Your Honor.

25          THE COURT:  All right.  Thank you.

1          All right.  Thank you.  We'll recess until

2   1:00 p.m.  Thank you.

3          MS. MARKS:  Thank you.

4      (Recess taken at 11:59 a.m.)

5                    AFTERNOON SESSION

6      (Proceedings resume at 1:00 p.m.)

7   STEPHEN WELCH, WITNESS FOR THE DEBTORS, PREVIOUSLY AFFIRMED

8          THE COURT:  All right.  Good afternoon, everyone.

9   We're back on the record.

10         Ms. Marks, are you ready to proceed?

11     (No verbal response)

12         THE COURT:  You're muted, Ms. Marks.

13         MS. MARKS:  Thank you.  Yes, Your Honor.

14                CONTINUED DIRECT EXAMINATION

15  BY MS. MARKS:

16  Q    Okay.  Mr. Welch, so, before we broke, we were switching

17  gears to the company's financial situation.  And the question

18  I had asked you was whether you could describe Mallinckrodt's

19  assessment of its financials around March 2020, which is when

20  the CMS decision came out.

21  A    Certainly.  So, in conjunction with the announced

22  February 2020 opioid settlement, we had publicly announced a

23  pathway to dealing with an April 2020 debt maturity.

24  Specifically, our term loan lenders had agreed to extend the

25  company new financing to deal with that maturity.

1    In the face of the CMS judgment, though, the term

2  lenders withdrew that financing and Mallinckrodt was required

3  to pivot strategically and pursue a private exchange to

4  satisfy that maturity, and that changed the financial --

5  company's financial position appreciably.  So the difference

6  between kind of new money in to a private exchange with $100

7  million of cash out resulted in a liquidity swing of about

8  $300 million in a matter of weeks.

9    And so the company's financial position was

10  increasingly pressured in light of the six-hundred-and-fifty-

11  million-dollar Acthar judgment and -- and the need to -- to

12  kind of take dramatic actions to shore up its capital

13  structure.

14  Q    In light of this, did the company begin to negotiate

15  with certain noteholders in the Spring of 2020?

16  A    We did.  We began negotiating with an ad hoc group of

17  our guaranteed unsecured noteholders, an ad hoc group of our

18  term loan lenders, an ad hoc group of our revolving facility

19  lenders, and the administrative agent under our credit

20  facility.

21  Q    Did the company reach an agreement with the guaranteed

22  unsecured noteholders pre-petition?

23  A    Yes, we did.

24  Q    And let's discuss how that agreement came to be.  Can

25  you describe the terms of the noteholder agreement?

1  A     Sure.  The -- the -- first and foremost, the noteholder

2  agreement was the product of extensive due diligence on the

3  company over the course of the summer months of 2020, and the

4  actual settlement itself was in light of the Acthar

5  settlement.  I talked about how that was important to the

6  parties.

7       What the guaranteed unsecured noteholders ultimately

8  agreed to was a path forward, whereby Mallinckrodt would

9  reinstate its secured debt, would issue 375 million of new

10 second lien take-back paper to the guaranteed unsecured

11 noteholders, and they would be equitized with respect to the

12 rest of their claims.

13 Q     Did the agreement allow the company to de-lever its

14 balance sheet?

15 A     Yes, it did.  That -- that resulted in approximately

16 $1.3 billion in de-leveraging.

17 Q     And why is de-levering important?

18 A     A company's net debt leverage -- that's its debt divided

19 by its EBITDA, and Mallinckrodt has had declining EBITDA for

20 some time -- that has a significant impact on the company's

21 ability to raise new capital and execute on its operational

22 objectives.  So, for some time, Mallinckrodt's stated capital

23 strategy had been the repayment of debt.  But with

24 accelerating declines in its EBITDA, you know, the ability to

25 significantly de-lever the balance sheet was a significant

1   objective of the restructuring.

2   Q    Did the agreement contemplate that the specialty brands

3   and specialty segments of Mallinckrodt would continue to be

4   owned and operated by debtor and nondebtor affiliates?

5   A    Yes, it did.

6   Q    And did the noteholder agreement make the original

7   opioid settlement feasible?

8   A    Yes, it did.

9   Q    Why is that?

10  A    The -- the guaranteed notes secure -- noteholders held

11  claims as a result of guarantee structure against

12  approximately 60 debtor entities, so they had recourse and

13  could have asserted claims against parties that were making

14  claims against the specialty generics entities, the same

15  parties that had settled with the opioid claimants.  And so

16  we would have had a significant intra-creditor fight between

17  the guaranteed unsecured noteholders and the opioid claimants

18  if there had not been, you know, kind of mutual settlements

19  within the RSA structure.

20  Q    Do you believe that this noteholder agreement was in the

21  best interests of the debtors' estates?

22  A    Yes, I do.

23  Q    So let's now turn to the RSA.  You testified a bit about

24  it already.  Did the debtors memorialize the original opioid

25  settlement, the noteholder agreement, and the terms of the

1  agreement with the Government on Acthar in the RSA on the

2  petition date?

3  A    Yes, we did.

4  Q    Who was the RSA signed by?

5  A    The RSA was signed by a number of parties.  It was the

6  debtors, 84 percent of the unsecured noteholders fulcrum

7  group.  It was signed by the plaintiffs' executive committee

8  in the opioid litigation that represented over a thousand

9  governmental units, and it was signed by 50 state and

10  territorial attorneys general.

11  Q    Do you believe that the RSA was in the best interests of

12  the debtors' estates?

13  A    I do.  I testified previously that it was an

14  unprecedented RSA, in terms of dealing with the opioid

15  liability.

16  Q    Why do you believe it was in the best interests of the

17  estates?

18  A    I believe it was in the best interests of the estates

19  because it provided a path forward to resolving the

20  enterprise-threatening litigation and to resolving the -- the

21  debt issues that the company had, and to restructure the

22  claims that had been brought against the company.

23  Q    And given the number of parties involved, did you

24  believe that it was important to have a framework in place to

25  settle some of those claims?

1    A     We did.  We knew that there was a potential for

2    significant litigation due to the history of the company,

3    potentially claims by opioid claimants against value on the

4    specialty brands side of the -- the business.  There had been

5    assertions that the specialty brands assets had been acquired

6    using opioid cash.  The settlement structure avoided a lot of

7    that litigation and gave us a path forward.

8    Q     Did the RSA provide stability for operations?

9    A     Yes, it did.  It gave employees and vendors and

10   customers confidence that we could actually achieve a

11   restructuring of the company.

12   Q     Post-petition, were there other parties that joined the

13   RSA?

14   A     Yes, there were.

15   Q     As the debtors negotiated with those parties post-

16   petition, which was the first one to join the RSA?

17   A     The first party to join was just a few months after we

18   filed the petition, that was the Multi-State Governmental

19   Entity group, or the MSGE group.

20   Q     And who does the MSGE group represent?

21   A     The MSGE group represented approximately 1,300

22   governmental entities.  These are mostly kind of cities and

23   counties, local government units, school districts, some

24   hospitals.  So it was a significant number of public opioid

25   litigants.

1  Q    Do you believe that the agreement reached with the MSGE

2  group, in connection with its RSA joinder, was in the best

3  interests of the estates?

4  A    Yes, I do.

5  Q    Why is that?

6  A    Well, it further built the support that we had garnered

7  for the plan and for the opioid settlement.  We still had to

8  deal with the private opioid claimants, but it put us in a

9  stronger position in negotiations with the OCC to have a

10  significant body of opioid claimants on board.

11  Q    Post-petition, did the debtors negotiate with other

12  parties who eventually joined the RSA?

13  A    Yes, we did.  We also negotiated with our first lien

14  term loan holders.

15  Q    And did they eventually join the RSA?

16  A    Yes, they did.

17  Q    Do you remember when that was?

18  A    It was March 2021.

19  Q    And by joining the RSA, what did the RSA parties and the

20  term lenders agree to?

21  A    So the -- the term loan lenders had been a vocal party

22  early in the case, expressing concerns about the debtors'

23  plan.  They believed -- they had a number of positions that

24  they were seeking to advance against our reinstatement

25  position, as well as different views on what the amount of

1   interests would be owed to them during the duration of these

2   cases.  The settlement avoided that entirely and brought us

3   peace with our, you know, senior secured debt holders.

4        The company gained a number of things from that:

5        First and foremost, it avoided significant litigation

6   within these cases and -- and brought an important party into

7   the plan.

8        We also gained the right in the settlement to refinance

9   the debt, to the extent that the market had better terms

10  available for us, and were still thinking about exit

11  financing.

12       And importantly, it also extended the maturities for

13  the term loans, so significant benefits to the capital

14  structure of the reorganized debtors.

15  Q    Did the first lien lenders include any timing

16  restrictions on the debtors' restructuring?

17  A    They did.  So we've enjoyed the consensual use of cash

18  under the cash collateral order, and which runs through April

19  of 2022.  But the outside date of the first lien term lender

20  settlement is March 15th, 2022.

21  Q    Do you believe that the agreement reached with the first

22  lien term loan lenders was in the best interests of the

23  debtors' estates?

24  A    Yes, I do.

25  Q    Let's discuss now the future claims representative.  In

1  this Chapter 11, is there a bar date for opioid claims?

2  A    There is not.

3  Q    Why not?

4  A    We thought it was very important to have a strategy with

5  respect to opioid claims that ensured that no opioid claimant

6  was impaired; that no one who was constitutionally unable to

7  bring forward a claim at this time would not have their

8  interests adequately represented in these cases.  And so we

9  did not set a bar date, but instead sought to have the

10  appointment of a future claims representative.

11  Q    And did that appointment occur?

12  A    It did.  So Roger Frankel was appointed as the FCR;

13  first, on a provisional basis, but then permanently.

14  Q    And why did the debtors think it was important to have a

15  future claims representative?

16  A    Again, the FCR played an important role in the opioid

17  mediation to ensure that the -- that the interests of

18  potential future claimants were adequately represented in

19  those negotiations, so that those who are constitutionally

20  unable to bring forward a claim today have their rights

21  preserved and protected under the plan.

22  Q    Does the future claims representative support the plan?

23  A    Yes, he does.

24  Q    In connection with further negotiations regarding the

25  opioid settlement, did the debtors reach an agreement with

1  the OCC or the Official Committee of Opioid Claimants?

2  A    We did.   In September of 2021; September 2nd, to be

3  exact, we announced a settlement with the OCC.  This was a

4  significant accomplishment.  We had spent months dealing with

5  the OCC, often contentiously, but always in good faith,

6  around diligence issues, discovery issues, depositions;

7  around kind of the extent to which liabilities ran throughout

8  our legal entity structure, for example.  And achieving

9  settlement with them was an important part of -- of bringing

10  into the fold a very important case constituency.

11  Q    This settlement was reached with the OCC, the debtors,

12  and the RSA parties?

13  A    That's correct, they all had to approve the settlement.

14  Q    I'll refer to this going forward as the "amended opioid

15  settlement."  And let's talk in -- in a little more detail

16  about what that includes.

17          MS. MARKS:  I'd like to pull up at this point a

18  slide, and if we could give Gail Reiser permission to control

19  the screen.  She'll raise her hand.  And she actually has two

20  computers named "Gail Reiser."

21      (Pause in proceedings)

22          THE COURT:  Do you need both computers with -- so

23  can you raise your hand on the --

24          MS. MARKS:  Yes.

25          THE COURT:  -- raise the hand on the second

1    computer, so we can find you more easily?  There you go.

2              THE ECRO:  Okay.  There we go.

3    BY MS. MARKS:

4    Q    So, Mr. Welch, if you take a scan of this slide -- you

5    know, this testimony is not meant to be a memory test or some

6    -- some of these slides are meant to help you in your

7    testimony.

8         Does this represent the general terms of the amended

9    opioid settlement?

10   A    Yes, it does.

11   Q    And under the amended opioid settlement, what additional

12   cash contributions will the debtors make?

13   A    So there was agreement to make an additional

14   contribution of $125 million on the eighth anniversary of the

15   effective date of the plan.  That took the kind of headline

16   settlement number from 1.6 billion to $1.725 billion.

17   Q    That's the total cash amount contributed by the debtors

18   to the trust?

19   A    That's correct.

20   Q    And under the amended opioid settlement, do you know

21   what the allocation of the initial payment from the debtors

22   to the trust will be; in other words -- in other words, how

23   that initial payment will be allocated?

24   A    Yeah.  So the initial payment is $450 million, and that

25   will be split with 445 million going to the Opioid MDT II

1   Trust, and obviously subsequent distribution to trusts

2   underneath that.  And importantly, $5 million will go to the

3   Public Schools Special Education Initiative.

4   Q    Does the amended opioid settlement resolve insurance

5   issues from the original opioid settlement?

6   A    It does.  The original opioid settlement had several

7   unresolved issues.  One of those issues was the treatment of

8   D&O coverage.  This settlement clarifies that D&O insurance

9   will not be contributed to the trust.  It clarifies which

10  types of insurance policies will be contributed to the trust,

11  like product liability and general -- general coverage.  So

12  it clarified some outstanding issues.  And the consideration

13  paid by the debtors is, in part, reflective of that

14  additional agreement on the part of the opioid claimants with

15  respect to D&O insurance.

16  Q     Under the amended opioid settlement, what did the

17  debtors agree to contribute with respect to the share

18  repurchase program?

19  A    So the debtors contribute their claims that might arise

20  from a share repurchase program that was in place from 2015

21  to 2018, and the OCC gains half of that interest.

22  Q     Under the amended opioid settlement, how did the

23  debtors' option to prepay cash contributions to the trust get

24  modified?

25  A    This was very important to the debtors.  The initial

1   settlement had given us 12 months to repay the settlement at

2   a specified discount amount.  This amended settlement extends

3   that 6 months, so that we have 18 full months after the

4   effective date of the plan to -- to prepay at a discount the

5   opioid settlement.

6   Q    And how were the terms of the new opioid warrants

7   modified?

8   A    The opioid claimants have additional time, now a full

9   six years from the effective date of the plan, in order to

10  exercise those warrants.  That gives the debtors additional

11  time to drive value to potentially make those warrants

12  increasingly valuable for the opioid claimants.

13  Q    Did the debtors and the opioid claimants agree in

14  principle on the covenants set forth in the opioid deferred

15  cash payment terms?

16  A    We did, yes.

17  Q    Under the amended opioid settlement, what types of

18  releases would be offered to certain co-defendants in the

19  opioid-related actions?

20  A    Yes.  We gained the ability to offer and negotiate with

21  co-defendants in the opioid cases full and mutual releases.

22  This is very important because the opioid claimants have

23  brought suits against the entire supply chain, so our

24  customers and our customers' customers.  And so -- and many

25  of those contracts have indemnity provisions.  And so gaining

```
 1   the ability to negotiate full releases with respect to opioid

 2   claims was very important to the debtors.

 3   Q    Would holders of the opioid claims receive a release

 4   from the debtors and certain other parties?

 5   A    Yes, they do.

 6   Q    Does the OCC now support the plan?

 7   A    Yes, it does.

 8   Q    And at a high level, what are the benefits to the

 9   debtors' estates of this amended opioid settlement?

10   A    It brought peace with a significant case party, you

11   know, an estate fiduciary.  It brought the private opioid

12   claims into support of the plan.  I noted that, you know,

13   under the RSA and then with the MSGE Group joining, we only

14   had the support of the public governmental opioid claimants.

15   This gained the support of the private claims, as well, and

16   becomes a pillar of -- of the case.

17   Q    Do you believe that the amended opioid settlement is

18   essential to the value-maximizing reorganization bod --

19   embodied in the plan?

20   A    I do.

21   Q    Do you believe that the amended opioid settlement is in

22   the best interests of the debtors' estates?

23   A    Yes, I do.

24   Q    And do you believe the settlement with the OCC was in

25   the best interests of the debtors' estates?
```

1   A    Yes, I do.

2   Q    So now let's turn to the settlement with the UCC.  Are

3   you aware that, on September 2nd, 2021, the debtors reached

4   an agreement in principle with the Official Committee of

5   Unsecured Creditors, or the "UCC"?

6   A    Yes, I am.

7   Q    Was the settlement the result of a mediation before

8   Judge Sontchi?

9   A    Yes, it was.

10  Q    Could you describe the general terms of the settlement

11  that was reached?

12  A    Yes --

13           MS. MARKS:  And here --

14  A    -- so --

15           MS. MARKS:  Here, we can switch to Slide 4,

16  please.

17  A    Yes.  Under the UCC settlement, the plan now calls for

18  the formation of a GUC trust to govern the administration of

19  general unsecured claims.  The amount of cash being

20  contributed by the debtors was increased by $35 million to

21  135 million in cash.  And other assets, as shown here on the

22  slide, were contributed, as well.

23  Q    Under the plan, whose claims will this trust satisfy?

24  A    It will satisfy the general unsecured claims.  It will

25  also satisfy any trade claims, where the trade claim holder

1    either did not approve the plan or did not agree to maintain

2    favorable terms with the debtors.

3    Q    As a result of the settlement with the UCC, has the UCC

4    also now agreed to support the plan?

5    A    Yes, it has.

6    Q    And did settling with the UCC and obtaining their

7    consent to the plan reduce risk for the debtors?

8    A    It did.  It avoided the likelihood of extensive

9    litigation with the UCC.  But for the settlement, it's hard

10   to believe that any of the Class 6 classes would have voted

11   in support of the plan, but -- but several did as a result of

12   this settlement.  So this settlement advances our interests

13   in the plan and gains important support from an estate

14   fiduciary.

15   Q    Do you believe that the settlement with the UCC is in

16   the best interests of the debtors' estates?

17   A    I do.

18   Q    Next, let's turn to the settlement with the second lien

19   noteholders.  Are you aware that, in September 2021,

20   Mallinckrodt also reached an agreement in principle with the

21   second lien noteholders?

22   A    Yes, I am aware of that.

23   Q    And what was that settlement related to?

24   A    That settlement resolved several issues with the second

25   lien noteholders around their covenant terms, whether they

1  could be reinstated.  It avoided significant litigation with

2  those holders.

3  Q    Under the second lien notes settlement, what would the

4  holders of the notes receive?

5  A    Under the settlement, the holders of the second lien

6  notes will receive new ten percent second lien notes with a

7  2025 maturity.  And they will have the reasonable and

8  documented out-of-pocket expenses, including, you know,

9  expenses incurred by their advisors, paid for.  Under the --

10  the debtors' business judgment, the settlement is in the best

11  interests of the estate.

12  Q    Would the debtors pay any additional expenses relating

13  to the second lien notes?

14  A    Yeah.  So it's -- it's the expenses of the second lien

15  noteholders that have settled with us, their collateral agent

16  and the -- the notes indenture trustee.

17  Q    And as a result of the settlement with the second lien

18  noteholders, are they voting in favor of the plan?

19  A    Yes, they have.

20  Q    And does that affect the risk of litigation for the

21  debtors?

22  A    It certainly reduced the amount and volume of

23  litigation, which has been very extensive in these cases.

24  Q    Do you believe that this settlement is in the best

25  interests of the debtors' estates?

1  A    Yes, I do.

2  Q    So now I'd like to switch gears and to talk about the

3  plan itself.  Mr. Welch, are you familiar with the debtors'

4  second amended joint plan of reorganization or what I've been

5  referring to as the "plan," for short?

6  A    Yes, I am.

7  Q    Do you remember when the first version of the plan was

8  filed?

9  A    Yeah.  We first filed the plan in April of 2021, and

10  then we filed several versions of it in June of 2021.  And we

11  filed what then has been referred to as the "first amended

12  plan" on September 29th, 2021.  The second amended plan, to

13  which you referred, was -- was filed just a few days ago.

14  Q    And Mr. Welch, you've testified about the various

15  settlements that the debtors have reached, including with

16  both committees, the Government related to certain Acthar

17  claims, other government entities with respect to opioid

18  claims, and settlements with certain noteholders.  Are all of

19  these settlements incorporated in the plan?

20  A    They are.  It's been suggested that the -- the number of

21  plan versions is somehow the debtors being sneaky.  In fact,

22  it's actually the debtors showing that we've made significant

23  progress in these cases to settle with creditors, to resolve

24  objections, and to memorialize those in -- in plan revisions.

25  Q    Let's talk about the treatment of the classes now.

 1          MS. MARKS:  And we can pull up the slides.  Let's

 2   quickly --

 3          THE COURT:  Hold on.

 4          MS. MARKS:  -- show Mr. Welch --

 5          THE COURT:  Mr. Jones, do you have any objection?

 6          MR. JONES:  Yes, Your Honor.  This is Evan Jones

 7   on behalf of Johnson & Johnson, with O'Melveny & Myers.

 8          Your Honor, I've kept quiet until now, but all of

 9   these questions are so open ended that we have no idea what

10   the answer from Mr. Welch is going to be, and the answers are

11   going well beyond even the open-ended questions.  He was just

12   asked when a plan a filed, and we got a whole statement on

13   the subsequent amended, why they were a good idea, so forth.

14   And my worry is, at some point, he's going to start saying

15   things that we'll then want to go back and object to because

16   we haven't had a fair warning what his answer is going to be.

17          THE COURT:  Ms. Marks, do you want to keep the

18   questions a little more narrow in focus, please?

19          And Mr. Welch, can you limit yourself to answering

20   the question that is presented?  You know, I'm sure, if Ms.

21   Marks wants to follow up, she'll -- she will do so.

22          MS. MARKS:  Certainly.

23          THE WITNESS:  Understood, Your Honor.

24          MR. JONES:  Thank you, Your Honor.

25          MS. MARKS:  All right.  So let's talk about the

1   treatment of the classes.  And there's a lot of information

2   on this topic, so we -- we put it into some slides to help

3   Mr. Welch.  If we could pull up and just quickly show him

4   Slides 5 to 7, and then we can go back to Slide 5.

5   BY MS. MARKS:

6   Q    Mr. Welch, including the subclasses on these slides, do

7   you know how many different classes there are?

8   A    There were 33 different classes.

9   Q    Okay.  So let's go through these classes at a high

10  level.

11       Can you describe the treatment of the holders of

12  administrative claims or priority task claims under the plan?

13  And that's in that first row on Slide 5.

14  A    Yes.  Those -- those will be paid in cash or as

15  otherwise consistent with the provisions of Section 1129(a).

16  Q    Moving down a row, can you describe the treatment of

17  other secured claims under the plan?

18  A    Yes.  There's some optionality here for the debtors.

19  Other those claims will be paid in full, in cash, including

20  any applicable interest, or collateral securing those claims,

21  or any other treatment that would render those claims

22  unimpaired under the Code, with the reasonable consent of --

23  of the parties, largely the RSA parties.

24  Q    Can you describe the treatment of the first lien

25  revolving credit facility?

1  A     Yes.  Those will be repaid in full and in cash.

2  Q     Can you describe the treatment of the 2024 and 2025

3  first lien term loan claims?

4  A     Yes.  As consequences our -- of our settlement with the

5  first lien term loan holders, at the debtors' option, either

6  those claims will receive new take-back loans plus repayment

7  in full of any cash into unpaid accrued interest, plus a

8  negotiated term loan exit payment, or those will be repaid in

9  cash.  We'll also cover, of course, the accrued and unpaid

10 interest and the term loan exit payment, but that would be in

11 a refinancing context.

12 Q     And what is the treatment of the second lien notes

13 claims?  I'm sorry.  The first lien notes claims.

14 A     Yeah.  So, as a result of the findings in phase one of

15 the confirmation process, we will be reinstating those

16 allowed first lien notes.

17 Q     And on the next slide, we get to the second lien notes

18 claims.  What is --

19 A     Yes --

20 Q     -- their --

21 A     -- they will --

22 Q     -- treatment?  Go ahead.

23 A     I --

24           THE COURT:  I don't think --

25 A     No.  Could I --

```
 1              THE COURT:  I don't think he heard the question,
 2   Ms. Marks.  Can you repeat the question?
 3              MS. MARKS:  Sure.
 4   BY MS. MARKS:
 5   Q    What is the treatment of the second lien notes claims?
 6   A    They will receive their pro rata share of the second
 7   lien -- new second lien notes.
 8              THE COURT:  Mr. Evans [sic], I see you raised your
 9   hand again.
10         (No verbal response)
11              THE COURT:  No.  Okay.  Go ahead, Ms. Marks.
12   BY MS. MARKS:
13   Q    What about the guaranteed unsecured notes claims?
14   A    As a result of our settlement with the guaranteed
15   unsecured noteholders, they will receive a pro rata share of
16   the $375 million of take-back second lien notes, 100 percent
17   of the new shares in the Reorganized Mallinckrodt, subject to
18   dilution on the account of the new opioid warrants that will
19   be issued and the management incentive plan.
20   Q    Can you describe the treatment of the other general
21   unsecured claims, such as the Acthar claims, the generics
22   price-fixing claims, and the others listed in that large row
23   in the middle?
24   A    Yes.  They will receive a pro rata share of the proceeds
25   that are going into the GUC trust that we reviewed on a
```

1  previous slide, you know, based on allocations governed by

2  the trust procedures, ensuring that those recoveries satisfy

3  the requirements of the Bankruptcy Code.

4  Q    Moving down, can you describe the treatment of trade

5  claims under the plan?

6  A    Sure.  The Class 7 trade creditors either will receive a

7  pro rata share of the trade claim cash pool, if they accept

8  the plan and have agreed to maintain favorable terms with the

9  debtors; or they go into the general unsecured claim

10  distribution, if, either they've rejected the plan, or they

11  haven't agreed to maintain favorable trade terms with us.

12              MS. MARKS:  And we can move to the next slide.

13  Q    Can you describe the treatment of the opioid claimants?

14  A    Yes.  Under the -- the terms of the opioid settlement,

15  these classes will have their respective opioid claims

16  channeled to the applicable opioid creditor trust or rapier

17  accounts [sic], as applicable and -- and be -- those claims

18  will be resolved, you know, following the trust procedures

19  that have been filed.

20  Q    Can you describe the treatment of the no recover opioid

21  claims?

22  A    This is perhaps the most clearly labeled/titled class.

23  They will receive nothing under the plan.

24  Q    And what about the treatment of the Acthar-related

25  claims held by the government entities with whom the debtors

1  settled?

2  A    Yes.  The Class 10 claims will be paid in accordance

3  with the terms of the -- the federal and state Acthar

4  settlement agreement.

5  Q    What is the treatment of the intercompany claims or the

6  intercompany interests under the plan?

7  A    No distribution here.  Those intercompany claims or

8  interests will either be reinstated or canceled and released

9  at the option of the debtors.  There's consultation rights

10  for various parties, including our unsecured noteholders,

11  that are being equitized and the supporting lenders.  But

12  that's solely with respect to the intercompany claims and not

13  intercompany interests and the parties to the RSA.

14  Q    And what is the treatment of subordinated claims and the

15  holders of equity interests under the plan?

16  A    The Class 13 subordinated claims will receive no

17  recovery under the plan.

18       And the Class 14 equity interests, those equity

19  interests will be canceled and extinguished.  There's no

20  recovery made for equity.

21  Q    Okay.  Now let's talk about restructuring transactions

22  that the debtors may enter into upon emergence.

23             MS. MARKS:  And we can turn to Slide 8.

24  Q    On the plan effective date, which transactions will take

25  effect?

1  A     So there are a number of -- of ifs on this slide because

2  it depends on exactly what exit financing ultimately comes

3  together.  But we know some of these elements, so we know

4  that there will be a new term loan facility in an amount of

5  up to $900 million, which is the amount of the existing

6  revolver that needs to be refinanced.  And it will be a

7  larger amount if there is a broader refinancing, so there --

8  the first term -- lien term loans could be larger in amount

9  here if there is a refinancing that could take out the

10 existing term loans, also potentially the first lien notes,

11 and maybe even some of the second lien notes, as well.

12 Q     And the debtors are considering other transactions, as

13 well?

14 A     That's right.  We are also considering entering into a

15 new accounts receivable revolver in an amount of up to $200

16 million.

17       I mentioned previously that, under the first lien term

18 loan settlement, we have the ability to issue a new 1.8-

19 billion-dollar take-back term loan, if we do not go down the

20 refinancing path.

21       We have the -- we will reinstate, under the second lien

22 noteholder settlement, approximately 495 million in 10

23 percent first lien senior secured notes.  That's due --

24 excuse me.  That's not under the settlement; that's under the

25 reinstatement finding.

1       Under the -- the settlement with the second lien

2  noteholders, we will issue approximately 323 million of new

3  second lien notes.  The covenants of those notes will match

4  those of the take-back paper that the guaranteed unsecured

5  notes are -- are receiving.  And then we will issue those 375

6  million of take-back second lien notes.

7       There are some financial payouts under the settlement.

8  So the first opioid payment, the 450 million that I testified

9  earlier to today, will be made.

10      Not on the screen, but nevertheless important, $15

11  million as the initial payment under the federal and state

12  Acthar settlement.

13      And then we will contribute the GUC trust

14  consideration, which includes $135 million in cash.

15  Q    Are you aware that, on August 6th, 2021, the debtors

16  filed a restructuring transactions memorandum as part of the

17  plan supplement?

18  A    Yes, I -- I am aware of that.

19  Q    And what does that memorandum contain?

20  A    The memo outlines potential transactions that the

21  debtors may undertake on or before the date of emergence to

22  restructure.  I think everyone that has seen our org chart

23  understands that it is a significant org chart, and so there

24  are some intercompany transfers and sales that are envisioned

25  that can optimize the value of our structure as we emerge.

1   Q     Are the debtors evaluating whether the restructuring

2   transactions would be in the best interests of the estates

3   and would maximize value?

4   A     Yes, we are.

5   Q     And have the debtors decided whether any of those

6   transactions will be consummated yet?

7   A     No decisions have been taken yet.  Many of them involve

8   very complicated tax analyses.

9   Q     Let's talk about the impact of confirmation on

10  operations.  What impact will confirmation and implementation

11  of the plan have on the funded debt obligations of the

12  debtors?

13  A     As a result of the implementation of the plan, we will

14  de-lever the company by over a billion dollars.

15  Q     And what effect will confirmation and implementation of

16  the plan have on the debtors' operational functions?

17  A     It will remove a significant overhang.  I still respond

18  to customer inquiries on a relatively frequent basis, asking

19  kind of how are things going with the restructuring, similar,

20  you know, conversations with employees.  It removes a

21  significant overhang, gives the parties that we do business

22  with confidence that Mallinckrodt has a go-forward future.

23  Q     Do you believe that the plan is a reasonable compromise

24  of all claims and is the best available alternative for the

25  debtors?

1   A    I do.  Judge Dorsey made a comment earlier in this case

2   about the fact that negotiations necessarily entail

3   compromise and -- and giving up something that is important.

4   And the parties that have negotiated on this plan have made

5   concessions in good faith.

6       And so is it a perfect plan?  I'm sure almost every

7   party wishes that they were getting more.  But it is a value-

8   maximizing plan that allows the debtors to restructure and --

9   and meet significant obligations to the creditor groups.

10  Q    And you mentioned all of the negotiations.  Prior to and

11  during these Chapter 11 cases, did the debtors engage in

12  arm's length and good faith negotiations to develop the plan?

13  A    Yes.  I think, you know, the history of this case shows

14  that we made deals all along the way, both pre-petition with

15  the RSA and then with -- with various case parties.  We've

16  always been open to entertaining offers from parties and to

17  having conversations with them about their -- their claims

18  and positions.

19  Q    Now let's talk about how the plan meets the requirements

20  for plan confirmation, and specifically Section 1129.

21      Do you understand that Section 1122 of the Bankruptcy

22  Code requires that a plan properly classify claims and

23  interests only with similar claims and interests?

24  A    Yes, I'm aware of that requirement.

25  Q    And is it your understanding that the plan complies with

1   this rule?

2   A     Yes, I believe that it does.

3   Q     How many classes, again, are there in the plan?  Remind

4   us of that number.

5   A     Yeah, there are 33 classes.

6   Q     And are the claims and interests basically classified

7   based on the debtors' capital structure?

8   A     Yes.  It's a very logical laying out from secured debt

9   to unsecured debts to equity.

10  Q     And then how are the classes further subdivided?

11  A     They're further subdivided to make it very

12  comprehensible to our creditors, in terms of where do they

13  fit into the plan.  So it's based on the underlying claims,

14  the factual and -- and legal considerations behind them.  The

15  goal was to be very clear and -- and transparent and -- and

16  accessible to anyone who picked up the plan.

17  Q     Do you believe that the private claimants and government

18  claimants should be classified differently?

19  A     I do.  I believe that the private and governmental

20  claims are -- are different factually, that the -- the

21  reasons for different treatment is based on kind of the --

22  the debtors' relationships with those parties.  The

23  Government is often, you know, a regulator of -- of the

24  debtors.  And so it's -- it's, in my mind, very explainable

25  and logical.

1  Q    And do you believe that the Acthar claims should be

2  classified differently from the opioid claims?

3  A    Yes, I do.  I -- I think one of the complexities of this

4  case is, if you think about the two bodies of litigation that

5  brought us in to Chapter 11, one the one hand, you have pills

6  that you can hold in your hand the debtors sold for mere

7  pennies.  On the other hand, you have Acthar, which is sold

8  for over $40,000 a vial.  They're very different underlying

9  business, very different underlying histories and underlying

10  fact patters.  And I think that treating them separately is -

11  - should be clear, based on the -- the way that these cases

12  have -- have dealt with those issues.  They're just very

13  radically different claims.

14  Q    Moving on to the next provision.  Do you understand that

15  the plan must comply with Section 1123 of the Bankruptcy

16  Code, which governs required content for a plan of

17  reorganization?

18  A    Yes, I do.

19  Q    And is it your understanding that the plan complies with

20  this section?

21  A    Yes, it is.

22          THE COURT:  Hold on.  Mr. Evans [sic], when you

23  have an objection, I appreciate you raising your hand and

24  turning on the video.  But go ahead and just say "objection,"

25  just as you would if you were in the courtroom.

1              MR. JONES:  I'm sorry, Your Honor.  Evan Jones on

2    behalf of Johnson & Johnson.

3              Your Honor, again, I've tried to sit silently.

4    But I don't think Mr. Welch has been offered, and certainly

5    hasn't been qualified as an expert on the meaning of

6    provisions of the Bankruptcy Code.  His opinion whether they

7    comply or not simply is not competent.  The Court will make

8    the decision.

9              I've sat here silently while Mr. Welch went

10   through the terms of the plan, which speaks for itself.  But

11   whether they comply with the Bankruptcy Code is not something

12   he's competent to opine on.

13             MS. MARKS:  Your Honor --

14             THE COURT:  Ms. Marks?

15             MS. MARKS:  -- we're not --

16             THE COURT:  Go ahead.

17             MS. MARKS:  Yeah.  We're not offering Mr. Welch as

18   an expert.  Again, we're asking for his understanding as the

19   debtors' Chief Confirmation Officer.  The debtors' good faith

20   has directly been challenged, and so we think it's important

21   to show why the company believes it has proposed this plan in

22   good faith.

23             THE COURT:  All right.  I'll overrule it.  He can

24   testify as to why the company believes it complies with the

25   requirements of the Code.  But ultimately, Mr. Jones, you are

1   correct, I will be the one who makes that determination.

2          MR. JONES:  Thank you, Your Honor.

3   BY MS. MARKS:

4   Q    Mr. Welch, do you understand that the plan must comply

5   with Section 1129(a)(2) of the Code, which generally requires

6   the plan to comply with the disclosure and solicitation

7   requirements of Section 1125?

8   A    Yes, I'm aware of that.

9   Q    And is it your understanding, the company's

10  understanding, that the plan complies with this section?

11  A    Yes, it is.

12  Q    So, next, I'll turn to Bankruptcy Code 1129 in more

13  detail; specifically, Subsection (a)(3), which requires that

14  the plan be proposed in good faith and not by any means

15  forbidden by law.  Are you familiar with this section?

16  A    Yes, I am.

17  Q    And is it your understanding that the plan complies with

18  this provision?

19  A    Yes, it is.

20  Q    Why did the debtors propose the plan?

21  A    As I've testified today, we proposed the plan to resolve

22  enterprise-threatening litigation on a variety of fronts, to

23  restructure the claims that have been brought against the

24  company, and the restructure our balance sheet, in terms of

25  our -- our debt.

1   Q    And earlier in your testimony, you discussed the

2   extensive negotiations with different creditor groups and

3   committees to reach the RSA?

4   A    That's correct.

5   Q    And you also testified that, after the filing of the

6   Chapter 11, the company continued to negotiate with creditors

7   and committees?

8   A    I would testify that it has been near continuous

9   negotiations with various parties-in-interest since the Fall

10  of 2019.  We have not stopped negotiating.  I think, even

11  behind the scenes, we are still working to resolve

12  objections, presumably, as I speak.  So we have been, in good

13  faith, trying to work positively with all case parties to

14  achieve a plan that is fair and equitable.

15  Q    Why did the company engage in all of these negotiations?

16  A    We've always believed that consensus is better than

17  litigation, both in terms of cost and speed.  And so we

18  believe that it's in the best interests of the debtors to

19  entertain settlement offers, to engage constructively around

20  the needs and desires of the various creditor groups.

21  Q    And did the management team seek the board's guidance in

22  connection with those negotiations?

23  A    Yes.  Our board has been very involved.  We have updated

24  them on a regular basis.  They've approved all significant

25  settlements.  So they have been a party-in-interest here all

1   along.

2   Q    Switching gears.  Can you describe the effect that the

3   opioid operating injunction in the plan would have on the

4   debtors' opioid business?

5   A    I think that the opioid operating injunction is

6   incredibly important to the debtors.  You know, I -- earlier

7   in the case, you asked me about, you know, the meritorious

8   defenses that we believe that we have on the opioid

9   litigation.  The public has a right to -- to believe that

10  Mallinckrodt is being a responsible opioid manufacturer.  And

11  the monitoring agreement, which is a key provision of the

12  operating injunction, will provide the public confidence that

13  there is an independent analysis being done of the debtors'

14  business -- in our case, it's Gil Kerlikowske, who was the

15  U.S. Drug Czar under President Obama -- that the monitor is

16  exercising appropriate oversight, to ensure that Mallinckrodt

17  is in legal compliance with its obligations as -- as

18  negotiated by the various state attorneys general that helped

19  bring about the operating injunction.

20       It will give confidence to future creditors of the

21  business, those who would invest in Mallinckrodt as

22  shareholders or lend money, that the company is being a

23  responsible actor in a very litigious area, due to the public

24  health crisis associated with opioids.  It's a very important

25  part of the settlement, from the debtors' perspective.

1   Q     Does the plan also contain a condition precedent related

2   to the Acthar business?

3   A     Yes, it does.

4   Q     And tell me a little more about that.

5   A     Yes.  I think the -- similar to the opioid injunction

6   giving certainty, there's been a lot of allegations around

7   Mallinckrodt's conduct with respect to Acthar.  And so we had

8   a plan condition in -- that would seek to have the legality -

9   -

10           MR. HAVILAND:  Your Honor, I just -- I -- Your

11  Honor, I want to object only because I've been told

12  repeatedly by debtors' counsel that this provision would not

13  be put before the Court in plan confirmation.  The current

14  amended plan makes some changes, but still seeks findings,

15  and I was told again, over the weekend, Your Honor, that this

16  would not be a subject of plan confirmation.  This witness

17  has been asked directly about the provision to which we

18  object.

19           MS. MARKS:  Your Honor, this -- the condition

20  precedent is in the plan.  I am solely asking Mr. Welch if it

21  is in there and what it is, that's it.

22           MR. HAVILAND:  So --

23           MS. MARKS:  We're not --

24           MR. HAVILAND:  -- we stipulate --

25           MS. MARKS:  -- (indiscernible)

```
 1              MR. HAVILAND:  -- to that.
 2              MS. MARKS:  We're not seeking factual findings,
 3   we're not making arguments here.  This -- I'm just asking him
 4   what it is.
 5              THE COURT:  Well, the plan speaks --
 6              MS. MARKS:  It's --
 7              MR. HAVILAND:  Your Honor --
 8              THE COURT:  The plan speaks for itself, I can read
 9   the plan to understand it.
10              MS. MARKS:  Okay.
11   BY MS. MARKS:
12   Q    Mr. Welch, are you aware -- moving on.  Are you aware
13   that the Ad Hoc Acthar Group has complained that the debtors
14   have refused to negotiate a settlement with them, unlike with
15   the opioid claimants?
16   A    Yes, I'm aware that they have made that assertion.
17   Q    And are you aware that they've argued that, as a result,
18   the plan was not proposed in good faith?
19   A    I am aware that they have made that objection, yes.
20   Q    Have there been any settlement negotiations with the Ad
21   Hoc Acthar Group?
22              MR. HAVILAND:  Your Honor --
23   A    Yes, there --
24              MR. HAVILAND:  -- I have to object.  Now the
25   debtors are putting in issue conversations that may have
```

1   happened -- I say "may have happened" -- with Judge Sontchi,

2   after having taken the position that there's a mediation

3   privilege.

4               We have pending before the Court briefing with the

5   UCC about that very subject matter and a claim of common

6   interest privilege.  We have been denied any communications

7   between the debtors and the UCC.  But now the debtors want to

8   put in issue what happened before Judge Sontchi, so we

9   object.

10              THE COURT:  Well, I --

11              MS. MARKS:  Your Honor --

12              THE COURT:  I don't --

13              MS. MARKS:  -- I --

14              THE COURT:  -- think they're putting it at issue.

15   And he can answer the question whether there were -- have

16   been settlement discussions or not, yes or no, and that's the

17   end of it.

18              THE WITNESS:  Yes, there have been.

19   BY MS. MARKS:

20   Q    Did they result in a settlement?

21   A    No, they did not.

22   Q    Okay.  That's all we'll say on that.

23        To circle back, do you believe that, under Section

24   1129(a)(3), the plan is being proposed in good faith and not

25   by any means forbidden by law?

```
 1   A     Yes, I do.

 2   Q     Now let's turn to Section 1124(a)(4) of the Bankruptcy

 3   Code.  Do you understand that this section requires that

 4   certain fees and expenses paid by the debtors under the plan

 5   must be approved by the Court as reasonable?

 6   A     Yes, I do.

 7   Q     And is it your understanding that the debtors are

 8   complying with this provision?

 9   A     Yes, it is my understanding.

10   Q     Does the plan provide that professional fees require

11   prior court approval and that they satisfy reasonableness

12   requirements?

13   A     Yes, it does.

14   Q     Does the plan require all estate professionals to file

15   all final requests for payments of professional fees no later

16   than 30 days after the effective date?

17   A     Yes, it does.

18   Q     What is the reason for that thirty-day window?

19   A     It gives parties time to object to fees.  There's a fee

20   examiner in this case, who has looked at a lot of fee

21   applications.  I mean, and it also gives the debtor certainty

22   that all of the various professionals that have worked on

23   these cases have submitted their amounts that they believe

24   are due and owing.

25   Q     Are you familiar with the debtors' motion, filed in
```

1  March 2021, seeking authority to make an exit loan payment?

2  A    Yes, I am.

3  Q    And is it your understanding that the Court entered an

4  order approving that motion?

5  A    Yes, it did.

6  Q    Are the debtors asking the Court to approve the

7  noteholder consent fee and any fees associated with the exit

8  financing documents?

9  A    Yes, we are.  We believe that those facilitate the best

10  interests of the debtors' estates, that it's based on making

11  contributions to the debtors' plan.  In the debtors' business

12  judgment, that those amounts are reasonable.

13  Q    Are the debtors also asking the Court to approve the

14  reasonable documented fees of the guaranteed unsecured notes'

15  indenture trustee?

16  A    Yes, the --

17  Q    Has this trustee provided contribution to the debtors'

18  Chapter 11 cases?

19  A    Yes.  The trustee worked with us on the RSA and -- and

20  subsequently in plan negotiations and will be, you know, the

21  distributing agent for the unsecured noteholders, and we

22  believe that -- that expense reimbursement is appropriate.

23  Q    Are the debtors asking the Court to approve the

24  reasonable documented fees of the four and three-quarter

25  notes, senior notes' indenture trustee?

1  A    Yes.

2  Q    And has this trustee provided contribution to the

3  Chapter 11 cases?

4  A    Yes.  This trustee contributed to the UCC settlement and

5  will be responsible for distribution to the four and three-

6  quarter noteholders.  We believe that reimbursement for

7  reasonable documented fees is appropriate in -- in the

8  debtors' best business judgment.

9  Q    Are the debtors asking the Court to approve the

10 reasonable documented fees of the legacy unsecured notes'

11 indenture trustee?

12 A    Yes, we are.

13 Q    And has that trustee provided contribution to the

14 Chapter 11 cases?

15 A    Yes.  We believe that that trustee also made valuable

16 contributions to the UCC settlement process and will be

17 responsible for distribution actions with respect to the

18 legacy noteholders.  And so we believe that reimbursement for

19 the reasonable fees and documented expenses is appropriate.

20 Q    And do you think it's in the debtors' best interests to

21 pay all of these fees?

22 A    Yes, we do.

23 Q    And why is that?

24 A    The -- the settlements that have been negotiated are --

25 were hard fought, they were also expensive.  A lot of time

1  and energy was -- was devoted to them to bring about a value-

2  maximizing plan.  And so we believe that parties that have

3  undertaken, you know, efforts that have contributed to that

4  process should be paid their reasonable fees.

5  Q    Moving on, do you understand that Section 1129(a)(5) of

6  the Code requires, among other things, that the plan

7  proponent disclose the identities and affiliations of the

8  proposed officers and directors of the reorganized debtor?

9  A    Yes, I do.

10 Q    And is it your understanding that the debtors have

11 fulfilled this requirement?

12 A    Yes, it is.

13 Q    Moving on.  Do you understand that Section 1129(a)(8) of

14 the Code requires that each class of claims or interests

15 either accept the plan or be unimpaired by the plan, subject

16 to certain exceptions?

17 A    Yes, I do.

18        MS. MARKS:  Okay.  I'd like to bring up Slides 9

19 and 10.  And these are a demonstrative showing the different

20 classes of claims, how they voted on the plan, and whether

21 they will be impaired or not.

22     (Pause in proceedings)

23 BY MS. MARKS:

24 Q    Mr. Welch, do these slides accurately represent the

25 class treatment, to your understanding?

1   A    Yes, they do.

2   Q    And despite the plan not satisfying 1129(a)(8) on

3   account of the rejecting classes, is Section 1129(a)(10)

4   satisfied, in your understanding?

5   A    Yes.  We certainly have more than one impaired class

6   voting to accept the plan, and so I believe that the cram-

7   down provisions will be satisfied.

8   Q    Okay.  Let's move on to the rest of 1129(a).

9         MS. MARKS:  And we can pull this down.

10  Q    Do you understand that the plan must comply with

11  Sections 1129(a)(9), (12), and (13) of the Code?

12  A    Yes, I do.

13  Q    And I'm not going to go into detail.  But is it your

14  understanding that the plan satisfies those requirements?

15  A    Yes, it is my understanding that it does.

16  Q    Do you understand that Section 1129(d) of the Code

17  prohibits the Court from confirming a plan if the principal

18  purpose of the plan is to avoid taxes?

19  A    Yes, I do.

20  Q    And was this plan made with the primary purpose to avoid

21  taxes?

22  A    No, it was not.

23  Q    Has the Government or any entity requested that the

24  Court decline to confirm the plan on the grounds that the

25  principal purpose was to avoid taxes?

1  A     No such objection has been made.

2  Q     Okay.  At this point, I'd like to turn the release,

3  exculpation, and injunction provisions of the plan.

4       Do you understand that the plan includes different

5  releases, including a release by the debtors, a release by

6  third parties, a release by opioid claimants, and a release

7  of opioid claimants?

8  A     Yes, I do.

9  Q     So we'll go into each release specifically.  But

10 generally speaking, why do you believe the releases should be

11 approved?

12 A     The releases are integral to this plan.  But for the

13 provision of these releases, the underlying deals that are

14 embodied in the plan would not have been done.  They were

15 negotiated over an extended period of time by very competent

16 parties.  They are done at arm's length.  They protect the

17 interests of the reorganized debtors going forward and give

18 the -- the parties and the company the fresh start that it

19 has been looking for in these Chapter 11 cases.

20 Q     Okay.  Let's talk about the release by the debtors

21 first, and I'll call this the "debtor release."

22      Can you explain what claims the debtor release

23 releases?

24 A     The debtors' release releases claims that the debtors

25 might have against the released parties that are enumerated.

1  Q    Okay.  And does that include the officers, directors,
2  advisors, and key cast constituents, including the
3  committees?
4  A    Yes.  I believe there are 17 different kind of
5  categories of released parties.
6  Q    Okay.  We'll get to those in a minute.
7       Are there any exclusions from the debtor release?
8  A    Yes.  The debtors' release expressly excludes any claims
9  of actual fraud, gross negligence, or wilful misconduct.
10 Q    Did many of the parties supporting the plan condition
11 their acceptance of the plan on the grant of the debtor
12 release?
13 A    Yes.  It was always part of the negotiated deal.
14 Q    Okay.  Do you know who?
15 A    The -- the OCC, the Ad Hoc Governmental Opioid
16 Claimants, you know, the RSA parties, you know, basically all
17 the parties that are listed as released parties.  Along the
18 way, you know, the expectation was that these releases would
19 be made.  They've been narrowly tailored to -- to fit the --
20 the facts of this case.
21 Q    And what steps did the debtors take to ensure that the
22 debtor release was appropriate?
23 A    The debtors undertook two independent investigations,
24 conducted by independent directors who had competent advice
25 and counsel.  So there was an investigation conducted by the

1  debtors' specialty generics directors and -- one of whom will

2  testify later in this case -- as to whether there were any

3  valid claims with respect to the specialty generics entities.

4  And then there was a second investigation, again, conducted

5  by an independent director of Mallinckrodt PLC, who will

6  testify in this case, as to whether there were any valid

7  claims that all the other debtors could bring against

8  released parties.

9  Q    Okay.  So I know that we'll be hearing from those two

10 independent directors in a bit.

11     But what was the result of their investigations?

12 A    Yes.  I attended board meetings at which the results of

13 those investigations were discussed.  And it's my

14 understanding, the debtors' understanding that there are no

15 valid claims that could potentially be brought where the

16 likelihood of recovery would -- would warrant litigation.

17 Q    Do you believe entering the debtor release was a sound

18 exercise of the debtors' business judgment?

19 A    Yes, I do.

20 Q    And why is that?

21 A    These releases are not atypical in the bankruptcy

22 context.  The scope of the -- these releases is similar to

23 others that have been approved, so we're not asking for

24 anything extraordinary here.  As I just testified to, they're

25 really central to the settlements that we achieved.  They're

1   a core aspect of this case, in terms of the debtors achieving

2   their objectives for the restructuring.

3   Q    Let's talk about who the released parties are, some of

4   whom you referred to earlier, and you mentioned there are a

5   lot of them.

6            MS. MARKS:  So if we could pull up Slide 11,

7   please.

8   BY MS. MARKS:

9   Q    In your understanding, are these all of the released

10  parties under the debtor release?

11  A    Yes, I believe this list is an -- an accurate summary of

12  the released parties, as set forth in the plan.

13  Q    In your understanding, did all of these parties

14  contribute to the restructuring?

15  A    Yes, these parties made significant contributions to our

16  restructuring.

17  Q    And I'll ask you about the directors and officers

18  separately.

19       But looking at the other entities and parties on this

20  list, they each contributed to the restructuring?

21  A    Many of them made meaningful concessions with respect to

22  their claims and interests.  Some agreed to have their claims

23  channeled to trusts.  All of them engaged in extensive

24  negotiations with the debtors.  So they -- they all made

25  meaningful contributions.  In my estimation, they did that on

 1  -- on a good faith basis with the debtors.

 2  Q    And to focus on the directors and officers.  What did

 3  the directors and officers generally contribute to the

 4  restructuring?

 5  A    The D&Os have contributed significant time and energy to

 6  these Chapter 11 cases, to underlying negotiations and

 7  settlements, to the oversight of the debtors' businesses as a

 8  debtor-in-possession, to ensure that sound strategies are

 9  devised for the post-reorganized -- Reorganized

10  Mallinckrodt's existence, so that we can meet our financial

11  requirements under the plan under the various settlement

12  agreements and fund those obligations, so significant effort

13  and energy in these cases.

14  Q    Do you believe that the debtor release provides

15  significant value to the debtors' estates?

16  A    Yes, I do.

17  Q    Let's talk about the non-opioid third-party release

18  next.

19          MS. MARKS:  And for this, we can pull up Slide 12.

20  BY MS. MARKS:

21  Q    Do you know who are the third parties who are providing

22  the non-opioid third-party release?

23  A    Yeah, I think this slide summarizes who those releasing

24  parties under the third-party release is.

25  Q    Yeah.  I think this slide summarizes who those

1    releasing parties under the third-party release is.  Again,

2    the released parties are the same as under the debtor's

3    release here.  So it's the same groups that were on the

4    previous slide, but at a high level the releasing parties are

5    claimants that were deemed to accept the plan, who voted to

6    accept the plan, who abstained from voting, but did not opt-

7    out of the releases, or they are claimants that rejected the

8    plan, but did not opt-out of the release, or they are

9    claimants that were deemed to reject the plan but who did not

10   opt-out of the release.

11   Q     Are there any exclusions from the release by these

12   third parties?

13   A     This release expressly excludes opioid claimants who

14   are dealt with under a separate release.  The release also

15   excludes actual fraud, gross negligence, willful misconduct,

16   you know, bad acts where a release would be inappropriate.

17   Q     Have the debtors provided claimants, other than those

18   who are unimpaired under the plan, with the opportunity to

19   opt-out of this third-party release?

20   A     Yes, through Prime Clerk, who is our noticing agent.

21   We sent opt-out forms with notice describing the types of

22   claims that would be released under the third-party release

23   to all of the parties that had an opt-out opportunity.

24   Q     So do you believe that the releasing parties have all

25   consented to the third-party release?

1  A     Yes, either by accepting the plan, which was the case

2  for many of them, or by not opting out of the release.

3  Q     Do you believe that the releases by the third parties

4  puts the non-debtor releasing parties on notice?

5  A     Yes, I do.  I believe we gave adequate notice.

6  Q     And was this release a part of the negotiations with

7  the supporting parties?

8  A     Yes, it was. It was an integral part of the plan.

9  Q     Do you believe that they would have agreed to support

10 the plan without this release?

11 A     I don't believe they would have supported the plan

12 without a third-party release.

13 Q     Do you think that the third-party release is

14 appropriate and beneficial?

15 A     Yes, I do.

16 Q     Is it your opinion that it should be approved?

17 A     Yes.

18 Q     Now let's talk about the release by the opioid

19 claimants.  Can you explain how that release operates?

20 A     Yes.  This release was part of the opioid settlement

21 and is envisioned by the terms of the operating injunction.

22 It's a release by all those who have opioid claims against

23 the protected parties which we can talk about in a bit, but

24 this was a central part of how the debtors would achieve,

25 along with the channeling injunction, a fresh start and total

1  -- a comprehensive dealing with the opioid liability.

2  Q    Let's pull-up Slide 13. Is it your understanding that

3  these are the protected parties under this release?

4  A    Yes.  I believe that this is a fair representation of

5  the projected parties under the plan.

6  Q    Does the release -- does this release by the opioid

7  claimants include any exclusions?

8  A    Yes.  Some of the other releases that we talked about

9  it excludes actual fraud, gross negligence, willful

10 misconduct, but it also excludes criminal liability.

11 Q    And are you aware that the opioid claimants do not have

12 the opportunity to opt-out of this release?

13 A    Yes.  It's my understanding that this is a non-

14 consensual release.

15 Q    Do you believe that the release by opioid claimants is

16 fair and necessary to the restructuring?

17 A    Yes, I do.

18 Q    So let's take those two components, fair and necessary,

19 separately.

20      Why do you believe that the release by the opioid

21 claimants is fair?

22 A    For three reasons:

23      First, we've seen in the voting results that the

24 overwhelming number of the opioid classes voting in very high

25 percentages to support the plan.  So opioid claimants largely

1  have expressed their support for the plan.

2      Second, the opioid claimants are receiving incredibly

3  valuable consideration from the debtors; the $1.725 billion

4  of cash, the warrants and the reorganized company, and the

5  ability to bring forward their claims and have them

6  administered under the trust proceeds.  I think that there is

7  consideration there.

8      Then there is also a mutual release that is provided by

9  the protected parties to, and on behalf of, and to the

10  benefit of the opioid claimants.  So there is a reciprocal

11  release that is being received.

12  Q    Now let's look at the necessary component.  Why do you

13  believe that the release by the opioid claimants is necessary

14  to the restructuring?

15  A    In the absence of the release it is very conceivable

16  that there would be, yet, another race to the courthouse to

17  file lawsuits against other parties to, kind of, have a

18  second bite at the apple, so to speak, litigation against the

19  directors, current -- the debtors' current and former

20  officers and directors, for example, that that could be a

21  pathway to suits.  The reorganized debtors would be drawn

22  back into it through indemnification, potential contribution

23  claims.

24      So we would have failed to achieve the true fresh start

25  that we were seeking at the beginning of these cases if the

1  opioid claimants are not curtailed as to the scope of claims

2  that they could bring where the reorganized debtors have an

3  ongoing interest.

4  Q    Let's talk about the potential post-effective date

5  litigation against the protected parties.  Is that litigation

6  purely hypothetical or do you have a reason to believe that

7  it would be commenced?

8  A    There is every reason to believe that it would be

9  commenced.  We actually have, as our confirmation brief

10  shows, you know, certain cases that have already been

11  brought.  To mention just one, the case against Mark Trudeau,

12  our CEO and president of the business, who was sued by the

13  state of Rhode Island for acts with respect to the opioid

14  business that are largely identical to the states sued

15  against the debtor entities.

16  Q    Are you also aware that there is a release of opioid

17  claimants?

18  A    Yes, I am.

19  Q    Who is giving the release of opioid claimants?

20  A    These are the protected parties releasing the opioid

21  claimants and their advisors.

22  Q    These are -- are these the debtors to the holders of

23  opioid claims?

24  A    That is correct.

25  Q    And are there exclusions for this release?

1  A     Yes. Its actual fraud, gross negligence, willful

2  misconduct.  Those are excluded causes of action.

3  Q     Are you aware of any valid claims or causes of action

4  being released under this release?

5  A     No, I am not.

6  Q     Which parties were part of the negotiations around all

7  four of these releases?

8  A     Certainly the RSA parties were.  The key case parties,

9  the committees.  As I said, these releases are integral to

10 the plan and so the very active parties in this case that

11 represent many of the key creditor interests were active in

12 the negotiation and the tailoring of these releases.

13 Q     Were the parties negotiating these releases represented

14 by sophisticated counsel and professionals?

15 A     They were.  It's a whose, whose list of global law

16 firms that represent these interests.

17 Q     Were these releases a condition too many of the

18 settlements set forth in the plan?

19 A     Yes, they were.

20 Q     Were they integral -- an integral part of the plan and

21 settlements?

22 A     They were.

23 Q     Is it your belief that these four releases are in the

24 best interest of the debtors' estates?

25 A     Yes, it is.

1    Q      Are you aware that the plan also provides for the

2    exculpation of certain parties for the claims or causes of

3    action arising on or after the petition date, but prior to

4    the effective date?

5    A      Yes, I am.

6    Q      If we could pull-up Slide 14, please.  Is it your

7    understanding that these are the exculpated parties under

8    this provision in the plan?

9    A      Yes.  This slide sets forth a reasonable description of

10   the exculpated parties under the plan.

11   Q      And does the exculpation clause contain any exclusion?

12   A      Yes.  It similarly contains exclusion for actual fraud,

13   gross misconduct -- gross negligence and willful misconduct.

14   Q      Do you believe that the exculpation provision also is

15   an integral part of the plan?

16   A      Yes.  It certainly was envisioned by the parties

17   negotiating the plan and an integral part.

18   Q      Mr. Welch, thank you for your time.  We are almost near

19   the end.  I just want to ask you a final few questions.

20          Is it your view that the releases, injunctions, the

21   exculpation clause I just asked you about are fair,

22   appropriate and reasonable?

23   A      Yes, it is.

24   Q      And is the plan being proposed by the debtors in good

25   faith?

1  A      Yes, it is.

2  Q      And is it your view that the plan has been structured

3  to maximize the returns to claimants and to effectively

4  reorganize the debtors?

5  A      It has.

6              MS. MARKS:  Thank you.  I have no further

7  questions, Your Honor.

8              THE COURT:  Thank you, Ms. Marks.

9              If you intend to cross Mr. Welch please raise your

10  hand and turn on your camera.  So it looks like we have

11  three, four, four takers.

12              Let's take a break.  Does anyone have a preference

13  on the order in which I take the cross examinations?

14              MS. MARKS:  Your Honor, we had asked the objecting

15  parties to negotiate amongst themselves.  They can correct me

16  if I'm wrong, but I believe that they agreed the U.S. Trustee

17  would go first.

18              THE COURT:  Okay.

19              MR. HAVILAND:  Your Honor, Don Haviland for the ad

20  hoc Acthar group.

21              We didn't have a chance to talk because we didn't

22  know of all those who objected who wanted to speak, but I

23  certainly happily defer to Mr. Schepacarter to lead us off.

24              THE COURT:  All right.  Then who wants to -- who

25  is going second, third?  Let me just have the order so I know

1   who to call on when the time comes.

2           MR. HAVILAND:  I have substantial cross, Judge. So

3   it's hard to gage.  I have got a couple hours, but we did not

4   speak between Mr. McCallum, and Mr. May, and myself.

5           THE COURT:  All right.  Mr. Haviland, you will go

6   second.  Then I will call on Mr. May and Mr. McCallum.

7           MR. HAVILAND:  Thank you.

8           THE COURT:  Let's take a short break and then we

9   will come back and start with the cross.  Let's recess until

10  2:25.

11          MS. MARKS:  Your Honor, before we break the

12  demonstrative slides we used they really just repeat facts.

13  So I would ask to move them into the record just so that the

14  court has them handy and can consider them.

15          THE COURT:  Well is there any objection?

16          MR. HAVILAND:  Well they weren't shared with

17  counsel, at least they weren't shared with us, Judge. They

18  went by so quickly I can't tell you whether they're accurate,

19  and complete, and all that. I would ask that we have the

20  chance to do that before they be admitted.

21          THE COURT:  All right, let's do that.

22          MS. MARKS:  Your Honor, that's fine.

23          THE COURT:  Mr. Edelman, I see you didn't turn on

24  your camera, but you have your hand up.  Do you plan on

25  cross-examining as well?

1          MR. MAY:  Your Honor?

2          THE COURT:  Yes.

3          MR. MAY:  This is Laurence May.  Your Honor, with

4    respect to the cross examination order Mr. Haviland has no

5    objection.  I think the U.S. Trustee examination would rotate

6    around the releases and that is what our examination will be

7    involved in as well.  We don't think our examination will

8    take more than three quarters of an hour to an hour.  So it

9    may make sense for us to follow right after the U.S. Trustee.

10          MR. HAVILAND:  Your Honor, I have no objection to

11    that. I do know Mr. Edelman reached out to me yesterday and I

12    believe spoke to debtor's counsel. I don't know where he is,

13    but he did ask to go early in the order as well.  I know he

14    is in Canada, but I have not spoken to him.

15          THE COURT:  Mr. Edelman, are you there. I saw your

16    camera on there or your hand raised there for a second, but

17    now I don't see you.  We must have lost him.  If he comes

18    back on we will deal with it at that point.  So we're going

19    to do the U.S. Trustee, Mr. May, then Mr. Haviland, then Mr.

20    McCallum.

21          MS. MARKS:  Your Honor, I believe Mr. Edelman

22    wanted to go last.  Is he on your list?

23          THE COURT:  I don't have him at all, no.

24          MS. MARKS:  So Mr. Edelman is a pro se objecting

25    party.  He had emailed with me separately.  So just to assist

1   him since, I guess, he's not on today he had indicated a

2   preference to go last if that is okay with the court.

3              THE COURT:  That's fine.  Hopefully he can -- I

4   know he was on for a moment.  I saw his name pop-up on the

5   screen, but now he's not there.  So hopefully he can get

6   logged back in.

7              All right.  We're now at almost 12:15.  Let's

8   recess until 12:30 and we will come back on.

9              Mr. Welch, again, don't speak to anybody during

10  the break.

11             THE WITNESS:  Understood.

12        (Recess taken at 12:15 p.m.)

13        (Proceedings resumed at 2:30 p.m.)

14             THE COURT:  All right. We're back on the record.

15  Let me ask if Mr. Edelman is available first.  Mr. Edelman,

16  are you there?

17        (No verbal response)

18             THE COURT:  Still not there.

19             MR. EDELMAN:  Hello?

20             THE COURT:  Yes, go ahead, Mr. Edelman.

21             MR. EDELMAN:  Yes, I am here.  I would like to

22  also ask questions of Mr. Welch as the last person, please.

23             THE COURT:  Mr. Edelman, I am having a very

24  difficult time hearing you.  If you want to question Mr.

25  Welch I'm going to have to ask you to find a better way to be

1  able to communicate with the court because it's not going to

2  work the way you are sounding right now.  Are you on a cell

3  phone?

4           MR. EDELMAN:  Yes, I am.

5           THE COURT:  Do you have a land line available?

6           MR. EDELMAN:  I do not, but I could

7  (indiscernible) get one.

8           THE COURT:  I am just really having a hard time

9  hearing you, Mr. Edelman, and I can't let you cross-examine

10  the witness unless I can understand the questions that you

11  are asking.  You are going to have to try to find some other

12  way to log-in so that we will be able to hear you.

13           In the meantime I've got two other people now on

14  my screen who weren't before the break.  Mr. Bentley?

15      (No verbal response)

16           THE COURT:  You're muted, Mr. Bentley.

17      (No verbal response)

18           THE COURT:  You're still muted.

19           MR. HURLEY:  Your Honor, its Mitch Hurley on

20  behalf of the opioid creditors committee.  It looks like Mr.

21  Bentley is having an issue with his phone.  Perhaps could I

22  briefly address the court?

23           THE COURT:  Go ahead.

24           MR. HURLEY:  It is possible, Your Honor, after the

25  plan objectors conduct their cross examinations of Mr. Welch

1   that the OCC may have some questions of its own. It also may

2   make sense, in that event, for the OCC to hold its questions

3   until after any redirect by the debtors as we suspect it's

4   possible that their redirect may obviate the need for any

5   examination by the OCC, but we obviously wanted to raise that

6   with Your Honor and make sure that we know what the court's

7   preference is in that regard.

8                 THE COURT:  Well --

9          (Inaudible - someone speaking)

10                THE COURT:  Who is speaking?

11                MR. BENTLEY:  Your Honor, this is Philip Bentley.

12  I'm sorry, can you hear me now?

13  Yes.

14                MR. BENTLEY:  I don't mean to interrupt, Your

15  Honor, but I wanted to make a -- I was raising my hand to

16  make a point similar to Mr. Hurley's.  Philip Bentley of

17  Kramer Levin for the governmental plaintiffs ad hoc

18  committee.

19                We may have questions based on some of the cross

20  that the other parties are doing.  It's really -- our

21  questions, we expect, will really be in the nature of

22  redirect and we have discussed with the debtors.  We think

23  that if Your Honor is amenable it might make sense for us to

24  hold our questions till after the debtors have done their

25  redirect, and then if Your Honor would then let us fill-in to

1    the extent it is necessary at that point.

2            We wanted to ask what Your Honor's preference is

3    in that regard.

4            THE COURT:  Mr. Haviland, I see you have your hand

5    up.  Go ahead.

6            MR. HAVILAND:  Well, Your Honor, we have been in

7    front of you for now 14 months and we know your preference

8    that redirect is redirect and that's it. I'm hearing now from

9    two interest groups who are aligned with the debtors if they

10   had questions they would be in the nature of direct in terms

11   of their interest.  We would want to cross-examine on a

12   fulsome record of direct examination, not have redirect going

13   to cross examination because then we would have to ask can we

14   have the opportunity and now you're at round four. I know

15   Your Honor's preference has never been to allow that.

16           THE COURT:  Well --

17           MR. BENTLEY:  Your Honor, our questions would not

18   be in the nature of direct.  They would be solely limited to

19   responding to issues that may come up in the course of other

20   parties cross.

21           THE COURT:  -- Mr. Haviland, did you identify Mr.

22   Welch as a witness on your witness list?

23           MR. HAVILAND:  Yes we did, Your Honor.

24           THE COURT:  All right.  So I am going to allow it

25   then.  It's going to be -- I will allow what will be in the

1   nature of a redirect from the two constituencies who have

2   identified, but I will give you the opportunity, Mr.

3   Haviland, to come back again based on their redirect

4   questions.

5           MR. HAVILAND:  Hopefully that is not necessary,

6   Your Honor.  Thank you.

7           THE COURT:  All right.  With that, Mr.

8   Schepacarter, you may proceed.

9           MR. SCHEPACARTER:  Thank you, Your Honor.  Can you

10  hear me clearly?

11          THE COURT:  Yes.  Thank you.

12          MR. SCHEPACARTER:  Good.  Thank you.

13                      CROSS EXAMINATION

14  BY MR. SCHEPACARTER:

15  Q    Good afternoon, Mr. Welch.  My name is Richard

16  Schepacarter with the United States Trustee.  I just want to

17  ask you a few questions based on some of your testimony.

18          With respect to the plan and disclosure statement you

19  executed or signed both of those documents, correct?

20  A    I did, yes.

21  Q    You read and reviewed both the plan and disclosure

22  statement before you signed them, correct?

23  A    I did.

24  Q    And before you signed them the plan and disclosure

25  statement was reviewed by the debtor's board of directors and

1   they authorized the execution, your execution, your signing

2   of the plan and disclosure statement, correct?

3   A     I don't recall whether in the Government's documents

4   that my name was expressly stated as the signatory, but

5   certainly they were aware of the content of the plan and

6   disclosure statements when I signed it.

7   Q     And I am not sure if you have copies of them with you,

8   we may refer to portions of it and you may want to refresh

9   your recollection.  Do you have copies of the plan and

10  disclosure statements either on your computer or --

11  A     I have a laptop that has a lot of things on it, whether

12  it has a plan or disclosure statement I will need my counsel

13  to point me to the appropriate file and reference number.

14  Q     You indicated, you testified, and I think they put up

15  some slides, Slides 11 and 12, regarding the third-party

16  releases that are going to be granted under Article 8(c) of

17  the plan, correct?

18  A     Yes.

19  Q     Okay.  And included in that definition of the released

20  parties there was a slide that was put-up, I think it was

21  Slide 11, but that slide did not refer to either the debtors

22  or the other release party's executive's estates or nominees,

23  did it?

24  A     I don't recall those words being on the slide.

25  Q     But you understand that as part of the -- in addition

1   to the parties who were being released not only are those

2   named parties being released, but the named entities, if you

3   want to call them, the airs, executors, estates and nominees

4   are also obtaining releases, correct?

5   A     All the release parties are defined in the plan.  Those

6   definitions are extensive and were heavily negotiated by the

7   parties since I don't have a specific definition that I am

8   being asked a question about it.  I will take it for your

9   word that those are included in the scope of what was

10  summarized on that slide.

11  Q     If I draw your attention to Section, I think it's, 361

12  of the plan, that is why I wanted to see if you had a copy of

13  it with you, but you also understand that the debtors and

14  these other parties, current and former officers, directors,

15  managers, principals, and members, employees and advisors are

16  also obtained third-party releases, correct?

17  A     It's my understanding that those parties that you just

18  listed would be included as release parties, yes.

19  Q     And as part of, I think it was on Slide 12 -- I'm not

20  sure if the debtors could put up Slide 12 real quick.

21            MS. MARKS:  Yes, just one moment.

22            MR. SCHEPACARTER:  Thank you.

23            MS. MARKS:  12.

24            MR. SCHEPACARTER:  Maybe it was 11.  It was the

25  one that dealt with the release parties.

1          MS. MARKS:  Just one moment.

2      (Pause)

3          MR. SCHEPACARTER:  That is the one.  Thank you.

4  BY MR. SCHEPACARTER:

5  Q    With respect to this -- if you can see that, Mr. Welch,

6  you can see that there is parties -- these are the releasing

7  parties, basically that under the plan the parties were

8  granting releases.  You see that number three has one that

9  says claimants who abstain from voting on the plan and do not

10  opt-out the releases, do you understand what that actually

11  states?

12  A    I can certainly read it on the slide.  You are asking

13  my belief as to what it what means I can explain what I think

14  it means.

15  Q    Well let me ask you a couple questions about that and

16  maybe you can -- do you know what it means for a creditor to

17  abstain from voting?

18  A    I would understand that to mean that someone has a

19  right to vote, but neither voted to accept nor reject the

20  plan.

21  Q    Is there a box on the ballot, on any of the ballots or

22  the opt-out release forms that ask for an abstention.

23  A    I do not recall whether there is a box that

24  affirmatively states that the party that has the right to

25  vote is abstaining.

1  Q     You testified a little bit about the votes that came in

2  that there was an overwhelming vote from the opioid creditors

3  and the like.  Do you know if any creditor is either the

4  opioid creditor, the non-opioid creditors, of any creditors

5  who actually abstained from voting, affirmatively abstained

6  from voting?

7  A     I don't recall what that might look like, no.

8  Q     Do you know if any of the claim holders or equity

9  holder ballots or the opt-out packages that were solicited

10 were returned or identified as undeliverable?

11             MS. MARKS:  I'm going to object.  Lack of

12 foundation for this question.

13             THE COURT:  He can answer if he knows.  Its cross.

14             THE WITNESS:  So I am aware that there were 2,000

15 plus affirmative opt-outs.  I don't know the number of, kind

16 of, notices that Prime Clerk mailed out that would have

17 returned to Prime Clerk for any number of reasons.  We have -

18 - you know, because equity holders were noticed and we had

19 $86 million shares outstanding I'm assuming that was a

20 voluminous outreach and it wouldn't surprise me at all if

21 there were returned notices in that mix.

22 Q     So if somebody did not obtain a copy of the plan or did

23 not get a ballot and, arguably, they would not have returned

24 it would you consider them having abstained from voting?

25 A     I think we exercised our very best efforts to make sure

1  that everyone who had an entitlement to vote was able to do

2  so.  To the extent that for whatever reason materials were

3  over-looked or didn't arrive, or for any number of

4  conceivable reasons they did not actually vote.  It would

5  only be speculation on my part as to what happened in those

6  instances.

7  Q    If those creditors did not return a ballot would they

8  be bound by the third-party releases?

9  A    They would be bound if they did not affirmatively opt-

10 out of the release.  So three on the slide is twofold; one,

11 abstaining from voting, and not opting out of the release.

12 Q    So creditors -- let's look at number four, creditors

13 that reject the plan, but fail to opt-out their bound by the

14 third-party releases, correct?

15 A    They are bound by their failure to opt-out of the

16 release given that they were given an opportunity to do so.

17 Q    If they return the ballot without a vote check, but

18 opting out of the release would they still be considered as

19 having opted out of the release even though they didn't vote

20 on the plan?

21 A    To the best of my knowledge I would consider that an

22 abstention.  I don't have a firm basis, though, in the

23 underlying voting methodologies to know is that how it would

24 be counted in the tally, but I am assuming that a return

25 ballot that neither voted to accept nor reject would be

1   considered an abstention. It would seem to be a reasonable

2   conclusion.

3   Q     You also testified that you had heavy negotiations or

4   the revisions were heavily negotiated for the number of

5   parties and groups, correct?

6   A     I did.

7   Q     But you didn't negotiate with each and every creditor

8   who received a ballot, correct?

9   A     That would have been impossible, so no.

10  Q     And you didn't negotiate with any of the former

11  officers, directors or employees of the debtor, correct?

12  A     No.  I don't believe that we negotiated with them

13  directly.

14  Q     And one of the things that you talk about with respect

15  to -- you can take that slide down, I'm sorry.  Thank you.

16        When you negotiated with these parties one of the

17  things that you had discussed was that part of what, I

18  assume, is good for the debtors that there is some kind of

19  certainty with respect to litigation and the like, correct?

20  A     Yes.  Can I expound on that a little bit?

21  Q     Go ahead.

22  A     So to your last point about we didn't negotiate with

23  each and every one of the former officers and directors the

24  release parties are conceptual categories, right. To my

25  knowledge there is no like master list that enumerates every

1  single one of the release parties.  They are definitionally

2  driven and those definitions have been narrowly tailored to

3  protect the interest of the reorganized debtors and the

4  release parties.

5  Q     So each individual under that category you wouldn't

6  know if they have been given anything of value to the debtor

7  or negotiated for that release or something along those

8  lines?

9  A     They may not even be aware that Mallinckrodt is in

10 bankruptcy, right.  They are the beneficiary of a categorical

11 release that is in the best interest of the debtor's estates

12 even if they are not aware that they are being released under

13 the release provisions.

14 Q     Did the debtors or any of the other parties either

15 assess or give any value to this sort of, what we will call,

16 litigation certainty aspect of the releases?

17 A     I believe that I testified that but for the release

18 structure this reorganization doesn't happen.  This was a

19 litigation driven bankruptcy.  My very first statement when

20 Ms. Marks asked me why did Mallinckrodt file for Chapter 11

21 protection it was to deal with enterprise threatening

22 litigation.

23        So thinking about not only how you settle the known

24 litigations, the suits that had actually been filed, but

25 dealing with the underlying subject matter that gave rise to

1  the litigation in the first place that was certainly

2  something that the debtors were concerned about, the

3  negotiating unsecured noteholders, really all of the parties

4  to the various settlements.

5  Q    But you wouldn't have any notional value for, say, a

6  suit that involves a former officer that is from 10 years ago

7  if he was to be sued for anything that -- what the value of

8  that would be to the debtor with respect to the

9  indemnification, or contribution.

10 A    Yeah, we did not undertake an analysis to think through

11 every potential hypothetical litigation that could be brought

12 against every hypothetical release party under those

13 definitions and try to quantify that.  I'm sure if you

14 imagined all the scope of potential litigation that could

15 ever be brought under any subject matter involving

16 Mallinckrodt's employees or officers you could have a huge

17 number, right.

18      We know from the opioid claimants that that number is

19 potentially trillions of dollars of damages alone, right.

20 There is no reason that trillions of dollars of damages could

21 be asserted against former employees that say even work the

22 line operating the pill press, right.  It's a conceptual

23 release that the debtors, because they have an identity of

24 interest, in many instances or other reasons, you know, to

25 protect the reorganized debtors go forward business that that

1   conceptual release makes sense to give the debtors the fresh

2   start that we are seeking.

3   Q     And I think you testified that it would be impossible

4   or at least you said it would be impossible for the debtors

5   to name each and every executive officer, director, manager

6   or employee who was getting released under the plan, correct?

7   A     You certainly could identify all the historic

8   directors, and all the historic officers and all the historic

9   employees, and all the historic advisors that ever rendered

10  advice to the company, and so on and so forth.  Very quickly

11  just the scope of the releases that is a very substantial

12  list and, again, it was conceived definitionally in terms of

13  what would protect the debtor's estate and the reorganized

14  debtors, how do we do something to protect, you know, Joe

15  Smith or Jane Doe that once upon a time served as an officer

16  or director.

17  Q     But you don't that it would be the average creditor who

18  is voting on the plan based on publicly available information

19  you don't think that they could identify the individuals who

20  are being released under the plan, did they?

21  A     Well they could certainly identify to the extent

22  available in public records who, you know, former employees

23  were.  Like you could do a LinkedIn search for Mallinckrodt

24  and take down those names.  Would it ever be comprehensive,

25  presumably not; it would be very challenging.

1   They certainly, the public can certainly hear the

2   testimony that will come from our independent directors that

3   undertook the (indiscernible) to determine whether there were

4   any valid claims that are being released and take some

5   comfort in that, but, again, you know, we're talking about

6   millions of pages of due diligence that have been provided in

7   these cases.  It's a voluminous amount of material to wade

8   through.

9   Q    And also the releases that are given here you have

10  indicated that they are, sort of, categorical.  It would be

11  an individual -- the categories are groups rather than

12  individuals, correct?

13  A    Correct. It's my understanding that that is customary.

14  Q    If I told you that the third-party releases buying

15  parties who don't have direct claims against the debtors

16  would that surprise you?

17  A    I don't know that it would surprise me.  There are a

18  lot of things that I have learned in these cases.  I would

19  have to just think about it a little bit, but that wouldn't

20  surprise me.

21  Q    Is it accurate to say that claims against non-debtors

22  will be released regardless of whether the claimant or

23  creditor received notice of the plan?

24  A    To the extent that an opt-out was not received, yes,

25  that release would be given.

1  Q      And it's also true that parties in other jurisdictions

2  other than this one who have direct claims against some of

3  these third parties that somehow relate to the debtors would

4  also be getting released under a plan, correct?

5  A      I am not sure I understood your question. When you say

6  other districts what --

7  Q      I don't want to say hypothetical, but if some were to

8  say to bring a suit somewhere in, we'll just say, State Court

9  in Wyoming, for example, and they were to bring that claim

10 against one of the third parties who are, arguably, getting

11 releases under this that claim would also be released,

12 correct?

13 A      I think that it would -- the applicability of the

14 release would be at issue there, right.  So I will give an

15 example, in the MSGE group is a released party, but hard to

16 envision the MSGE group being successful in asserting the

17 release as a defense against any and every potential

18 litigation that could ever be brought against it by any party

19 in Wyoming, right. I think that the scope of the releases --

20 it's in the context of our plan and so I would assume that

21 the releases would be interpreted appropriately and

22 contextualized.

23 Q      Isn't it also true to say that claims that relate to

24 potential future conduct would also be released under the

25 plan?

1  A      Future conduct post-effective date I'm not

2  (indiscernible) to opine as to whether that would provide

3  protections or not with respect to, you know, the debtor's

4  ongoing business operations unless expressly protected under

5  the plan. I am not sure why the release would provide -- I

6  don't think it's a provision of immunity on a go-forward

7  basis.  I think it's dealing specifically with a

8  retrospective concern about claims being made in the future

9  with respect to, you know, post-emergence conduct on the part

10  of the debtors.

11  Q      Okay.

12  A      On the part of the release parties, excuse me.

13  Q      And in that same vein would these release parties be

14  released from future actions that relate to the misuse of

15  opioids?

16  A      The opioid claimants were expressly excluded from the

17  third-party releases because there are other releases that

18  deal expressly with the opioid claimants.  So there is no

19  intent to provide protection against opioid claims in the

20  third-party release.  That is not what is envisioned there.

21  Q      And that release is a different release?

22  A      It is a different release under the plan.

23  Q      Under that portion of the plan that release provision

24  would that also be -- there is future actions regarding

25  opioids, would those be released?

1  A     They would be, but with important exclusions, right. As

2  I have testified there are exclusions for actual fraud, for

3  gross negligence, for willful misconduct, for criminal

4  liability and as a part of the operating injunction

5  Mallinckrodt will be making available, into the public

6  domain, a vast array of historical records. To the extent

7  that there is criminal liability in our past the release

8  would offer the perpetrators of those actions no security.

9  Q     But for the, we'll even say, negligent misuse of

10  opioids, we could argue why it's gross or not, but just

11  negligent use of opioids or the misuse of opioids that

12  conduct would be released, correct?

13  A     That would be released, yes.

14  Q     I think you would agree that the releases in the plan

15  that were approved by the board were, basically, because, and

16  I think you testified a little bit to this on your cross, is

17  that the releases have begun in other cases and they sort of

18  were customary or standard operating procedures, these types

19  of third-party releases, correct?

20  A     Well I did note that they were customary and that the

21  scope is similar to releases that have been approved in other

22  contexts, but they weren't included in our plan for that

23  reason.  They were concluded in that plan because they were

24  instrumental to the settlements that were achieved in this

25  case and reviewed by the parties to this case, again, who are

1   hyper-competent individuals who are represented -- parties in

2   interest represented by very qualified counsel that it was

3   understood that it was in the best interest of the estate and

4   the creditors underneath the plan for these releases to be

5   approved.

6   Q     Before the plan was filed the Mallinckrodt board

7   performed no formal investigation of any of the claims

8   against the numerous parties named in the release party

9   provision of the plan, correct?

10  A     Prior to the filing of the plan was that the --

11  Q     Correct.

12  A     Yes, that is correct.  Prior to the initial filing in

13  the plan in April the directors had not conducted a

14  comprehensive investigation.

15  Q     The board, for the most part, relied upon counsel to

16  decide whether these parties were to be granted releases,

17  correct?

18  A     Certainly counsel for the debtors was involved in the

19  negotiation of the definitions of the release parties, yes.

20  Q     And with respect to those release parties, all the

21  numerous individuals, you don't know if they have, or you may

22  know, did they give any kind of item of value, or pay money,

23  or give anything in consideration or return for the releases?

24  A     Since we have been talking a lot about D&O's, you know,

25  I mentioned that the question of what happened to D&O

1   liability coverage under the initial opioid settlement was an

2   open question and as a consequence of the amended opioid

3   settlement it was agreed in exchange, at least in part,

4   right, as part of the settlement consideration in the amended

5   opioid settlement that the directors would maintain their D&O

6   coverage which they are a beneficial -- you know, they hold a

7   beneficial interest in that asset and the opioid trust would

8   receive an incremental $125 million of cash consideration.

9        So whether that a direct contribution I am not enough

10  of an insurance attorney to know whether it was.  I am not an

11  insurance attorney.  I don't know whether that could be

12  deemed a direct contribution, but certainly there was an

13  interest that they had in the negotiations that was being

14  used as deal consideration.

15  Q    But no former officers or directors or even employees

16  other than that insurance title gave no cash or anything else

17  of value that you know of, correct?

18  A    That is correct, no cash consideration by any

19  individual.

20       MR. SCHEPACARTER:  Your Honor, I don't have any

21  further questions. I will reserve for, I guess, re-cross

22  based on redirect if there is any.

23       THE COURT:  Thank you, Mr. Schepacarter.

24       I think we're going to Mr. May.

25       MR. MAY:  Thank you, Your Honor.

|   |   |
|---|---|
| 1 | CROSS EXAMINATION |
| 2 | BY MR. MAY: |
| 3 | Q     Mr. Welch, my name is Laurence May.  I represent the |
| 4 | Canadian Elevator Industry Pension Trust as lead plaintiff in |
| 5 | something called the Strougo Securities litigation.  I may |
| 6 | end up repeating in certain different forms some of the |
| 7 | questions of Mr. Schepacarter, but I hope not to. |
| 8 |      In any event, I first want to direct your attention to |
| 9 | the release provisions in Article 9(c) of the amended plan. |
| 10 | I am working off of the amended plan because that was |
| 11 | admitted into evidence at Phase I as Joint Phase I Exhibit 3. |
| 12 | I think the second amended plan, which the debtor filed just |
| 13 | a few days ago, has not changed any of the provisions that I |
| 14 | will be questioning you about.  So you can feel free to pull- |
| 15 | up either of those.  I don't think there is going to be any |
| 16 | difference. |
| 17 |      MS. MARKS:  Your Honor, we weren't told in advance |
| 18 | that anyone wanted to cross-examine Mr. Welch on the plan. |
| 19 | So we need to take a few minutes to get it up on his computer |
| 20 | screen. |
| 21 |      THE COURT:  All right.  How long do you need? |
| 22 |      MS. MARKS:  Three minutes, two minutes. |
| 23 |      THE COURT:  Go ahead.  We will just hold while you |
| 24 | are trying to do that. |
| 25 |      MS. MARKS:  Okay. |

1        (Pause)

2              THE COURT:  Are we ready?

3         (Off record discussion)

4              THE COURT:  Was this included, Ms. Marks, within

5    the debtor's exhibit list for Phase II?

6              MS. MARKS:  My understanding is no, no one put the

7    plan on their exhibit list.

8              MR. MAY:  My understanding, Judge, was this was

9    admitted into evidence in Phase I as Joint Phase I Exhibit 3.

10             THE COURT:  I don't know how you have a plan

11   confirmation and not include the plan as part of one of the

12   exhibits that the court is going to have to refer to.  Which

13   exhibit was it?

14             MS. MARKS:  Your Honor, Mr. Welch, he has the

15   second amended plan in front of him.  He just needs to be

16   directed to a page number.

17             THE WITNESS:  I'm -- Mr. May, I'm in Article 9,

18   paragraph A --

19   BY MR. MAY:

20   Q     Paragraph C.

21   A     Paragraph C?

22   Q     Captioned, "Releases by nondebtor releasing parties,

23   other than opioid claimants."

24   A     Okay.  I'm to that paragraph.

25   Q     You have that?

1  A      I have that.

2  Q      Okay.  Thanks.  Good.

3         Okay.  And this section proposes, does it not, that all

4  nondebtor releasing parties will be providing releases to

5  released parties, which is also a defined term under the

6  plan, correct?

7  A      That's correct.

8  Q      And the definition of nondebtor releasing parties

9  includes, does it not, basically, any entity that held a

10  claim against any of the debtors?

11  A      That's correct.  It's very broad in its scope.

12  Q      Right.  And does that also -- and that also includes

13  holders of claims that are not getting any distributions

14  under the plan, who have been deemed to reject the plan; is

15  that correct, as well?

16  A      That's correct.

17  Q      In that same definition, and that's definition 260, I

18  believe -- it's on page 27 of the plan document that I'm

19  looking at -- the definition is nondebtor released parties,

20  is the caption -- is the definition.

21  A      I'm to that definition.

22  Q      Okay.  That definition also includes something called

23  the Shenk suit.  Do you see that?

24  A      Yes, I see reference to the Shenks.

25  Q      And what is the Shenk suit?

1  A      The Shenk suit is a securities law matter that the

2  Court might remember that we requested that be a carve-out to

3  Section 105 injunction.  That litigation was very far along.

4  The parties had a mediation plan in hand and desired to move

5  forward with the mediation.  A settlement emerged that that

6  has not been brought before the Court yet for approval.

7  Q      So, the Shenk suit is a securities litigation; is that

8  correct?

9  A      Yes, it is.

10  Q      And the claims in that suit arise out of the purchase

11  of securities issued by Mallinckrodt; is that correct?

12  A      That's correct.

13  Q      And the members of the class -- the members of the

14  putative class -- that's the word that I'm taking from the

15  definition -- will not be providing any releases to anybody,

16  unless the Shenk settlement is appropriately approved; isn't

17  that correct?

18  A      The Shenk settlement contains release provisions, which

19  is why it's excluded.

20  Q      No, that wasn't my question.

21         My question was if a settlement is not approved, isn't

22  it a fact that the Shenk plaintiffs will not be providing any

23  third-party release?

24  A      That's correct.

25  Q      And this provision was the subject of a negotiation,

1  was it not, between the debtor and other parties?

2  A    Many parties negotiated on many of these definitions.

3  I don't know exactly which parties had negotiated

4  specifically, with respect to the nondebtor releasing parties

5  definition here.

6  Q    But my point was that it was a negotiated provision

7  among parties, correct?

8  A    That's correct.

9  Q    And what role, if any, did you play in those

10  negotiations?

11  A    I certainly reviewed iterations of the plan that

12  contained markups, redlines, as plan documents went back and

13  forth.  I reviewed and made notes to counsel along the way as

14  I reviewed.  I did not engage, to the best of my knowledge,

15  on kind of any direct negotiation with another party on this

16  litigation.

17  Q    Okay.  Did any of the defendants in the Shenk

18  litigation tell you that they would not agree to this

19  particular provision, that is, making the releases to them

20  contingent on approval of the Shenk settlement?

21  A    They did not tell me that, no.

22  Q    Okay.  Now, you are aware, are you not, that the

23  parties that I represent, the Canadian Industry Elevator

24  Pension Trust, which is lead plaintiff in a securities class

25  litigation, also have claims arising out of the purchase of

1    the securities issued by the debtor; is that correct?

2    A     That's my understanding.

3    Q     And can you explain why the debtor agreed to provide

4    for a different treatment for the plaintiffs in the Shenk

5    settlement than the plaintiffs in the Strugo (phonetic)

6    action.

7    A     Certainly, so a settlement has been negotiated with

8    respect to Shenk that has its own set of releases and the

9    Strugo litigants were treated, as with all other third-party

10   releasing parties and received notice and the ability to

11   opt-out of the releasing -- the releases.  So, in my mind,

12   there was no disparate treatment, it's just that the parties

13   were not similarly situated.

14        The underlying allegations between -- in the

15   litigations may be based on similar facts, but the plaintiffs

16   in the two actions are very differently situated, which is

17   why the stay was given -- a relief from the stay was given so

18   we could move the Shenk mediation forward, but the action,

19   with respect to your clients was stayed.  Your litigation was

20   very recent, relative to the filing of the petition and it

21   just was at the very beginning of the case.  So, I don't know

22   why even though the underlying actions were similar, why we

23   would view them as being somehow on the same footing.

24   Q     Well, I mean, you testified in your direct testimony

25   that the plan was consistent with all the provisions of 1129

1  and I believe one of your statements was that like creditors

2  are receiving like treatment.

3       So, my question to you is both, the Shenk plaintiffs

4  and my plaintiffs are Class 13 creditors and they're not

5  receiving the same treatment under the plan, are they?

6  Regardless as to the what the reasons are, the question is,

7  are they -- they're not receiving the same treatment under

8  the plan; isn't that correct?

9  A    The -- I don't know, Mr. May.  We have held off on

10 bringing the Shenk settlement for approval because of

11 concerns expressed by the UCC prior to the UCC settlement.

12      So, that has been held off on.  I would have to spend

13 more time with my advisors to understand, you know, is the

14 plan actually providing disparate treatment between like

15 classes.

16      So, I don't want to suggest that my testimony was, in

17 any way, incorrect.  I don't believe that's the case, even

18 though I may not have at the tip of my tongue, an argument

19 for you as to why it's not the case.

20 Q    You mentioned, and I was going to get to this later,

21 but I think now would be an appropriate time, you mentioned

22 that one of the reasons I believe that you believed these

23 third-party releases are fair and reasonable is that because

24 all the parties received the opportunity to opt-out.

25      Did I get that right?

1   A     Yes.  We went through the slide that showed the various

2   types of voting dispositions and actions and parties that,

3   you know, wanted to opt-out for notice by Prime Clerk and had

4   the opportunity to opt-out and over 2,000 parties did

5   ultimately opt-out.

6   Q     Well, were you aware that the 2,000 parties -- 2,000

7   entities that opted out were all holders of Class 14 claims,

8   that is, current equity holders, were you aware of that fact?

9   A     I haven't, to the best of my knowledge, received a

10  breakout of which classes were received from the opt-outs.

11  Q     So, do you know who Mr. James Daloia is?

12  A     Yes, he testified in Phase 1 as Prime Clerk.

13  Q     And did you ever review his testimony?

14  A     I certainly listened to all of Phase 1's testimony, but

15  he was a subject-matter expert and I didn't make it my

16  business to become an expert in everything that he was an

17  expert in, but I did listen.

18  Q     And were you aware that he testified that no opt-out

19  notices were sent to holders in Class 13?

20  A     Class 13 being the subordinated claims that received no

21  recovery?

22  Q     Right.

23  A     I don't recall that.  I remember that there were

24  exchanges around that, so I'm assuming that the answer to

25  that is yes and I have no reason to dispute that he didn't

1   make that representation in his testimony.

2   Q    So, is it still your testimony that if no opt-out forms

3   were sent to holders of Class 13 claims and they didn't have

4   the opportunity to fill out those forms, that the releases

5   that they're giving are fair and reasonable under the terms

6   of the plan?

7   A    I think if we had a definitive categorical

8   representation that a certain class did not receive notice,

9   then the opt-out procedures with respect to that class, I

10  think, could be called into question.  The meaning of that is

11  beyond my ability to speak to, but I --

12  Q    Well, I mean --

13  A    -- agree with the logic.

14  Q    Yeah.  Well, you did listen, I think you said you did

15  listen to Mr. Daloia's testimony, and on page 124 of his

16  testimony, he said -- the question was, by me:

17          "Now, as I understand your direct testimony, and,

18  again, your reference to your declaration of October 26th, is

19  it your testimony that no opt-out notice forms were sent to

20  any entity in Class 13 because it was your determination,

21  based on information provided to you, that no such entities

22  existed?

23          And his answer was:

24          "Not my determination, but, yes, based on

25  instructions provided to us."

1        And he further -- another question was asked to

2   Mr. Daloia and it was:

3            "Based on the information and instructions

4   provided to you, is it your testimony that no opt-out package

5   was sent to any entity with respect to Class 13, because you

6   were advised that there were no entities in that class?

7            "Answer:  That's correct."

8        So, is it still your testimony in light of a witness

9   that the debtor put forward in Phase 1 in his testimony that

10  opt-out forms, that it's fair and reasonable for holders of

11  Class 13 to provide third-party releases, having not received

12  opt-out forms?

13  A    Mr. May, I don't know whether there are any creditors

14  in Class 13, so, I think there's an assumption there that any

15  party that's been harmed by that procedure, as explained in

16  that testimony.

17  Q    Well, I believe you just testified that the claims that

18  my clients held were subordinated and they would fall in

19  Class 13, wouldn't they?

20  A    I didn't testify to that effect.  I'm not in a position

21  to make that evaluation.

22  Q    Well, you testified that my clients hold claims -- I

23  believe you agreed in your testimony that my client holds

24  claims arising out of the purchase of securities issued by

25  Mallinckrodt.

1        Do I have that correct?

2    A    Yes, I believe that's what I said.

3    Q    And isn't that -- those claims under your plan,

4    classified as Class 13 subordinated claims?

5    A    I don't know the answer that that, Mr. May.

6    Q    Well --

7    A    I know that there's been disagreements as to whether

8    your clients -- your claims were appropriately classed and

9    noticed, but I'm not an expert in that area and I would have

10   to defer to my advisors on that.  I just don't know.

11   Q    I wasn't asking for your expertise.  I was asking for

12   your understanding of the plan, which you testified at length

13   on your direct testimony and you put up a slide that listed,

14   according to the slide, subordinated claims in Class 13.  So,

15   I'm just asking if I understand your testimony correct that

16   the claims of my client, which arise out of the purchase of

17   securities, would, based upon your prior testimony, fall

18   within Class 13?

19   A    I testified that Class 13 subordinated claims, this

20   morning, would receive no recovery under the plan.  I didn't

21   testify as to the identity of those claims within Class 13

22   and that would be something that I would have to revert to my

23   advisors on to give competent testimony.  I just don't know

24   whether your clients' claims are appropriately classed in 13,

25   as you're maintaining to me right now.

1  Q      Which advisors would you refer to, to testify in this

2  issue, then?

3  A      I have a building full of lawyers behind me.  I would

4  exit these doors and inquire of them.

5  Q      So, you think this is a purely legal question then?

6  A      Very few questions are purely legal, Mr. May.  I'm

7  assuming that there's an analysis, though, and that we could

8  have a litigation over whether your claims were appropriately

9  classified or not.

10       I did testify that I believed that the classification

11 structure within our plan was logical and comprehensive.

12 That may not be true in every case and I'm not an expert

13 enough in all of the underlying legalities and facts to know

14 how every single claim in this case is classified and whether

15 or not there are any objections to the classifications that

16 have been made.  I haven't given any such testimony today,

17 other than that the plan meets the bankruptcy requirements

18 from the debtors' perspective with respect to what we were

19 obligated to do to bring forward a confirmable plan.

20 Q      Well, I mean, we don't have to argue about this

21 anymore.  The plan speaks for itself and I'll refer you to

22 definition 406, which is the definition of subordinated

23 claims in the debtors' plan, of which you are the

24 representative and testifying about, which says that it's --

25 a subordinated claim is any claim that arises under

1  Section 510(b) of the Bankruptcy Code.  But we can go on

2  because it says what it says.

3      Now, the definition of released parties in the plan, I

4  think Mr. Schepacarter went into this just briefly, includes

5  the debtors, their nondebtor affiliates, the debtors' and

6  nondebtor affiliates' predecessors, successors, permitted

7  assigns, controlled affiliates, and their current, former

8  officers, directors, managers, principals, employees, agents,

9  advisors, accountants, and other professionals, among others.

10     My question to you is much:  How many people are we

11 talking about here, can you give me an order of magnitude?

12 A    I'd probably have to, in order to give you -- given

13 that that's the question, based on your intro, I'd have to

14 have you state it again --

15 Q    Okay.

16 A    -- but just what I've heard was asking about former

17 officer, director, and assigns and I'm assuming that --

18 Q    Let me break it down and make it easier for us.

19     How many employees does the debtor have currently --

20 does the debtor and their affiliates have currently?

21 A    We have a little over 3,000 employees today, at

22 present.

23 Q    And each of those employees is getting a release,

24 correct?

25 A    That's correct.

1  Q     And how many former officers and directors does the

2  debtor have?

3  A     Many.  Because the debtors -- there are 64 debtors and

4  they each have slates of officers and there have been changes

5  over the years as individuals have -- certainly, far more

6  officers than directors, historically, right.  Our history of

7  our board since we spun from 2013, that's a much smaller list

8  than the list of officers, but over time it's become a fairly

9  lengthy list, especially with respect to officers, you know,

10 who are employees, who have come and gone from the company.

11 It's knowable.  We could figure that out, but it's a long

12 list.

13 Q     So, we're talking in the hundreds here, at least,

14 right?

15 A     I don't know if I would say "hundreds"; there was

16 overlap between the debtors in terms of the officer slate, so

17 that might be an overstatement.  But it's a significant body

18 of individuals that contributed their time and energies to

19 the debtors' business over the years.

20 Q     And how many professionals does the debtor employ as of

21 today?  By "professionals," I'm talking about attorneys,

22 accountants, consultants, anyone who you would categorize as

23 providing professional, outside services to the debtors.

24 A     This is a great opportunity to explain why what you're

25 asking is very challenging.  So, we have existing

1  relationships with Deloitte, with KPMG, with E&Y, and with

2  PwC, globally, right.  We have auditors in Ireland.  Auditors

3  that work for those firms, sometimes under different

4  subsidiaries of those firms, and they have employees.  They

5  have hundreds of thousands of employees, collectively.  Those

6  firms are being released and, presumably, all the

7  professionals at those firms that ever worked on Mallinckrodt

8  matters, to the extent covered by the releases, would enjoy

9  the protections of the releases.

10      So, the lists start to get really long which is why I

11  said, you haven't (indiscernible) to enumerate each and every

12  individual that benefits from the releases.  We have spoken

13  about it categorically.

14  Q    All right.  So my point is, the actual entities, the

15  actual human beings and entities that are getting releases

16  and numbering into the thousands, and it looks like it even

17  could go way beyond the thousands, is that correct, just from

18  what you just said?

19  A    I mean, four employee -- you know, they have, each of

20  them has, I believe, over a hundred thousand employees.  It's

21  a big number.

22  Q    Okay.  So, we could be getting into half a million

23  people getting a release under the terms of the debtors'

24  plan; is that correct?

25  A    Well, certainly not every employee at PwC, for example,

1  worked on Mallinckrodt at a matter or at E&Y worked on

2  Mallinckrodt as a matter.  If you spent an infinite amount of

3  time and energy, you could identify, presumably, every single

4  PwC employee that ever touched Mallinckrodt within a defined

5  period.  Whether that would be a fruitful exercise or not, I

6  would leave to others.

7  Q    Well, I'm not asking if it's a fruitful exercise.  My

8  point is, if they have done that, they're getting a release,

9  right?

10  A    That's correct.

11  Q    Okay.

12  A    To protect the reorganization.

13  Q    Well, for whatever justification you want to offer, I

14  understand that.  The point -- the question -- the only

15  question I'm asking is, are they getting a release?

16  A    Yes.

17  Q    Okay.  Who is Matthew K. Harbaugh?

18  A    Matt Harbaugh was our former CEO.  He was the president

19  of Mallinckrodt Generics before Mark Trudeau was brought in

20  to be the CEO of the SpinCo and Matt became the chief

21  financial officer of Mallinckrodt PLC and the SpinCo and he

22  was also, for a number of years, the president of the

23  Specialty Generics business.  He had been publicly announced

24  to be the CEO of the Specialty Generics SpinCo and he left

25  the company in the fall of 2019.

1  Q     Okay.  Did Mr. Harbaugh participate in any negotiation

2  over the terms of the nondebtor releases, which are set forth

3  in Article 9, Subsection C of your plan?

4  A     No, he did not participate directly in the negotiation

5  of that term.

6  Q     Did Mr. Harbaugh ever state, to your knowledge, that

7  unless he was included in the nondebtor releases, he would

8  not support this plan or any other plan that anyone would

9  propose?

10  A     I certainly did not have a conversation of that nature

11  with Mr. Harbaugh.  I'm not aware of any, no.

12  Q     Is Mr. Harbaugh making any monetary contributions in

13  connection with the plan or its confirmation?

14  A     I testified just a moment ago that no current or former

15  officer or director is making a cash contribution.

16  Q     Is he making any specific or identifiable contribution,

17  to your knowledge, to holders of claims in Class 13?

18  A     Not to holders of claims in Class 13.  I've talked

19  about the opioid settlement and D&O policy negotiations a

20  moment ago, but not for the benefit of Class 13, no, was

21  there's no recovery for Class 13.

22  Q     Okay.  So, nothing -- okay.  So, the only contribution

23  he is making, your testimony is, in connection with the

24  overall confirmation of the plan?

25  A     I think even that, Mr. May, I mean, Mr. Harbaugh is the

1   CFO of another publicly traded company today.  He is included

2   in the release, not for his benefit, primarily, but more for

3   the benefit of the reorganized debtors because there's a

4   commonality of interest.  There's a common interest, you

5   know, suit against Mr. Harbaugh, who enjoys an ongoing

6   indemnification benefit and, presumably, contribution claims,

7   as well.  That is his benefit, a benefit under the D&O

8   policies and it's the interests of the reorganized debtors to

9   make sure that there's not an indemnification claim brought

10  against the reorganized debtors that would either draw on

11  insurance proceeds or make future insurance policies under

12  expensive for the debtors to obtain.

13  Q    Well, we can argue about whether that is sufficient, as

14  a matter of law, to support a release, but we'll go on.  By

15  the way, would the debtor indemnify Mr. Harbaugh if he's

16  found to have committed fraud?

17  A    I have stated in my testimony that the other releases

18  exclude actual fraud.  So, to the extent that there's any

19  findings of fraud proven in a court of law that would meet

20  the exclusion criteria, there's no protection for Mr.

21  Harbaugh if he's committed actual, proven fraud.

22  Q    Well, I understand that your testimony is that the

23  release wouldn't apply to him if he committed fraud.  My

24  question was a little bit different, and that is, would the

25  debtor be obligated to indemnify him under the

 1  indemnification that you just testified if he were to have

 2  found to have committed fraud?

 3          MS. MARKS:  Objection; calls for a legal

 4  conclusion.

 5          THE COURT:  He can state what his understanding is

 6  if he knows.

 7          THE WITNESS:  Mr. May, to investigate that, I

 8  would have to review the indemnification agreement between

 9  the company and Mr. Harbaugh.  And some of the

10  indemnification, as I've testified in previous hearings, is

11  within our articles of incorporation, as well.  If well-

12  written, presumably, they would not provide a protection for

13  fraudulent activity, although, I would have to review those

14  documents.

15  BY MR. MAY:

16  Q     Who is George Kegler?

17  A     George Kegler served as the interim CFO between Matt

18  Harbaugh stepping down from the CFO duties to become the CEO

19  of the failed SpinCo and the hiring of Brian Reasons, who's

20  our current CFO.

21  Q     Did Mr. Kegler participate in any of the negotiation

22  over the terms of the nondebtor releases in Article 9,

23  Subsection C?

24  A     No, he would not have been a direct participant in any

25  of the negotiations.

1   Q     Did Mr. Kegler, to your knowledge, ever state that

2   unless there was a nondebtor release in the plan releasing

3   him, he would not support the plan and he would object to

4   confirmation of such a plan?

5   A     I did not have any conversations with George or have

6   been reported to have any conversations -- heard any

7   conversations that would have anything like that in it.  I've

8   not talked to Mr. Kegler since he left the company.

9   Q     Who is Brian Reasons?

10   A     Brian Reasons is our current chief financial officer.

11   Q     Did he participate in any negotiations over the terms

12   of the nondebtor releases in Article 9, Subsection C of the

13   plan?

14   A     Brian has been heavily involved on a day-to-day basis

15   with the negotiations around the plan, but just as I received

16   about myself, I have no awareness of Brian being expressly

17   involved in any negotiation of this specific language.  We

18   certainly had conversations with the advisors about the

19   releases and concerns about the releases that various parties

20   were being raised, so Brian would have been participants in

21   discussions with counsel about that, but he would not have

22   been in any formal negotiations with other parties around the

23   language.

24   Q     Did he ever state, to your knowledge, that unless he

25   was included in the nondebtor releases, that he would not

1  support the plan or file an objection to the plan?

2  A     I didn't have any conversations to that effect with

3  Mr. Reasons.

4  Q     And, again, he's not making any monetary contribution

5  in connection with the plan, correct?

6  A     He's not making any, other than -- I think even though

7  the D&O insurance wasn't for the years where he was at the

8  company, so no, he's not making any financial contribution to

9  the plan.

10  Q     Who is Kathleen A. Schaefer?

11  A     Kathy Schaefer was our longstanding controller.  Sadly,

12  she's exiting the business to move on to other things in her

13  life, but for over 20 years, Kathy was really the backbone of

14  the finance group within Mallinckrodt.

15  Q     And did she participate in any negotiations over the

16  terms of the nondebtor releases in Article 9, Subsection C of

17  the plan?

18  A     No, she was not directly involved in any of those

19  negotiations.

20  Q     And did she ever state, to your knowledge, that unless

21  she was included in the nondebtor release that she would not

22  try to support the plan or she would object to confirmation

23  of the plan?

24  A     I did not have such a conversation with Kathy, nor am I

25  aware of any conversations of that nature with Kathy.

1  Q      Now, you're also a nondebtor release, are you not?

2  A      I am.

3  Q      Okay.  And if the provision of the plan -- did you

4  negotiate this provision, with respect to Article 9,

5  Subsection C, nondebtor releases?

6  A      I testified just a moment ago that I did not directly

7  negotiate it, but I was certainly aware of the markups to the

8  plan that were being exchanged all along the way.

9  Q      And if the nondebtor releases were not included in the

10 plan, would you file an objection to the plan?

11 A      The release is important to me.  I don't know what

12 future litigation I might be subjected to.

13        I was sued by Mr. Haviland in the course of this

14 bankruptcy case.  This is the first time my name and my home

15 address has ever been in a federal lawsuit, alleging fraud

16 and racketeering, a whole host of things.  I don't love that

17 and I certainly would not welcome more of that, because I

18 believe that my conduct has been upstanding within the bounds

19 of the law.  So, the release is important to me.  I believe

20 in what this restructuring is intending to accomplish.

21        But this is larger than my interests.  I believe,

22 ultimately, that the world is a better place with a

23 reorganized Mallinckrodt that is running a responsible,

24 legal, lawful, opioid business that provides important --

25                MR. MAY:  Your Honor, may I interrupt the witness

1  and ask the witness just to confine his remarks to the

2  question asked.

3          THE COURT:  Well, you asked an open-ended

4  question, Mr. May.  When you ask an open-ended question, you

5  get an open-ended answer.

6          So, go ahead, Mr. Welch.

7          THE WITNESS:  So, I believe in this restructuring

8  and I sit here today not as an individual, merely, but also

9  on behalf of the 3,000 employees that look to Mallinckrodt

10  for gainful employment to support their families.  I sit here

11  on behalf of the patients that will benefit from

12  Mallinckrodt's products.  Even if those products like

13  opioids, like Acthar, are controversial, they are important

14  to our health care system and they make meaningful

15  differences in patients' lives.

16          Complaints being made about pricing and a whole

17  host of things, but the important thing is that those

18  products exist for patients for whom they're appropriate.  I

19  believe in what we're trying to accomplish.

20          I'm really proud that we've been able to negotiate

21  with as many parties as we can.  I said in the creditors

22  call, what was it, a 341 call, that I wish that the outcomes

23  were different for our equity holders.  We tried hard to find

24  the solution that would preserve a value for equity.

25          I wish that our bondholders didn't have to

1   equitize their claims and have less than a complete

2   recovery --

3              THE COURT:  All right.  Mr. Welch, I'm going to

4   cut you off now.  You're getting way beyond the -- even

5   beyond the open-ended question.

6              THE WITNESS:  I don't know whether I would object.

7              MR. MAY:  Thank you, Judge.

8   BY MR. MAY:

9   Q    Mr. Welch, who is Angus C. Russell?

10  A    Mr. Russell is the chairman of our board of directors.

11  Q    And did he participate in any negotiations over the

12  terms of the nondebtor releases in Article 9, Subsection C?

13  A    He did not directly participate in any negotiations,

14  no.

15  Q    Did he ever state, to your knowledge, that unless he

16  was included in the nondebtor releases that he would object

17  to the plan or not support any plan that didn't have those

18  releases?

19  A    Well, he certainly spent quite a bit of time with our

20  board of directors, with competent advisors talking about the

21  releases and the importance of the releases.  The releases

22  were very important to our directors.

23         The existence of the releases in our plan is one of the

24  reasons why the directors have stuck with the company and

25  continue to provide their leadership and guidance to the

1  debtors, as debtors-in-possession throughout these cases.  I

2  said that the releases were an integral part of the plan.  I

3  don't believe that the Board would have signed off on a plan

4  that did not include releases that protect the Board, the

5  officers, and the employees of this company, as well as the

6  many advisors that have served us over the years.

7  Q     And notwithstanding your belief, I guess the question

8  is, did anyone on the Board actually tell you that?

9  A     It would -- yes -- tell me in the context of a board

10  meeting, the need for and the importance of the releases was

11  expressed as a paramount concern and it was certainly a

12  concern of the directors.  And, yes, there was statements to

13  that effect, that they understood what the counsel was

14  telling them about the importance of the release and that

15  they wanted to make sure that appropriate releases were part

16  of any plan construct.  So, yes, there was direct guidance

17  given to the management team, with respect to the releases.

18  Q     And my question is a little bit different, and my

19  question is, did they tell you, any member of the board tell

20  you that unless there was a third-party release in the plan

21  releasing them, they would not support a plan of

22  reorganization, they would not be a proponent of such a plan?

23  A     I don't recall the identity of the debtors that did

24  engage in the board meeting.  Not everyone talks to every

25  single issue.  I don't recall the individuals that spoke out

1   about the importance of the releases, but I do know that

2   directors did express concern about releases.  And they may

3   have, but not to me on an individual basis; no one called me

4   directly and said, If you don't get this done, I'm not going

5   to support the plan.  I did not have any such conversations.

6   Q     Okay.  Who is Melvin D. Booth --

7               THE COURT:  Mr. May, are we really going to go

8   through every single officer, director, employee, and anyone

9   else in connection with this?

10              MR. MAY:  Well, we --

11              THE COURT:  I've got your point.  I understand

12   what point you're making.

13              MR. MAY:  Well, how about I do it this way, Judge.

14   There was one, two, three, four more individuals and how

15   about if I said, With respect to these individuals, if I

16   asked you the same questions, Mr. Welch, would your answers

17   be the same?

18              THE COURT:  That will work for me, thank you.

19   BY MR. MAY:

20   Q     And the individuals are Melvin D. Booth, Joanne Reed,

21   Paul Carter, and Mark Casey, with respect to each of the

22   four, if I asked you the following three questions, would the

23   answers be the same:  Number one, did any of them participate

24   in the negotiations over the term of the nondebtor releases

25   in Article 9, Subsection C of the plan?

1    A     Of the four individuals you mentioned, certainly, only

2    Mr. Casey may have been involved in the negotiations.  I've

3    been in many of the same meetings as Mr. Casey, so he was

4    receiving updates from counsel, as I was.  But Mr. Casey's

5    engagement with counsel is, you know, we don't have exactly

6    overlapping schedules, so he may have been more involved on

7    that front than I was, but, certainly, Mr. Booth, Ms. Reed,

8    and Mr. Carter were not directly involved in the negotiation.

9    Ms. Reed and Mr. Carter are current members of the board.

10   Mr. Booth was the former chairman of the board.  He left

11   several years ago.  Mr. Russell became a chairman of the

12   board.  Mr. Carter and Ms. Reed would have been in board

13   meetings with advisors when the importance of the release

14   structure was discussed as part of the overall plan construct

15   and their support for the plan would have been contingent on

16   the existence of those releases.

17   Q     At the end of Article 9, Subsection C of the plan, and

18   it's on page 137 of the first amended plan, the plan --

19            MS. MARKS:  Mr. May, if I could just pause you, we

20   learned that the document that you're asking about is a Trial

21   Exhibit.  I believe it's UCC Exhibit 40.

22            MR. MAY:  Okay.

23            MS. MARKS:  So, Steve has access to that

24   electronically if he wants to pull up that version of the

25   plan.

```
 1            MR. MAY:  Okay.  It was also -- I don't know if he
 2  has the Phase 1 exhibit, but it was Phase 1 exhibit, Joint
 3  Exhibit 3.
 4            THE COURT:  Are we going to bring it up on the
 5  screen?
 6            THE WITNESS:  I'm bringing up the UCC Exhibit 40
 7  from my files and I'm going to that paragraph.
 8            I'm there, Mr. May.
 9  BY MR. MAY:
10  Q    Okay.  So, the last paragraph of that section of the
11  plan begins by saying that entry of the confirmation order
12  shall constitute the Bankruptcy Court's approval that -- and
13  a finding -- shall constitute the Bankruptcy Court's
14  finding -- I'm skipping ahead a bit -- that the releases were
15  given in exchange for the good and valuable consideration
16  provided by the released parties.
17       Other than their participation in the plan process and
18  serving as the officers and directors, what other
19  considerations were provided by any of the thousands of
20  released parties?
21  A    Again, not every released party under the definition is
22  similarly situated.  Unlike the Purdue bankruptcy, there is
23  no Sackler family here making a significant financial
24  contribution.  We were a publicly traded company with
25  publicly traded governance.  That was a privately held and
```

1   owned company.  So, a very different situation.

2        In terms of things beyond financial consideration, I

3   mentioned, you know, it's important it says, "good and

4   valuable consideration."  It doesn't say financial

5   consideration.

6   Q     I --

7   A     That was never their representation.

8        Certainly, the energies -- I get your point.  Not every

9   former employee that left Mallinckrodt, say, in 2014, did

10  anything with respect to this, even though, definitionally,

11  they are covered as a released party.  Certainly, as you get

12  to directors and officers, you know, especially the current

13  ones, there was more engagement than involvement around the

14  plan.

15  Q     And I'm assuming all those officers and directors have

16  been paid all along for the services they provided to the

17  debtor during the course of the bankruptcy, correct?

18  A     Yes, but I would argue that the compensation --

19  Q     I'm not asking --

20           MS. MARKS:  Yes.  Please don't cut him off.

21           THE COURT:  Now, let's -- he answered the

22  question.  If you want to bring it up on redirect, you can.

23  But limit the answers, Mr. May or -- excuse me -- Mr. Welch.

24           MR. MAY:  Thank you.

25  BY MR. MAY:

1   Q      In that same paragraph, Mr. Welch, it says that entry

2   of the confirmation order shall constitute a good faith

3   settlement and compromise of the claims released by this

4   article, Article 9, Subsection C of the plan.

5         Do you see to where I'm referring?

6   A      Yes, I do.

7   Q      Okay.  Can you describe the good faith settlement and

8   compromise between the debtors and holders of Class 13

9   claims?

10  A      So, this is a general statement.  It does not say that

11  we negotiated and settled with every conceivable party,

12  right.  That would be an incredibly long list.  It says that

13  it was a good faith settlement and a compromise and many of

14  the key parties to this restructuring did engage with the

15  debtors around plan language.  We certainly have been open to

16  discussions with objectors to plan language and in my

17  instances, have modified plan language in response to

18  objections.  And those parties that have reached agreement

19  with us have done so with Article 9(c) not in regular font,

20  but in bolded font.

21        That was one of my first questions when I got the first

22  draft:  Why is this language in bold?

23        And the answer was:  Well, because releases are so

24  important, we want to make sure that it's highlighted and

25  that's kind of customary.

1      I'm assuming that every party who has seen the plan

2   that cares about this, has had the opportunity to reach out

3   to members of the debtors' counsel.  We've encouraged them to

4   be engaging and we've seen many settlements in the course of

5   these cases.  So, from my perspective, we have done this and

6   Article 9(c)'s release is brought forward in good faith, with

7   respect to all --

8   Q     I respect that, Mr. Welch.  That wasn't my question,

9   however.  My question was very narrow and very specific.

10      I want you to describe the valuable consideration

11   that's being provided to holders of Class 13 claims pursuant

12   to the plan.

13   A     As Class 13 subordinated claims receive no value under

14   the plan, I think the answer to that is they receive no

15   value.

16   Q     Okay.  So, what is being compromised with Class 13

17   claims if they're receiving no value under the plan?

18   A     Again, I'm not aware.  I guess categorically, given

19   that there is no recovery, there was no negotiation around

20   that plan provision, to the best of my knowledge, so I'm not

21   aware of -- I cannot cite anything specifically that has been

22   compromised with respect to the claims that are receiving no

23   recovery under the plan.

24          MR. MAY:  No further questions, Your Honor.

25          THE COURT:  All right.  Thank you, Mr. May.

1          Let's see.  We're going on to Mr. Haviland next, I

2    believe.

3          MR. HAVILAND:  Yes, Your Honor.  And just as a

4    point of order, I know it's about a quarter of.  I won't be

5    able to finish today.  I have about three hours.  I'm happy

6    to start now, take a break, at Your Honor's pleasure.

7          THE COURT:  Yeah, we're going to go until five

8    o'clock and then we'll pick it up again tomorrow morning.

9          MR. HAVILAND:  All right.  Thank you.

10                    CROSS-EXAMINATION

11   BY MR. HAVILAND:

12   Q    So, Mr. Welch, can you hear me all right?

13   A    I can, Mr. Haviland.

14   Q    All right.  Thank you.

15         So, I want to start where Mr. May and Mr. Schepacarter

16   ended.  I'm going to go out of order and try to streamline as

17   best I can.

18         But you have in front of you, sir, the first amended

19   plan; is that right?

20   A    I have that document open, yes.

21   Q    And do you have the second amended plan?

22   A    I do have that plan, as well.

23         MR. HAVILAND:  All right.  And, Your Honor, I

24   don't know if you have it, because it has not been

25   introduced, but I would like to share screen and show the

1   redline version of that document for purposes of my

2   questioning, if I could have the screen?

3               THE COURT:  I have it, as well.

4               MR. HAVILAND:  Oh, perfect.  Then we won't need to

5   do that.

6   BY MR. HAVILAND:

7   Q    I will -- Mr. Welch, I want to start with the release.

8        So, in my redline version, which, for my purpose is

9   very helpful, because it allows me to see the changes that

10  were made on December 2nd.

11       And are you able to see the changes that were made

12  between the 1st and the 2nd?

13  A    I don't believe that I have a redline.  I certainly

14  don't have a redline in front of me.  I don't know whether I

15  have a redline that's accessible.

16  Q    All right.  Well, let me do this, then.  The document

17  that I'm looking at is Docket 5637-1, which is the notice of

18  a redline.  And I don't want to belabor the point, but I want

19  to go over the release language with you in a slightly

20  different context.

21              MS. MARKS:  Mr. Haviland, he doesn't have internet

22  access.

23              MR. HAVILAND:  That's fine.  I'm going to read to

24  him.

25  BY MR. HAVILAND:

```
 1  Q     So, under Article 9, Section A, Mr. Welch, if you can

 2  get that provision of the first amended plan --

 3  A     Okay.  Give me just a moment to get there.

 4            THE COURT:  Can you tell me where that is in the

 5  redline, Mr. Haviland.

 6            MR. HAVILAND:  It's 141, Your Honor, of the second

 7  amended plan, 5637.

 8            THE COURT:  Paragraph 141?

 9            MR. HAVILAND:  I'm sorry, it's page 141 --

10            THE COURT:  Page 141.

11            MR. HAVILAND:  -- Article 9, Section A.  It

12  carries from 141 to 142.

13            I'm sorry, Your Honor, the docket references 148

14  of 183.

15            THE COURT:  I've got the redline.

16            MR. HAVILAND:  147.  I think it's just easier to

17  work off of that.

18  BY MR. HAVILAND:

19  Q     Do you have the second amended plan, Article 9 in front

20  of you now, sir?

21  A     I have the first.  Let me get the second, as well, so I

22  can toggle between them.

23  Q     Well, if you have the second, I can point out to you

24  the change.

25  A     Okay.  I have them both, Mr. Haviland.
```

1  Q     All right.  I want to go to -- there was some

2  discussion with debtors' counsel about the plans and the

3  versions of the plan.  You made a comment, sir.  You said

4  that the debtors weren't being sneaky.

5        Do you remember that?

6  A     I did say that, yes.

7  Q     I find that interesting.  The original plan was filed

8  in April, right?

9  A     It was.

10 Q     And the first amended plan didn't come until the end of

11 September, right?

12 A     We filed -- what was labeled the first amended plan was

13 filed in September, that's correct.

14 Q     Okay.  Let me see if I have this right.  This is April.

15 We go to May, June, July, August, and the end of September.

16 Five months, right?

17 A     What am I saying "right" to, the time between the first

18 filing of the plan and --

19 Q     April and September --

20 A     -- the amended --

21 Q     -- I had kept those months out.

22       It was five months between the two plans, correct?

23 A     As I testified this morning, we filed multiple versions

24 in June around the plan -- there was a solicitation version

25 of the plan --

1  Q      But there were no material --

2  A      -- so, it's not five months between plan versions.

3  Q      All right.  Fair enough.

4         From the 1st to the -- what I have as the first amended

5  plan filed in September, and that's what it's called, is a

6  period of more than five months, right?

7  A      Between April and September, yes, that's five months.

8  Q      And there was an addition made to this release, was

9  there not, sir, and, in particular, if you go -- and, Your

10 Honor, I'm at the redline, page 148, and there's some redline

11 language and I'm just going to read for the record, there's a

12 line added, For avoidance of doubt.

13        Let me know if you have that, Mr. Welch.

14 A      I am aware of the sentence that you're referring to,

15 yes.

16 Q      And you're aware that that was inserted at the end of

17 September, for the first time, right?

18 A      Yes, I believe that was the first occasion when that

19 appeared.

20 Q      Okay.  And that provision reads:

21        For avoidance of doubt, the claims against debtors, the

22 reorganized debtors and any of their assets and properties

23 discharged, pursuant to the plan, shall include, little Y,

24 any claims to the extent based on the assertion -- on any

25 assertion that the wholesale product purchase agreement has

1    an effect on the -- and there's was a change; it used to say

2    "effective date" now it says "petition date" -- and including

3    any prior versions of such agreement between Mallinckrodt

4    ARD, LLC, and Priority Healthcare Distribution, Inc., and/or

5    the debtors or any predecessors, pre-effective date

6    performance thereunder, consistent with its terms, constitute

7    an anticompetitive agreement or other anticompetitive conduct

8    under applicable law and, Z, any claims -- and this was

9    inserted -- based on pre-effective date sales of Acthar Gel

10   to the extent, based on any assertion that the debtors or any

11   predecessors acquisition by license and maintenance of any

12   rights to Synacthen Depot and related assets, constitute

13   anticompetitive conduct under applicable law.

14        Did I read that correctly?

15   A    I originally had the first amended plan.  I'm assuming

16   that you read the redline correctly.

17   Q    So, I'm going to go to the change in a moment, but the

18   line that I just read, that one line beginning with, "For

19   avoidance of doubt ..." was not added by the debtors until

20   the end of September, correct?

21   A    I believe that that's correct, yes, that that's the

22   first time --

23   Q    And in between -- I'm sorry, I have to turn my mic up

24   so I can hear you a little better.  I didn't want to cut you

25   off.

1          Go ahead.

2    A    Yes, I believe that that language was included in the

3    first instance with the first amended plan in September of

4    2021.

5    Q    Okay.  Why was that done?

6    A    We've learned a lot as we've gone through this case

7    together, I think, and the goal of amending the plan each

8    time has been to strengthen the plan.  Sometimes, it was to

9    capture settlements and other times, to capture things that

10   have been thought through and considered as the parties, you

11   know, have met and discussed the plan.

12         And so, it was included to give greater certainty to

13   the reorganized debtors with respect to the subject matter

14   that's covered in the language there.

15   Q    You're not suggesting, sir, that this language was

16   added by virtue of any discussions of settlement with any

17   member of the Ad Hoc Acthar Group, are you?

18   A    I'm not suggesting that, no.

19   Q    It's other parties you were talking with, right?

20   A    That's correct.  Throughout these cases, debtors'

21   counsel have been engaged in discussions around the plan with

22   other case parties.

23   Q    And with respect to this release language, the

24   discussions you had were with the RSA parties?

25   A    I'm actually not aware of which conversations it was

1  sourced to, whether it was purely directly from debtors'

2  counsel.  I don't have enough information around kind of the

3  origination of it.  I can certainly speak to conversations

4  around strategy, but I don't know where the language

5  originated.

6  Q     Did the thought of adding this additional protection

7  for the released parties in this release, did that emanate

8  out of discussions with Express Scripts?

9  A     I don't know the answer to that, Mr. Haviland.  I don't

10  know if they had any discussions with us on that topic.

11  Q     Well, you're aware that there have been discussions

12  with Express Scripts because that led to a document that was

13  put as part of a motion to assume you're familiar with,

14  right?

15  A     I'm certainly aware that debtors' counsel and Express

16  Scripts' counsel have had conversations, but I certainly have

17  not been involved in all of those by any means.

18  Q     And did those conversations with Express Scripts come

19  after April when the first plan was proposed?

20  A     Mr. Haviland, I don't know the timeline.  So, I don't

21  know what calls have been had by whom and when.

22  Q     Well, sir, I want to be clear.  I don't want to know

23  what you don't want to know.  So, one thing I want to be

24  clear about is what you know and what you don't.  So, were

25  you privy to any of the discussions with Express Scripts

1 about the wholesale product purchase agreement?

2 A     Can you repeat the question, because I think there was

3 a statement at the beginning and I want to make sure that I'm

4 answering the right thing.

5 Q     Were you involved in any of the discussions with

6 Express Scripts about the wholesale product purchase

7 agreement that's reflected here?

8 A     I have not had any conversations with Express Scripts

9 about that contract.

10 Q     Do you know who within the debtor organization was

11 involved in those discussions?

12 A     I don't know a definitive list.  I know individuals

13 that would have been part of those discussions.  Whether they

14 had direct conversations or not or whether the conversations

15 were purely by and through counsel, I don't know.

16 Q     Who within Mallinckrodt was involved?

17       MS. MARKS:  Mr. Haviland, are you asking with

18 respect to this language in the plan or are you just asking

19 generally about the relationship?

20       MR. HAVILAND:  The latter, because I want to get

21 to the language above in terms of the conditions precedent.

22       So, I'm just asking about the discussions and the

23 relationship at this point.

24 BY MR. HAVILAND:

25 Q     Do you know?

1             THE COURT:  Go ahead, Mr. Welch.

2             THE WITNESS:  Yes.  So, the parties, certainly on

3   the debtors' side that would have been interested and

4   involved in thinking through the new CuraScript contract,

5   there certainly would have been awareness on the part of Hugh

6   O'Neill; presumably, Josh Schaefer, that's the head of our

7   immunology business; the legal team that supports that

8   commercial business; and others.

9   BY MR. HAVILAND:

10  Q     And are you aware of any specific RSA parties that were

11  involved in those discussions?

12  A     RSA parties discussing things with Express Scripts, I'm

13  not aware of that.

14  Q     And then let me just focus on the change, because you

15  have the first amended plan before you.  I want to look at

16  the language that happened on Thursday night, I believe it

17  was, December 2nd, with the redline.

18             And do you know why these changes were made, the

19  word "effective" was changed to "petition" and then the

20  insert in the second phrase, Z, was, "Claims based on pre-

21  effective date sales of Acthar."

22  A     I believe that changes were made that we told you that

23  we were going to make changes to address your concerns.  You

24  said today already that they didn't satisfy your concerns,

25  but I think that the change from "effective date" to

1   "petition date" makes it clear that we're not looking at the

2   new contract that's the subject matter of the adversary

3   proceeding.

4        We're talking about the contract that was in place on

5   October 12th when we filed the petition.

6   Q    And that language and that change would carry forward

7   as long as the existing contract remains in effect, in terms

8   of the release, correct?

9   A    That's correct.

10  Q    And then as far as the addition to Z, it says, "Claims

11  to the extent based on any assertion."  You added the

12  language, "Claims based on any pre-effective date sales."

13       So, the date got moved back to the effective date,

14  right?

15  A    So, you're asking about the language in Z, claims

16  based -- the current version says -- just because, since I

17  don't have the redline -- the current version says, "Any

18  claims based on pre-effective date sales."

19       And version one, as I have it, was "any claims, to the

20  extent based on any assertion."

21       And I didn't see a marker, but presumably,

22  "claims" there is pre-petition; is that the point?

23  Q    Well, I'm asking you, sir.  It seems to me when you

24  move -- when you add a clarifier, based pre-effective date,

25  you move the deadline back further beyond plan confirmation.

1  You've moved it to the effective date, have you not?

2  A    So, I would view that as moving it forward, not

3  backward, right.  We're not going backwards in time.

4  Q    Oh, fair enough.  Forward in time.

5  A    You see what I'm saying?

6  Q    Beyond the confirmation, right.

7  A    Yes, I would see this as kind of -- and, again, the

8  legal import of this, I have not have any direct

9  conversations with counsel, but I would assume that it would

10 remove any ability to make any claims at a very late date now

11 in the case about conduct between the pre-petition period and

12 the effective date under that contract.

13 Q    And that has expanded the release since even the first

14 amended plan, right?

15 A    Whether it's expanded or not, I don't know, right.

16      If it's the contract that was in place as of the

17 effective date, then the release -- it's like, what is the

18 release doing?

19      In my mind, it's relative to behavior under that

20 contract.  Certainly, behavior in the post-petition period

21 now, but the release is still the same, with respect to the

22 underlying relationship that I'm assuming is being contested.

23 Q    So, this is a little different, sir, and I apologize,

24 this is Subsection Z, not Y, which is the contract.

25      Do you see that?

1  A      Yeah, I was speaking to Z, the claims.

2  Q      Relating to any claim of anticompetitive conduct in

3  relation to Synacthen, right?

4  A      Right.  So, the change that we're talking about,

5  because we're talking about changes between the versions --

6  Q      Uh-uh.

7  A      -- was from claims, just claims, which presumably was

8  pre-petition, to now claims before the effective date.  So,

9  that is an expansion of what claims here, but we're talking

10 about is claims within the period between the petition date

11 and the effective date, but with respect to the pre-petition

12 contract that was in place, not with respect to the new

13 contract.

14      I don't think you can read Z without reading -- I mean,

15 I haven't done a deep diligence on the construct of the

16 sentence, but I think Z has to be interpreted in light of Y,

17 doesn't it?

18 Q      I'm asking you.  It says, "Include any claims" and it

19 talks about the contract, and then it says, "And Z."  You see

20 Z as modifying Y, so it's only claims in relation to the

21 contract?

22 A      Based on sales, so maybe it is separate.  Maybe it is a

23 completely different term.

24 Q      Okay.  So, I want to ask you about that expansion.  And

25 you made a comment earlier that you don't have the Sacklers

1  in this case and you were referring to Purdue, right?

2  A     I was.

3  Q     And in the Purdue case, the Sackler family, the Ds & Os

4  put up $4.5 billion for the release, correct?

5  A     That's correct.  I've not read the plan extensively;

6  I've just seen the public reporting on it and that's my

7  understanding.

8  Q     Does this release language anywhere in this section,

9  and by that, I mean the entirety of Article 9, in any way,

10 release Express Scripts or any Express Scripts entities, sir?

11 A     In all of Article 9?

12 Q     Yes, sir.

13 A     Give me just a second to think about that answer.  It's

14 a big question.

15 Q     Take your time, please.

16 A     Mr. Haviland, I think it's fair to answer at this point

17 in time that I am not aware of the releases, releasing claims

18 against Express Scripts.  I could be wrong, but I'm not aware

19 of that.

20 Q     Well, and you agree that Express Scripts is a

21 nondebtor, right?

22 A     They are.

23 Q     They're a third party, right?

24 A     They are.

25 Q     And they have been sued in litigation outside of

1   bankruptcy, correct?

2   A      That's correct.

3   Q      Now, is there any plan in the future of the debtors to

4   release Express Scripts through bankruptcy?

5                            MS. MARKS:  Objection,

6   calls for speculation.

7            THE WITNESS:  By future plan --

8            THE COURT:  Hold on --

9            THE WITNESS:  -- do you mean --

10           THE COURT:  -- hold on, hold on.

11           Mr. Haviland?

12           MR. HAVILAND:  Your Honor, we have seen amendments

13   in a very short window of time in conjunction with the motion

14   to assume, which I know Your Honor has a pending motion to

15   dismiss, I think it's fair to ask this designee whether there

16   has been any plan in the -- tomorrow or the next day to amend

17   this plan further.  I only intend to ask him what he's aware

18   of and whether or not there's been discussions about it,

19   that's my --

20           MS. MARKS:  I'll withdraw my objection.  He can

21   answer.

22           THE COURT:  Go ahead, Mr. Welch.

23           THE WITNESS:  Yeah, Mr. Haviland, I testified

24   earlier today that it's my understanding that we are working,

25   you know, tirelessly to deal with plan objections and, to the

1   extent that those require us to amend the plan to capture

2   those settlements, then it's very possible that there will be

3   a third or a fourth amended plan.  And I think that that's

4   not unusual in cases for there to be updates to the plan

5   based on settlements.  I'm not specifically aware of any plan

6   update that would change the release disposition with respect

7   to Express Scripts; I have not been involved in any

8   conversations to that effect with any party.

9   BY MR. HAVILAND:

10  Q    Express Scripts has not put any money into this plan

11  for settlement or otherwise, correct?

12  A    That's correct.

13  Q    Has any offer to pay money been made by Express Scripts

14  that you're aware of?

15  A    I am not aware of any.

16  Q    And so I want to be very clear, you're not aware of any

17  discussions in your presence or that you've heard about that

18  there's a future plan to add Express Scripts, or any of its

19  subsidiaries or formers, into this release language, is that

20  fair?

21  A    I'm not recalling any, no.

22  Q    All right.  And let me just finish with the releases.

23  This release does not include any providers like pharmacies,

24  hospitals, doctors, those who provide medicines sold by

25  Mallinckrodt, correct?

1  A     I've testified earlier that the definitions of releases

2  parties are very technical and tailored, but they're also in

3  some instances broad.  And so to say that there are no

4  hospitals ever included under any of those umbrellas, I don't

5  know that I could agree with what you just said, I'd have to

6  look at that more specifically.

7  Q     And I suppose hospitals are part of the opioid group,

8  so let me take that out and ask you just about pharmacies and

9  doctors who prescribe and dispense Mallinckrodt medications,

10 they're not included in the release, right?

11 A     Well, I testified earlier that the OCC settlement gives

12 us the ability to negotiate full releases with respect to

13 codefendants.  So there may be ongoing negotiations around,

14 you know, releases there with respect to the opioid

15 litigation.

16 Q     For opioids, not Acthar, right?

17 A     I'm not aware of any such conversations around Acthar.

18 Q     Well, let me just focus on Acthar because I realize

19 there's a separate construct for releases.  This release

20 language does not release any other drug company for conduct

21 in relation to Acthar, right?

22 A     I believe that's --

23           MS. MARKS:  Your Honor --

24           THE COURT:  Hold on.  Go ahead, Ms. Marks.

25           MS. MARKS:  Mr. Haviland, can we just clarify,

1  which provision -- which release are you talking about?

2         MR. HAVILAND:  Article 9.

3         MS. MARKS:  The release of the debtors?

4         MR. HAVILAND:  No, the entirety, release,

5  injunction and related, so A, B --

6         MS. MARKS:  Well, like A, for example, is a

7  release of the debtors.  So I would object that these

8  questions aren't tailored to that provision.  If you could be

9  more specific, which release are you talking about?

10         MR. HAVILAND:  Well, I want to know from this

11 witness whether or not there is any release given to any

12 party.

13 BY MR. HAVILAND:

14 Q     Did you understand I was asking, when I asked about

15 Express Scripts, whether or not there was any release being

16 given to Express Scripts in this?

17 A     So, Mr. Haviland, there are four discrete releases in

18 this section, right, which is why the questions sometimes are

19 hard to answer.  I'm not aware of any releases to Express

20 Scripts under any of these; however, Express Scripts, you

21 know, may be a participant in the opioid supply chain.  So

22 it's very difficult for me to say that there's not any

23 provision within this very dense language that would adhere

24 to them.  I don't -- I'm not aware, though, of any design to

25 release Express Scripts within the plan.  I may be mistaken

1  about that.  It's very dense and I'd have to confirm that

2  with my advisers, but --

3  Q    Well, you're the guy, sir, so I have to ask you today

4  because I don't get to examine your advisers.  So, as you sit

5  here today, you're not aware that this language was intended

6  by the debtors to release Express Scripts or any of its

7  subsidiaries, current or former, correct?

8            MS. MARKS:  Objection; asked and answered.

9            THE COURT:  Overruled.

10            MR. HAVILAND:  Well, I just want to clarify.

11            THE WITNESS:  Yeah, I think I've testified that,

12  to the best of my knowledge, it does not --

13            MR. HAVILAND:  All right.

14            THE WITNESS:  -- but my knowledge isn't infinite.

15  BY MR. HAVILAND:

16  Q    Thank you.  So, sir, I want to leave the release and

17  then I want to scroll up.  What I'm going to do is just use

18  my redline here and go to the language of conditions

19  precedent, which is the preceding section.  So if you look at

20  the second amended plan, sir, it's Article 8 in both

21  conditions precedent to the effective date.

22        And counsel asked you about this provision, but I want

23  to just ask -- and I'm not going to ask you about the

24  underlying issues that they relate to, just about the plan

25  language, sir.  So if you can go to Section 20.

 1              MR. HAVILAND:  On the redline, Your Honor, it is

 2   page 140, or 146 of 183.

 3              THE COURT:  All right, go ahead.

 4              MR. HAVILAND:  Thank you.

 5   BY MR. HAVILAND:

 6   Q     And, Mr. Welch, when you have -- I'm hoping that you

 7   have the second amended plan because I want to talk to you

 8   about the changes.

 9   A     I do have the -- I have both plans open, Mr. Haviland.

10   Q     All right.  So between the September plan and the one

11   that was filed December the 2nd, last Thursday night, there

12   were some changes made.  And the first change, it used to

13   say, "The confirmation order shall," and then it has four

14   subdivisions.

15         The current order -- or the current provision says, "an

16   appropriate order or orders."  Do you see that?

17   A     I do see that.

18   Q     That does not take away the power of this Court to do

19   the four things listed, correct?

20   A     That's correct.

21   Q     And it's actually three things because subdivision (d)

22   was removed.  You have that in your second amended plan, the

23   part that says, "Contain findings of fact and conclusions of

24   law that any claim arose prepetition," that's been removed,

25   right?

1    A      That's correct.

2    Q      But there's three provisions that have not been removed

3    and I want to ask you about those.

4           And, first, this entire section, paragraph 20, was

5    added at the end of September, right?

6    A      That's correct, it makes its first appearance with the

7    first amended plan.

8    Q      Okay.  And this one asks for the Court to do three

9    things, right?  Approve the assumption of the wholesale

10   product purchase agreement, and that's subject to the

11   assumption motion referenced, right?

12   A      Yes.

13   Q      And (b) says, "Contain findings of fact and conclusions

14   of law that such agreement does not constitute," and I'll

15   just paraphrase, a violation of the antitrust laws, correct?

16   A      I see that, yes.

17   Q      And then (c) says, "Contain findings of fact and

18   conclusions of law that no marketing conduct in connection

19   with Acthar gel undertaken in connection with the resolution

20   of any administrative claims constitutes violations of RICO,

21   state consumer fraud laws, common law fraud, negligent and

22   intentional misrepresentation, conspiracy to defraud, aiding

23   and abetting, and unjust enrichment," right?

24   A      Yes, I see that.

25   Q      So they are the three provisions that maintain --

1    they're continuing to be conditions precedent to this plan

2    being confirmed, correct?

3    A    Yes.

4    Q    All right.

5    A    Or to -- not to be confirmed, but to plan

6    effectiveness.

7    Q    They are under the heading, "Conditions precedent to

8    the effective date."

9        So it's the debtors' position that the plan could be

10   confirmed, but just not go effective without these three

11   provisions, is that right?

12   A    Yes.  I think that was one of the imports of the

13   change, right, in September, we viewed the question around

14   the assumption of the new contract and the questions around

15   its legality to be a great confirmation matter, but then, as

16   you know, procedurally, we switched gears, and now that's the

17   subject of the adversary hearing after confirmation.  And so

18   this just makes it clear that it's not the confirmation order

19   where this is being sought, it's, as it says now, "an

20   appropriate order or orders."

21   Q    And is it accurate, sir, that this provision was added

22   after April, after there were discussions between the debtors

23   and Express Scripts?

24   A    I think I've testified that I don't know the exact

25   origins of where this came from, that plan language is

1  something that is discussed by a variety of parties to the

2  case, including our RSA parties, that review and sign off on

3  any plan changes.  So I don't know the history enough to know

4  where this specific language originated.  I have no reason to

5  believe that it was in conjunction with discussions from

6  Express Scripts; that has not been something that was

7  conveyed to me.

8  Q     Well, you said that Mr. O'Neill and maybe Mr. Schaefer

9  were involved from the debtors' side, do you know who was

10 involved from Express Scripts' side in terms of the company

11 officers or directors?

12 A     Mr. Haviland, I believe that's a misstatement of my

13 testimony.  I didn't say that Mr. O'Neill and Mr. Schaefer

14 were involved in this plan language.  You asked me the

15 question of who was involved in the underlying new CuraScript

16 contract and I suggested that the commercial business team

17 would have been involved in the shaping of that contract,

18 that's different than the plan language; they wouldn't have

19 been involved in the development of the plan language.

20 Q     Fair enough.  And let me just ask you that piece of it,

21 who was involved from the Express Scripts business side on

22 the contract negotiation?

23 A     I was not a party to those negotiations; I don't know

24 who from Express Scripts was involved in those discussions.

25 Q     There was a change on the December 2nd plan from the

1   September, the late September one in subsection (b).  And if

2   you're looking at the second amended plan, it won't be there,

3   but the strikeout says, "After contain findings of fact and

4   conclusions of law that such agreement" -- referring to the

5   wholesale product purchase agreement -- "and the parties'

6   performance thereunder, consistent with its term, in each

7   case from and after the effective date do constitute an

8   agreement."

9       Do you see that?  I mean do you see that strikeout in

10  terms of the change?

11  A    I don't see the strikeout because I don't have the

12  redline, but I do see the language that you're referring to

13  in the original --

14  Q    So if --

15  A    -- the parties' performance language being referenced.

16  Q    So the debtors are not seeking a finding about

17  performance under this unsigned contract, is that right?

18  A    No.  And I think that was in part due to considerations

19  that were -- that had been raised in the context of

20  discussing the adversary hearings that we, the debtors, had

21  been seeking a very narrow determination that the contract

22  itself is not an antitrust violation.  And Mr. Ciardi -- and

23  this is just me speaking what I've heard in these cases --

24  Mr. Ciardi suggested that you can't view the contract in

25  isolation, that the whole relationship -- and I think you've

1  stated this as well, Mr. Haviland -- the whole relationship

2  needs to be examined, and I think that's why the parties'

3  performance thereunder has been struck.

4      We recognized that the parties' performance thereunder

5  does raise much broader considerations than the contract

6  itself as to whether the contract, having an exclusive

7  relationship with CuraScript violates, you know, the

8  provisions of the Sherman Act.

9  Q    Well, I know I asked a poor question because I said

10  "right" and you said "no," but I think the answer was

11  actually yes.

12      So let me just frame it based on your answer that the

13  debtors are no longer seeking a finding of the Court of fact

14  or a conclusion of law as a condition precedent to the

15  effective date of the plan going effective a finding that the

16  parties' performance, as opposed to just the contract,

17  doesn't constitute a violation of the antitrust laws, did I

18  say that correctly?

19  A    I want to be -- I'll revert to the-plan-speaks-for-

20  itself answer, that the reframing in the second amended plan

21  expresses the condition for effectiveness and it is more

22  narrow, in my estimation, than in the previous version where

23  performance was raised.  And so I do believe it's a narrowing

24  of the issues.

25  Q    And, to be clear, the debtors are not seeking the Court

1    to make a finding about conduct or performance of either the

2    debtor entities or Express Scripts, is that fair?

3    A     Let me read again the current version, the second

4    amended plan.

5          (Pause)

6    A     Mr. Haviland, I need to be careful here because I am

7    not an expert -- I'm a pharmaceutical business guy, at the

8    end of the day, who has a law degree in his resume.  Where it

9    says, "The unlawful maintenance of monopoly power," I don't

10   want to constrain what that means for any party here.  I

11   think that that will be hashed out, presumably, in the

12   adversary hearing and the debtors can -- and the parties of

13   interest can determine whether the conditions for

14   effectiveness have been -- and the Court -- whether the

15   conditions for effectiveness have been satisfied.

16         There are findings of fact that are still envisioned

17   here and I'm assuming that that will be interpreted more

18   narrowly and more broadly by different parties in the

19   adversary proceeding.  So I need to be careful --

20   Q     Well, I actually --

21   A     -- not to characterize what will happen in those

22   matters.

23   Q     I actually objected to giving a legal opinion, so I

24   don't want one, sir.  I really wanted your agreement with me

25   that the non-legal language about performance, that the

1   debtors are not seeking the Judge to look at the factual

2   aspects of performance or conduct in relation to the

3   contract, correct?

4              MS. MARKS:  Objection.  At this point, the

5   document speaks for itself, and he's already answered.

6              THE COURT:  Well, I don't think he's answered --

7              MR. HAVILAND:  Judge --

8              THE COURT:  -- I don't think he's answered that

9   specific question.

10             THE WITNESS:  Sorry, Mr. Haviland, to make you do

11  this, can you repeat the question?

12  BY MR. HAVILAND:

13  Q     So I want to make sure you have the language in front

14  of you.  So if you can go to the first amended plan, the

15  September, late September version, because you'll have that

16  language and I'll tell you what was stricken.

17  A     I have that version.

18  Q     All right.  If you're under subsection (b), right after

19  the first comma after "such agreement," the language that it

20  reads, "and the parties'" -- in the plural possessive,

21  referring to Mallinckrodt ARD and Priority Healthcare d/b/a

22  CuraScript -- "the parties' performance thereunder,

23  consistent with its terms, in each case from and after the

24  effective date do not constitute an agreement."  By that

25  striking of that language, the debtors are not seeking this

1  Court to make a finding about performance and conduct in

2  relation to these contracts, correct?

3  A     I do believe that the striking of the language "the

4  parties' performance" is meaningful, it's a meaningful

5  change, whether that means that there are no questions,

6  though, when the new second amended plan says, "Contain

7  findings of fact," dot, dot, dot, "that the agreement does

8  not constitute the unlawful maintenance of monopoly power," I

9  don't know that that can be resolved without questions of

10 performance.  That's all I was saying.  I don't know if --

11 Q     Well --

12 A     -- the elimination of the phrase, "the parties'

13 performance," really does remove all questions about the

14 parties' performance.  Do you see my point there?  I don't

15 know --

16 Q     Well, I do, sir --

17 A     -- does that edit --

18 Q     Well, I --

19 A     -- (indiscernible) I don't know.

20        THE COURT:  All right, all right, all right.  Hold

21 on, hold on.  I'm getting to the point where I'm going to say

22 the document speaks for itself and the lawyers can argue

23 about what this means in the context of confirmation of the

24 plan.

25 BY MR. HAVILAND:

1  Q     One more question, Mr. Welch.  The debtors are

2  unwilling to strike paragraph 20 to make it clear that

3  they're not seeking any of these findings in relation to plan

4  confirmation, is that correct?

5  A     We are not willing to strike paragraph 20, no.

6  Q     So I want to work through your testimony on direct and

7  then I'll see how that tries to shortchange what I had

8  planned, but I want to go back to your earliest comments

9  about the enterprise-threatening litigation, sir.  And you

10 walked through kind of the history about the December '18

11 spinoff attempt, the issues with financing, and then getting

12 to the summer of 2019 and the pivot.  Do you remember that

13 earlier testimony?

14 A     I do.

15 Q     So I want to put Acthar and Mallinckrodt ARD in that

16 timeline because you didn't really speak to that, but you

17 remember at your earlier deposition in relation to the

18 unsubstantiated claims objection you agreed with me, did you

19 not, sir, that Mallinckrodt ARD, the seller -- marketer and

20 seller of Acthar, was insolvent by the fall of 2018, do you

21 recall that?

22 A     I don't recall that testimony as to that particular

23 date, no.

24 Q     Okay.  Well, that's a fact, though.  We looked at

25 documents that show that ARD was in fact insolvent by the

1   fall of 2018, right?

2   A    I believe that our tax department at some point took a

3   position that that legal entity was insolvent --

4   Q    It had no --

5   A    -- (indiscernible) --

6   Q    -- ability to pay bills, to draw credit, it was

7   insolvent.

8           MR. HAVILAND:  I just lost the witness.

9           THE COURT:  Yeah, I can still see him.

10          MR. HAVILAND:  He flashed -- they're moving around

11  as people turn their cameras on and off.

12          THE COURT:  Yeah, I keep telling people not to do

13  that.  I might have to institute a new rule that says, if you

14  keep flashing your camera on and you're not one of the people

15  that's supposed to be on camera, I'm going to kick you out

16  too.  And I'll say it again, you can turn on -- you can log

17  into the call without having your camera turned on, learn how

18  to do that, it's not that hard.  If I can figure it out,

19  anybody can figure it out.

20          MR. HAVILAND:  It took me a while, Judge.  I

21  agree.

22  BY MR. HAVILAND:

23  Q    Mr. Welch, I just want to get ARD into this timeline,

24  and you agree that it was insolvent in 2018 and by early 2019

25  when we started talking about the pivot in the summer of '19

224

1  to the Chapter 11, right?

2  A     That's correct.  You made a statement that insolvency

3  meant that it couldn't pay its bills, but Mallinckrodt ARD

4  LLC was a party to a cash-pooling arrangement, so it was able

5  to draw funds to meet its near-term business obligations.  It

6  would have just become increasingly insolvent with respect to

7  its liability to the pool, right?  So the impact of being

8  insolvent may not have been felt externally even though on an

9  internal, legal-entity basis as a subsidiary, on its balance

10  sheet, it would have been insolvent.

11  Q     I actually misspoke, I apologize.  I meant to refer to

12  Mallinckrodt ARD, Inc. that was the going concern in 2018,

13  that entity became insolvent.

14  A     Yes, that entity is -- there's historic continuity with

15  the entity today that's Mallinckrodt ARD LLC, we can agree

16  that they're one and the same.

17  Q     And the legacy company was Questcor Pharmaceuticals,

18  Inc., the one that Mallinckrodt purchased in 2014, right?

19  A     That merged into, yeah.

20  Q     And then that entity was renamed Mallinckrodt ARD,

21  Inc., right?

22  A     That's correct.

23  Q     And then that entity, when it became insolvent in 2018,

24  actually changed its corporate form under California law in

25  January of 2019, did it not?

1    A     It did, it became an LLC.

2    Q     And that's the same time that Judge Kapala denied

3    Mallinckrodt's motion to dismiss in January 2019 in the City

4    of Rockford case, right?

5    A     I'll take your word for it in terms of that timing.

6    Q     Okay.  And then from that point forward, the entity

7    that was sued in Rockford was an LLC, right?

8    A     That's correct.

9    Q     But Rockford and the other Ad Hoc Acthar Group had also

10   sued the PLC, the parent company, right?

11   A     I will take your word for it that they were named

12   parties in your litigation.

13   Q     Well, I'm going to try to streamline because I know we

14   have just a little over a half hour, so I want to try to get

15   through some things.  You talked earlier about the

16   government's Medicaid claim, do you recall that testimony,

17   sir?

18   A     I do.

19   Q     The government never sued the PLC, did they?

20   A     That's correct.  And, if you recall, this morning I

21   testified that it was Mallinckrodt ARD LLC that sued CMS for

22   a declaratory injunction that CMS could not take its

23   threatened actions with respect to Mallinckrodt ARD LLC's use

24   of the base date AMP.

25   Q     Right.  And the Medicaid rebate obligation was one of

1  the Mallinckrodt ARD entities, not any other debtor entity,

2  right?

3  A     That's correct, because that was the entity that sold

4  Acthar and participated in the federal programs.

5  Q     Okay.  So the government didn't have any claims against

6  any other entity other than the one that was committing the

7  Medicaid fraud that was ultimately adjudicated.  I know you

8  don't agree with that, but that was the finding of the court,

9  correct?

10 A     The government did not, to the best of my knowledge,

11 ever bring a claim in the action against Mallinckrodt PLC,

12 yes.

13 Q     Okay.  I want to -- and I'm going to again work through

14 your historical section, so it kind of overlays with some of

15 the things debtors' counsel did.  When you were talking about

16 enterprise-threatening litigation, you then started talking

17 about opioids, and I just have a couple of questions about

18 that.

19             MS. MARKS:  Your Honor, before Mr. Haviland goes

20 on a -- I apologize, I know we're stopping at 5:00, but I'm

21 not sure if I can make it to then without a quick restroom

22 break.  Could we break just for five minutes?

23             THE COURT:  All right, we'll take a short, five-

24 minute recess.

25             MS. MARKS:  Thank you.

1        MR. HAVILAND:  I don't have any objection to that,

2    Judge, actually.

3        THE COURT:  Me neither.

4        (Recess taken at 4:29 p.m.)

5        (Proceedings resumed at 4:34 p.m.)

6        THE COURT:  All right, it looks like everybody is

7    back.  Mr. Haviland, you may proceed.

8        MR. HAVILAND:  Thank you, Your Honor.

9    BY MR. HAVILAND:

10   Q    Mr. Welch, before we broke, I was going to walk through

11   your direct just as logically as you had presented it.  I

12   want to talk to you a little bit about opioids, if I can,

13   sir.

14       Do you remember talking about when the bankruptcy was

15   filed in October there were about 3,000 cases, right?

16   A    That's correct.

17   Q    And so the number of cases filed against Mallinckrodt

18   for opioids has been stopped since that point in time, right?

19   A    That's correct.

20   Q    And in the years prior to the bankruptcy, while you

21   were talking about, you know, the different SpinCo, surgical

22   bankruptcy and all that, the sum total of plaintiffs that

23   sued Mallinckrodt was only about 3,000, right?

24   A    It was growing new cases every week, so that -- up

25   until the petition date, new cases were being filed.

1  Q     But in the Purdue case -- and there's been some

2  discussion about it -- there's been many more cases filed

3  against Purdue, do you know that?

4  A     That would not surprise me.

5  Q     Why is that, sir?

6  A     Purdue -- you know, we are a generic company, so we

7  fill orders, we don't typically -- and we had a small amount

8  of branded opioids, but it paled in comparison to what Purdue

9  had.  And if we just think about the opioid-manufacturing

10 universe, it's actually the case that some of the generic

11 companies haven't even been sued at all.  Mallinckrodt, by

12 volume, makes more and so that's attracted more attention,

13 but the plaintiffs' bar has not sued every manufacturer

14 equally.  Purdue's history and the facts around that case

15 were different and for that reason I think it attracted more

16 suits than is the case with Mallinckrodt or some of the other

17 generic companies.

18 Q     And when you were describing the opioid litigation

19 generally, you said that there were a number of theories that

20 were put forth and I think you mentioned nuisance, right?

21 A     I think I go into great detail about this in my first

22 day declaration that there were marketing theories and then

23 there were diversion theories.  The marketing theories were I

24 think probably more important in Purdue.  For a generic

25 company where it's high volumes going to the distributors and

 1  to the retailers, diversion becomes a bigger interest.

 2       Public nuisance is more of a novel theory.  You know,

 3  should sugar manufacturers be responsible for obesity in this

 4  country, right?  That's kind of the theory there that the

 5  opioid-producing manufacturers, whether brands or generics,

 6  somehow contributed to -- in a nuisance way to the public

 7  health crisis about opioids in this country.

 8  Q    And before this second amended plan was proposed, sir,

 9  are you aware of verdicts that have come down in the opioid

10  space on public nuisance theories?

11  A    Yes, I am.

12  Q    In fact, in California a defense verdict was entered,

13  correct?

14  A    That's correct.

15  Q    And the Supreme Court of Oklahoma reversed a

16  plaintiff's verdict, correct?

17  A    They did, yes.

18  Q    And in both of those courts, California and Oklahoma,

19  the courts rejected public nuisance partly on the theory

20  that, as a Schedule II drug, there are legitimate

21  prescriptions.  Are you aware of that?

22  A    Yes, I've read those decisions.

23  Q    And that's part of the defense that Mallinckrodt had

24  and was going to bring, right, that it has legitimate generic

25  prescriptions in the marketplace, right?

1  A     That's correct, that would have been our -- similar

2  defenses would have been brought by Mallinckrodt to public

3  nuisance claims, yes.

4  Q     But Mallinckrodt never tested any of those defenses in

5  any court, right?

6  A     That's actually not the case.  We actually did have

7  some successful motions to dismiss prepetition, I believe in

8  Delaware and Connecticut.  So the issue was never would we

9  win some of these cases, we believed that we had strong

10 defenses, the question was could we win them all on all

11 counts.  And, you know, there was also a multi-district case

12 against the retailers in Ohio where a federal jury trial

13 found against the retail defendants, Walmart, Walgreens, CVS.

14 And in their public statements about that decision they were

15 like, we're just pharmacists filling prescriptions, we don't

16 even make the drugs, right?  So they pointed their fingers at

17 the manufacturers, that's Mallinckrodt, we have contracts

18 that feed those large pharmacy chains.

19 Q     You're one step removed from the pharmacy who has the

20 interface with the patient filling prescriptions, right?

21 A     If you think about the supply chain --

22 Q     Well, before you get there, you're one step removed

23 from retail, right?

24 A     Correct, in most instances -- I believe in all

25 instances.

1  Q      Mallinckrodt doesn't fill scripts directly like the

2  retail pharmacies, right?

3  A      We do not, no.

4  Q      And of course that verdict is subject to a potential

5  appeal by the pharmacies, we don't know what's going to

6  happen?

7  A      Correct.

8  Q      All right.  I just want to focus on Mallinckrodt and

9  these defenses.  And the two verdicts that came down on

10  nuisance threw out the theory because of the idea that you

11  can't have an attractive nuisance, as you used the sugar

12  example, but the two courts in California and Oklahoma said,

13  no, you can't have that theory against brand companies,

14  right?

15  A      I'm trying to remember exactly which parties were part

16  of the California decision, but it was narrow, right?  It was

17  not every cause of action that is found in the suits against

18  Mallinckrodt, these were narrow cases on public nuisance

19  under state statutory law for really a novel application of

20  public nuisance law to the opioid epidemic.  But it would be

21  a misrepresentation to condense all of the opioid litigation

22  into just the public nuisance claims, that's not the case.

23  Q      And I'm not trying to do that, sir, I'm just trying to

24  clarify a couple of things.

25         So when you talked about 3,000 cases, that's a known

1  quantity of cases filed against Mallinckrodt that alleged

2  theories, right?

3  A    That's correct, we know how many suits existed at the

4  petition date.

5  Q    Now, in conjunction with the plan, has Mallinckrodt

6  taken the Oklahoma cases and the California cases and taken

7  them out because of the loss of that liability theory?

8         MS. MARKS:  I'm going to -- what do you mean take

9  -- objection, vague.  I'm not sure what --

10         MR. HAVILAND:  Let me ask a different question.

11  BY MR. HAVILAND:

12  Q    What has the debtor done in relation to the loss of a

13  liability theory?  For instance, in Oklahoma, the Supreme

14  Court says you can't have nuisance, has the debtor done

15  anything prior to proposing this second amended plan?

16  A    Mr. Haviland, we have not gone back in light of just

17  two decisions and thought, oh, did we make a mistake by

18  needing to settle our opioid liability, and I think that's

19  really want --

20  Q    Correct.  I want to ask you about marketing, I want to

21  ask you next about marketing, because those verdicts didn't

22  cover marketing, right?

23  A    That's correct.

24  Q    Okay.

25  A    They were narrow findings on -- with respect to public

1  nuisance law in two states.

2  Q    And so the marketing theory -- and I think you said it

3  works for Purdue because it's a brand product and they go out

4  and promote the brand, right?

5  A    That's correct, and engaged in market-forming

6  activities.

7  Q    And did Mallinckrodt market its generic opioids?

8  A    Not our generic opioids, no, those are -- those are

9  sold differently.

10  Q    And isn't that the vast business of Mallinckrodt's

11  opioid business?

12  A    The overwhelming business.  In fact, today, we don't

13  have any branded opioids in our portfolio.

14  Q    And the debtors agreed to an injunction, they agreed to

15  stop marketing back in February of 2020 when the original

16  settlement was reached, correct?

17  A    That's correct.  We do not promote opioids, I think

18  that's the technical language that's in the injunction -- and

19  maybe marketing too, but we don't engage in that activity.

20  Q    And Mallinckrodt didn't think they did it before they

21  gave the injunction, right?

22  A    That's correct.  We said when we put the operating

23  injunction in place that we were abiding by it already.

24  Q    But, as of February 2020, Mallinckrodt made it clear

25  that whatever was alleged the company was doing, the company

1   wasn't going to do it going forward, right?  They had given

2   that injunction.

3   A     That's correct, we negotiated the scope and the

4   substance of the operating injunction, and we believed that

5   it fits our business needs and requirements and allows us to

6   continue to operate the generic opioid business in a lawful

7   way.

8   Q     And, at that time in February 2020, it was agreed that

9   Mallinckrodt would pay 1.6 billion in cash, plus warrants for

10  almost 20 percent of the NewCo entity, if you could do the

11  reorganized spinoff, right?

12  A     Yeah, structured over seven years on the cash.

13  Q     And that number and that construct stayed the same all

14  the way from February 2020 right up until October 12, 2020,

15  the bankruptcy filing, right?

16  A     That's correct, the $1.6 billion headline number did

17  not change between the February 2020 announcement and what we

18  entered into the restructuring process with.

19  Q     So there was an agreement by the parties that

20  everything that had gone on before was worth about 1.6

21  billion and this 20 percent stake -- I know it's 19.99, but

22  these warrants in whatever would become NewCo, right?

23  A     That's correct.

24  Q     And when you came -- when I say you, Mallinckrodt --

25  came into bankruptcy with an RSA that embodied that

1  agreement, right?

2  A    That's correct.

3  Q    And then the debtors went into an allocation mediation

4  with -- I forget the mediator, I should know, he's --

5  A    Kenneth Feinberg?

6  Q    Thank you.  I apologize to Mr. Feinberg.  And that was

7  done in the early part of this year, right?

8  A    That's correct.

9  Q    And that was to allocate that settlement, the 1.6

10  billion -- and there was some other consideration too, but

11  really those monies, right?

12  A    Among very different types of opioid claimants, yes,

13  that was the --

14  Q    And, as a result of that, that pot was allocated among

15  all the constituents in the bankruptcy, right?

16  A    That's correct.

17  Q    Okay.  And then, after that was all done, at some

18  point, sir, there was an agreement by the debtors to give

19  more money, another $125 million, right?

20  A    So the --

21  Q    Well, just is that right that --

22  A    Yes.

23  Q    Okay.

24  A    The opioid -- the settlement with the OCC that we

25  announced on September 2nd, 2021 followed the opioid

1  mediation.

2  Q    So I apologize, I'm jumping around, but I am trying to

3  tidy up here.  When you talked about that with Ms. Marks, I

4  was confused.  Is that additional money, addition to what had

5  been agreed to, did that come out of insurance?

6  A    No, it's a commitment by the debtors, the reorganized

7  debtors, to pay an incremental $125 million in cash in year

8  eight, so eight years after the effective date.

9  Q    But I want to be clear, nothing about the litigation

10 risk of the company had changed, there were still 3,000

11 cases, everything had been stayed, everything was going to

12 funnel to a trust, there was a standing injunction, and there

13 was these 20 -- roughly 20 percent warrants, nothing had

14 changed, right?

15 A    Mr. Haviland, at the time of the -- you know, before

16 the OCC settlement, the OCC had not come to support the plan

17 or the opioid settlement.  So --

18 Q    I understand that.

19 A    -- the mediation -- the mediation dealt with specific

20 issues among opioid claimants, but, as a result of the opioid

21 mediation itself, the OCC did not become a settling party.

22 The OCC was continuing to do due diligence and to look at the

23 history of the company.  The OCC had argued that the brand's

24 business was built on the back of the opioids and

25 intercompany claims history needed to be evaluated, and the

1  prospect of litigation with the OCC within these Chapter 11

2  cases, but for a settlement, that existed.

3         So even though there were not incremental opioid cases

4  being added, the litigation itself had kind of jumped into

5  around the plan as to whether the opioid creditors, including

6  the OCC as an estate fiduciary, could support the plan, and

7  we would have expected extensive litigation around that.

8  Q     Okay, I think I'm clear.

9         So, in answer to my question, there was nothing from

10  the debtors' risk perspective that changed because you had

11  the same amount of money, the same warrants, you already had

12  an allocated amount of all the constituents.  The OCC was

13  threatening litigation and, to get them on board, additional

14  consideration was given, is that fair?

15  A     It was the risk of an unsuccessful reorganization.

16  Q     Okay, I understand.  Okay.

17         And I'm going to just try to tidy up just a couple of

18  loose ends.  When you talked about the settlement in Ohio,

19  that was in early -- the fall of 2019, late summer, fall,

20  right?

21  A     That's correct --

22  Q     You said it --

23  A     -- October 2021, when it was finally done.  It was

24  announced in early September.

25  Q     You said it was 30 million, but it included free

1  product.  Do you recall that?

2  A    It was $24 million of cash and six million in free

3  product.

4  Q    You had said 30 million, I didn't know what piece of

5  it.  So the company gave free product valued at $6 million,

6  right?

7  A    Correct.

8  Q    And the PEC was involved in that -- and it will save me

9  some time tomorrow, I was going to show you some documents,

10  but Ropes & Gray was involved in negotiating that with the

11  plaintiffs' committee, correct?

12  A    They were -- Ropes was involved in those negotiations,

13  yes.

14  Q    And then the parties agreed that there would be cash

15  and then product consideration, right?

16  A    Correct.

17  Q    This bankruptcy has zero product, right?  There's no

18  consideration of product to the opioids.

19  A    That's correct.

20  Q    Why is that?

21  A    I think, as we worked on a global settlement, there

22  were lots of potential considerations.  We do have an

23  addiction treatment business and that's where the free

24  products come, just to be clear, that's what they were.

25           It's my understanding that it's challenging for

1  the various counties and cities to figure out and assess

2  their needs for free product, it just is an administrative

3  burden what the public parties that are settling with us that

4  entered into the RSA, those communities are hungry for cash

5  to abate a significant crisis that's a drain on their

6  budgets, and so cash was king in the negotiations.

7  Q     Well, the two Ohio counties that were going to trial,

8  they were hungry for cash too, right?

9  A     And from Mallinckrodt they received $24 million.

10  Q     And six million in product, which is pretty substantial

11  in terms of the overall value, right?

12  A     Relative to 24, yes.

13  Q     But the debtors have never sought to provide

14  consideration in lieu of cash to any opioid constituency in

15  the bankruptcy with this product that has value, right?

16  A     Mr. Haviland, so I testified this morning that

17  following the announcement of the settlement in September, we

18  began negotiating with the plaintiffs' executive committee,

19  with representatives of various states attorney general, they

20  hired competent advisers, they were doing due diligence, we

21  were showing them business plans, and what emerged was a

22  settlement that was announced in February of 2020.

23        I can tell you, between September '19 and February of

24  2020, if we're counting months, that was a time to talk about

25  what consideration the debtors could bring to the table, and

1  what was of interest and ultimately reflected in the

2  settlement was cash, other types of considerations, so

3  insurance -- some of that was undefined -- and warrants to

4  benefit from the upside in the equity, that's what emerged in

5  the deal.  A lot was talked about over the course of those

6  negotiations.

7  Q    I understand that, sir, but an asset of these debtors

8  is its product, right?

9  A    That's correct.  And the sale of our addiction

10 treatment is going to generate cash, which is going to be

11 used to fund, in part, these settlements.

12 Q    I'd like to move on.

13      You talked about the future claims representative, do

14 you remember that?

15 A    I do.

16 Q    There is no future claims representative for Acthar, is

17 there?

18 A    No, there is not.

19 Q    All right.  Again, I'm not actually jumping around, I'm

20 moving forward in your testimony.  So it's tracking Ms.

21 Marks' line, but you had some questions about the CMS

22 settlement.

23      And I realize, sir, you weren't at the table, so I

24 don't want to know what you don't know, okay?  And I also

25 don't want your legal opinions.  I want to be clear about

1   that.  But you did talk about exclusion and you did it in

2   context of out-of-compliance.  You have not presented any

3   document, have you, where the government threatened exclusion

4   of Mallinckrodt, correct?

5   A    I have not put forward any document that makes that

6   threat, no.

7   Q    And earlier we talked about it was Mallinckrodt ARD's

8   obligation to pay the Medicaid rebate that it didn't for

9   many, many years, right?

10  A    Yes, that -- the rebate issue was -- involved

11  Mallinckrodt ARD LLC, since it was the participant in the

12  Medicaid program.

13  Q    And, sir, that obligation actually went back to 2007

14  when Questcor decided to jump the price from 1600 to 23,000,

15  right, that's when that obligation kicked in?

16  A    No, Mr. Haviland.  The CMS issue, which is also the

17  underlying issue in the false claims action, is a very

18  specific controversy around the use of a base date average

19  manufacturer's price in the calculation of the Medicaid

20  rebate and that -- and Questcor first began using that base

21  date AMP figure in its rebate calculations in 2013.

22       So it's more --

23  Q    I understand that was the issue --

24  A    -- it's more math -- rebate math issue than a price

25  history issue.

1  Q     I do a lot of Medicaid work, I know exactly what the

2  AMP is and how it works, but the price change back in '07,

3  sir, actually changed the company's obligation for a rebate,

4  did it not?

5  A     It certainly impacts the math in terms of what the

6  rebate computation is.

7  Q     And when you testified, you said that IS, the

8  prescriptions of Acthar for infantile spasms, was

9  unprofitable if you took into account the rebate obligation

10 to the Medicaid program, do you remember that?

11 A     I did.

12 Q     And that was actually the case way back when Questcor

13 decided to take the price from $1600 to $23,000, but not pay

14 the Medicaid program, isn't that right?

15 A     I think, though, that that may be a confluation (sic)

16 of -- conflagration -- I'm blowing the word -- that may be

17 different issues.  It's clear --

18 Q     Well, I understand --

19 A     -- it's clear -- it's clear that --

20             THE COURT:  Wait, let him finish his answer.

21             MR. HAVILAND:  Yes.

22             THE COURT:  Go ahead.

23             THE WITNESS:  It's clear that the history of

24 Acthar, that selling it for infantile spasms, a very small,

25 narrow population, at $40 a vial, that's not a commercially,

1   economically viable model, right?  Questcor would have gone

2   bankrupt had it persisted in that.  It had to take the price

3   -- now, you can argue, you know, what is the right price, but

4   I think it's clear from what's been said in this case that

5   they would have gone bankrupt financially had they not

6   changed from $40 a vial, that historic price was

7   unsustainable.

8           Certainly, you don't get to a $650 million

9   retroactive rebate judgment in the CMS matter if you're still

10  at $40 a vial, we can agree on that.  But I think you have to

11  delink the 2007 price increase from the $650 million CMS

12  judgment, those are not alike situations.

13  BY MR. HAVILAND:

14  Q    And the company's lawsuit against the government was

15  premised upon the idea that, because the government had

16  issued a new NDC, National Drug Code, as a placeholder and

17  the company was using that one, that was the essence of the

18  argument that the company wouldn't have to pay a rebate, but

19  the government rejected that argument, right?

20  A    I believe it's an NDA, that there was a new NDA issued,

21  which allowed for the use of a base date AMP in conjunction

22  with that NDA, and I think that's when Questcor changed the

23  rebate calculation to correspond to that new NDA that had

24  been issued for Acthar.

25  Q    I just have one more thing I want to ask you about this

1   and I'm going to --

2          MR. HAVILAND:  -- I'll try to reach Your Honor's 5

3   o'clock deadline.

4   BY MR. HAVILAND:

5   Q     The ARD company that Medicaid had its obligation

6   against, its $650 million, is the same entity that my client

7   sued, right?

8   A     That's correct.

9   Q     And so the debtors' position that ARD is worthless --

10  are you aware of that?

11  A     Yes, we've talked about the insolvency of that legal

12  entity.

13  Q     So, if it's worthless for AHAG commercial payers, is it

14  not worthless for the federal government in terms of being

15  able to pay that settlement?

16  A     Those are two different things, Mr. Haviland, they're

17  two different -- they're two -- these are not alike

18  situations.  One --

19  Q     Well, I want to ask you, sir, where is the money coming

20  from?  That's what I want to know, where is the money coming

21  from?  If ARD is worthless and that's being used -- and I

22  know you're not involved in allocation, but you're aware that

23  the Class 6(a) creditor class where my clients reside are

24  getting six -- seven and a half million in cash, you're aware

25  of that, right?

1  A      I am aware of that.

2  Q      On the premise that that entity is worthless, you're

3  aware of that?

4  A      That's correct, historically.

5  Q      But the federal government only has claims against ARD,

6  not PLC, is getting $260 million, where is that money coming

7  from?

8  A      So the settlement is not specific to that legal entity,

9  so it's --

10 Q      It's coming from somewhere else?

11 A      -- (indiscernible) it's not being driven by a waterfall

12 as much as it's being driven by a settlement.

13 Q      I understand.

14         MR. HAVILAND:  Your Honor, I'm at a stopping

15 point, and I think what I was able to do will really help

16 streamline tomorrow.

17         If I may, I know we had an issue with our

18 exhibits.  So we sent to Mr. Cavello, Ms. Marks, and also to

19 Mr. Welch a set of exhibits that have numbers, which will

20 make it a lot easier for us tomorrow.  I predict that I

21 should be less than two hours.  I'm going to do my best in

22 the overnight to really streamline it, but it's been helpful

23 to follow the debtors' direct.

24         THE COURT:  All right.

25         MR. HAVILAND:  I'm going to adjourn for now.

1          THE COURT:  All right.  Thank you, Mr. Haviland.

2          All right.  Tomorrow, we don't start until 11:00

3    because I have other things I need to attend to in the

4    morning.  Is there anything we need to discuss before we

5    adjourn for the day?

6          I am going to try to review the materials that

7    were submitted for the motions *in limine* this evening and we

8    can perhaps, if I get through them, discuss those first in

9    the morning at 11:00 and then go back to Mr. Welch, unless --

10   I don't know, maybe it makes sense to finish up Mr. Welch and

11   then we'll do the motions *in limine*, since none of them

12   relate to Mr. Welch.

13         So we'll finish up Mr. Welch's testimony and then

14   we'll probably get to the motions *in limine* in the afternoon.

15   Okay?

16         MR. HAVILAND:  Thank you, Your Honor.

17         THE COURT:  All right.  Anything else we need to

18   discuss before we adjourn?

19         All right -- oh, go ahead, Ms. Marks.

20         MS. MARKS:  Your Honor, I would just -- I just

21   wanted to raise one suggestion for the other objecting

22   parties who will be examining Mr. Welch tomorrow.  It would

23   help us streamline things a little bit, he does have all of

24   the exhibits in front of him, but if anyone plans to show him

25   any documents that aren't in the exhibit list, please let us

247

1  know.  If you have particular exhibits you'd like him to look

2  at, if you want to let us know in advance, we can have -- you

3  know, make sure those are in front of him.

4            And, as you're doing the questioning, if you would

5  -- you know, if everyone could make sure to call out the

6  specific exhibit number, that would help Mr. Welch pull them

7  up.

8            THE COURT:  Yes, that helps me as well, so let's

9  do that.

10            MR. HAVILAND:  I'll certainly do that in the

11  overnight.  Thank you.

12            THE COURT:  All right.  Thank you, Mr. Haviland.

13            All right, anything else?

14       (No verbal response)

15            THE COURT:  Okay.  Thank you all.  We're

16  adjourned.  I'll see everybody tomorrow morning at 11:00 a.m.

17            COUNSEL:  Thank you, Your Honor.

18       (Proceedings concluded at 5:01 p.m.)

19

20

21

22

23

24

25

1

CERTIFICATE

2

3       We certify that the foregoing is a correct transcript

4  from the electronic sound recording of the proceedings in the

5  above-entitled matter.

6

7  /s/Mary Zajaczkowski              December 7, 2021
   Mary Zajaczkowski, CET**D-531

8

9  /s/Coleen Rand                    December 7, 2021
   Coleen Rand, AAERT Cert. No. 341

10

11 /s/William J. Garling             December 7, 2021
   William J. Garling, CE/T 543

12

13 /s/ Tracey J. Williams            December 7, 2021
   Tracey J. Williams, CET-914

14

15

16

17

18

19

20

21

22

23

24

25