No. 21-cv-01780-TLA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

In re MALLINCKRODT, PLC, et al., *Debtors*.[*]

ATTESTOR LIMITED and HUMANA INC., *Appellants*,

v.

MALLINCKRODT, PLC, et al., *Appellees*.

On Appeal from the United States Bankruptcy Court
for the District of Delaware, No. 20-12522 (JTD)

## REORGANIZED DEBTORS' MOTION
## TO DISMISS APPEAL AS EQUITABLY MOOT

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
**RICHARDS, LAYTON
& FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700
collins@rlf.com
merchant@rlf.com
steele@rlf.com
schlauch@rlf.com

Melissa Arbus Sherry
James A. Tomberlin
Andrew Sorkin
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
melissa.sherry@lw.com
james.tomberlin@lw.com
andrew.sorkin@lw.com

*(additional counsel listed on inside cover)*

---

[*] A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.ra.kroll.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

George A. Davis
George Klidonas
Anupama Yerramalli
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200
george.davis@lw.com
george.klidonas@lw.com
anu.yerramalli@lw.com

Jeffrey E. Bjork
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
(213) 485-1234
jeff.bjork@lw.com

Jason B. Gott
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700
jason.gott@lw.com

*Counsel for Debtors-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ..................................................................................................... 2

 A. Events Leading Up To The Bankruptcy.................................................. 3

 B. The Chapter 11 Cases.............................................................................. 3

 C. Administrative Claims Trial .................................................................... 5

 D. Plan Confirmation And Subsequent Proceedings ................................... 7

 E. Plan Consummation ................................................................................. 8

ARGUMENT ........................................................................................................ 10

I. The Unstayed Plan Has Been Substantially Consummated ........................ 11

 A. Substantial Consummation.................................................................... 11

 B. Failure To Seek A Stay ......................................................................... 11

II. Granting Relief Would Significantly Harm Third Parties And Scramble The Plan ........................................................................................ 14

 A. Effect Of Granting Relief On New Mallinckrodt's Finances ............. 14

 B. Harm To Third Parties.......................................................................... 16

 C. Scrambling Effects ............................................................................... 18

III. Public Policy Favors Dismissal ................................................................. 21

CONCLUSION .................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Chateaugay Corp.*,
  10 F.3d 944 (2d Cir. 1993) ...............................................................................19

*In re Continental Airlines*,
  91 F.3d 553 (3d Cir. 1996) ...........................................................................*passim*

*In re Millennium Lab Holdings II, LLC*,
  945 F.3d 126 (3d Cir. 2019) .........................................................................*passim*

*Nordhoff Inv.'s Inc. v. Zenith Elecs. Corp.*,
  258 F.3d 180 (3d Cir. 2001) ...............................................................12, 16, 17

*In re Phila. Newspapers, LLC*,
  690 F.3d 161 (3d Cir. 2012) .......................................................11, 16, 17, 19

*In re Semcrude, L.P.*,
  728 F.3d 314 (3d Cir. 2013) .....................................................................11, 19

*In re Specialty Equip. Cos.*,
  3 F.3d 1043 (7th Cir. 1993) ...............................................................................20

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015) .........................................................................*passim*

*In re UNR Indus., Inc.*,
  20 F.3d 766 (7th Cir. 1994) ...............................................................................16

*In re Zenith Elecs. Corp.*,
  329 F.3d 338 (3d Cir. 2003) ...............................................................................12

## STATUTES

11 U.S.C. §§ 1101(2)(A)-(C) .......................................................................11

Mallinckrodt plc and its affiliated reorganized debtors ("New Mallinckrodt") submit this motion to dismiss Attestor's[1] above-captioned appeal of the Bankruptcy Court's Order dated December 12, 2021 [Bankr. D.I. 5886] ("Order") as equitably moot.[2]   New Mallinckrodt relies on the appeal record and the accompanying Declaration of Bryan Reasons ("Decl."), and states as follows:

## PRELIMINARY STATEMENT

In this appeal, Attestor seeks allowance of administrative claims that Attestor valued at over $300 million in November 2021 and that, based on Attestor's projections, would total over $600 million today.  Although New Mallinckrodt does not believe Attestor is entitled to $600 million (or any other relief), if Attestor ultimately prevailed, that amount would become due immediately.  Saddling New Mallinckrodt with that kind of new liability—when it just emerged from one of the most complex chapter 11 bankruptcies to date during exceedingly difficult market conditions—would harm purchasers of equity and debt securities that made new investments in the Company in reliance on the validity of the Confirmation Order. The potential liability would also substantially weaken New Mallinckrodt's liquidity

---

[1] This Motion refers to Attestor Limited; Avon Holdings I, LLC; and Humana Inc. collectively as "Attestor."

[2] "Bankr. D.I." refers to the docket in the main chapter 11 case, No. 20-12522 (JTD). "D.I." refers to the docket in this appeal.  Capitalized terms not defined have the meanings ascribed to them in the Fourth Amended Joint Plan of Reorganization (the "Plan") [Bankr. D.I. 6510] or the Confirmation Order [Bankr. D.I. 6660].

position.  The relief Attestor seeks would require the Company to use up too much liquidity and would likely eliminate the Company's equity value altogether, to the detriment of third parties.

Attestor's failure to seek a stay in connection with this appeal and other litigation conduct make the case for dismissal stronger still.  Attestor claims entitlement to hundreds of millions of dollars in administrative claims.  And the Bankruptcy Court explicitly relied on the denial of those claims in confirming the Plan.  Yet Attestor never sought a stay in connection with this appeal.  And when Attestor sought a limited stay in connection with a separate, unrelated appeal (which Attestor dismissed when the stay was denied), it made clear it was *not* seeking to prevent the Plan from becoming effective.  More than *six months* have now passed since the decision Attestor seeks to challenge on appeal, but merits briefing has yet to begin because Attestor refused to set a briefing schedule in this Court.  Attestor's failure to expeditiously prosecute this appeal, paired with its failure to seek a stay, weigh against granting relief.  Dismissal is the only equitable result.

## BACKGROUND

The facts most pertinent to this Motion are presented below.  Additional background can be found in the Debtors' opposition to certification in this appeal. *See* D.I. 19 at 9-13.

2

## A.      Events Leading Up To The Bankruptcy

Mallinckrodt is a global specialty biopharmaceutical company that produces and sells generic and branded products.  Decl. ¶ 6.  In the years leading up to the bankruptcy, certain Mallinckrodt entities were named in thousands of lawsuits stemming from the production and sale of opioid products and were subject to a number of government investigations.  *See* Bankr. D.I. 128 at 32-35.  Mallinckrodt entities separately faced litigation and government investigations relating to other business lines, including its Acthar® Gel ("Acthar") product.  *Id.* at 36-37.  The cost and burden associated with those matters, and the fact that any judgments could quickly aggregate into tens of billions of dollars, ultimately led the Debtors to file for chapter 11 protection.  *Id.* at 5, 36-38.

## B.      The Chapter 11 Cases

On October 12, 2020, the Debtors filed chapter 11 petitions.  Bankr. D.I. 1.  By then, the Debtors had already negotiated and executed a Restructuring Support Agreement ("RSA"), which included cornerstone settlements with major governmental opioid claimants and the fulcrum class of funded debt creditors, the Guaranteed Unsecured Noteholders.  Bankr. D.I. 128 at 7.  The Debtors had also achieved settlements of significant litigation with the Department of Justice and the Centers for Medicare and Medicaid Services concerning Acthar.  *Id.* at 10-11.

The core settlements underlying the RSA, which were reflected in the Plan, included an allocation of the residual value of the reorganized enterprise between the Guaranteed Unsecured Noteholders and the opioid claimants. Decl. ¶ 8. Under the RSA (and the Plan), the Guaranteed Unsecured Noteholders received all of the equity of the reorganized enterprise (before dilution for certain plan transactions), while the opioid claimants received deferred cash payments totaling $1.725 billion and certain other assets, including warrants to purchase 19.99% of the equity of the reorganized enterprise at an agreed-upon strike price. *Id.* During the bankruptcy, the Plan was amended to incorporate a settlement with additional opioid claimant constituencies and a settlement (also incorporated in an amended RSA) with an ad hoc group of Term Loan Lenders, the Debtors' largest funded debt constituency. Bankr. D.I. 1631; *see* Decl. ¶ 11 (explaining background of Supporting Term Loan Lenders settlement providing crucial support for the Plan and the restructuring).

Each of the RSA creditor constituencies bargained for the right to terminate the RSA if certain case milestones were not met. The RSA parties originally bargained for the right to terminate if the Debtors did not emerge from bankruptcy by January 2022. *Id.* ¶ 9. As part of the Supporting Term Loan Lenders' settlement, the parties renegotiated some of those milestones, initially permitting any party to terminate unless the Debtors emerged from bankruptcy by November 15, 2021. *Id.* ¶ 11. Over the course of the case, the Debtors achieved settlements with other key

4

constituencies as well.  *See* Bankr. D.I. 6510-4 at 2-4 (Second Lien Noteholders); Decl. ¶ 11 (Revolving Lenders).

The settlements included in the RSA were memorialized in the conditions precedent in the solicitation version of the Plan, one of which required that the RSA "remain in full force and effect and not have been terminated, and the parties thereto shall be in compliance therewith."  Bankr. D.I. 2916 at 110.

### C.   Administrative Claims Trial

Attestor's claims against the Debtors relate to Acthar, a naturally derived ACTH product with no generic or non-name brand equivalent.  Order 2-3.  Attestor filed proofs of claim for prepetition purchases of Acthar and moved for payment of administrative expense claims based on postpetition purchases.  Order 1-2; *see* Bankr. D.I. 2159.  Attestor argued that the Debtors' acquisition of the rights to Synacthen—a synthetic ACTH compound, which has only some properties similar to Acthar—violated the federal antitrust laws, the RICO Act (among other laws), and state laws.  Order 1-3.  The Debtors objected to Attestor's administrative claims, Bankr. D.I. 2521, and the Bankruptcy Court conducted a two-week bench trial in late 2021.  Order 2.[3]

---

[3] Attestor's prepetition claims were largely disallowed for lack of substantiation. Bankr. D.I. 3406.  Those claims are the subject of a separate appeal that has been fully briefed and is pending in this Court.  *See* Case No. 21-cv-01093-TLA.

In a pretrial brief filed in November 2021, Attestor cited its expert's analysis estimating Attestor's "postpetition damages" to be "more than $300 million." Bankr. D.I. 5196 at 42 ¶ 93. Attestor's expert provided a breakdown of the average postpetition damages he estimated Attestor accrued from the petition date through June 2021 (or later for some claimants). AICX-1455, Table 11 (showing monthly average of approximately $29.3 million). Based on those estimates, and assuming the rate of accrual remained constant through the Debtors' emergence in June 2022, Attestor's administrative claims would total over $600 million.

At the end of the trial, on December 6, 2021, the Bankruptcy Court found that Attestor "failed to meet [its] burden of proof on" its antitrust and RICO claims, and had abandoned its state-law claims. Bankr. D.I. 5740 at 8:5-9. A written order followed. Order 2, 24-25, 34.

On December 20, 2021, Attestor appealed. Bankr. 5882; *see* D.I. 1. In January 2022, the Debtors proposed a merits briefing schedule that would have begun on March 4, 2022 and concluded on April 18, 2022. *See* D.I. 8. Weeks later and well over a month after filing its appeal, on February 4, 2022, Attestor filed a motion asking this Court to certify a direct appeal to the Third Circuit, which the Debtors opposed. D.I. 12, 19. The motion remains pending. Attestor also took the position that no briefing schedule should be set until certification was resolved. D.I. 8. To date, merits briefing has not begun, and no schedule has been set.

### D.    Plan Confirmation And Subsequent Proceedings

Following the Bankruptcy Court's ruling on Attestor's administrative claims, the confirmation hearing proceeded, concluding on January 6, 2022.  The court issued an opinion confirming the Plan on February 3, 2022.  Bankr. D.I. 6347; Bankr. D.I. 6378 (revised opinion).  On March 2, 2022, it entered the Confirmation Order. Bankr. D.I. 6660.    The Confirmation Order included specific provisions memorializing and relying on the court's prior ruling disallowing Attestor's administrative expense claims.  *See* Bankr. D.I. 6660 at 55 (citing administrative claims order, and other evidence, as "establish[ing] that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan").

Attestor appealed from the Confirmation Order, challenging the Plan's treatment of its prepetition claims.  *See* Case No. 1:22-cv-215-TLA, Dkt. 1.  In connection with that appeal, Attestor sought a limited stay of distributions to Class 6 General Unsecured Creditors under the Plan.  Bankr. D.I. 6722.  The Bankruptcy Court denied the motion.  Bankr. D.I. 6942, 7021.  Attestor filed a renewed stay motion in this Court, which was likewise denied.  Case No. 1:22-cv-215-TLA, Dkt. 18, 48-49.  Following that ruling, Attestor dismissed that appeal.  *Id.*, Dkt. 51-52. Attestor never sought a stay in connection with this appeal or the relief at issue.[4]

---

[4] Attestor's stay motion in this Court referenced and discussed its disallowed prepetition claims and related appeal.  D.I. 18 at 11-14; *see* Case No. 21-cv-01093-TLA.  There was no reference to this appeal or Attestor's administrative claims.

And throughout the stay briefing, Attestor emphasized that it sought "to stay distributions only to one creditor class" and that it was not asking the court to stay "the rest of the Plan." *Id.*, Dkt. 18 at 2; Bankr. D.I. 6722 at 15.

### E.  Plan Consummation

Mallinckrodt plc, the parent company, is an Irish public limited company, and was required to commence an examinership proceeding in Ireland to recognize the result of the chapter 11 proceeding. Bankr. D.I. 6660 at 30. The examinership proceeding concluded on April 27, 2022.

As required by the Plan, after the Confirmation Order was entered, the Debtors undertook to raise exit financing, which market turmoil made quite challenging. Decl. ¶ 22. The Debtors ultimately issued new first lien secured notes to new-money bondholders on June 16, 2022. *Id.* The same day, substantially concurrently with the issuance of the new secured notes, the Plan went effective. *Id.* ¶ 16.

On and immediately after the Effective Date, New Mallinckrodt undertook an array of complex transactions to effectuate the Plan and continue post-closing business operations. Among other things, the Mallinckrodt companies:

(a)  Cancelled their pre-petition public equity;

(b)  Caused the creation of New Mallinckrodt and caused New Mallinckrodt to acquire substantially all of the assets of Mallinckrodt plc;

(c)  Issued the New Mallinckrodt Ordinary Shares and distributed those shares to the holders of Guaranteed Unsecured Notes Claims;

(d)     Entered into the New Opioid Warrant Agreement, issued the New Opioid Warrants, and distributed those warrants to the Opioid MDT II (the master trust for disbursements to opioid creditors);

(e)     Issued new First Lien Notes in exchange for $650 million in financing from third-party lenders;

(f)     Paid $22,631,640 in cash and entered into the New Takeback Term Loans in a principal amount of $1,762,634,900.41 in satisfaction of the First Lien Term Loan Claims;

(g)     Issued the Takeback Second Lien Notes in a principal amount of $375 million, and paid an approximately $19 million Noteholder Consent Fee, in partial satisfaction of the Guaranteed Unsecured Note Claims;

(h)     Issued the New Second Lien Notes in a principal amount of $322,868,000 in satisfaction of the Second Lien Notes Claims;

(i)     Paid approximately $900 million in cash to satisfy the First Lien Revolving Credit Facility Claims;

(j)     Paid approximately $135 million in cash in exchange for the discharge of General Unsecured Claims;

(k)     Paid approximately $1.4 million in cash in exchange for the discharge of the Allowed Trade Claims;

(l)     Paid approximately $447 million, and assumed the obligation to make the Opioid Deferred Cash Payments of $1.275 billion over the next 8 years, as part of the Opioid Settlement;

(m)     Paid approximately $18 million, and assumed the obligation to make the Federal/State Acthar Deferred Payment of $245 million over the next 7 years, as part of the Federal/State Acthar Settlements; and

(n)     Assumed or rejected, as applicable, all of the Executory Contracts and Unexpired Leases, and made approximately $23.8 million in cure payments.

*Id.* ¶¶ 17-31.

Immediately following the Effective Date, equity in New Mallinckrodt began trading in the OTC marketplace. *Id.* ¶ 19. Approximately 1.2 million shares, or approximately 9% of the total number of shares, have thus far traded in public market transactions, and shares will continue to publicly trade moving forward. *Id.* ¶ 20. As of the date of this filing, the opening price of New Mallinckrodt's shares was $24.50 per share, implying a total equity value of approximately $325 million. *Id.* New Mallinckrodt's new debt instruments, including the newly issued New First Lien Notes and newly issued New Second Lien Notes, are also actively trading in the debt markets. *Id.* ¶ 24.

## ARGUMENT

Courts have dismissed appeals as equitably moot following plan confirmation when "effective relief could conceivably be fashioned," but "implementation of that relief would be inequitable." *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996) (en banc) (citation omitted). The "equitable mootness analysis proceeds by asking two questions:  '(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation.'" *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 140 (3d Cir. 2019) (quoting *In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015)). Courts also consider other factors, including whether an

appellant sought and obtained a stay (which relates to the first prong), and "the public policy of affording finality to bankruptcy judgments." *In re Phila. Newspapers, LLC*, 690 F.3d 161, 168-70 (3d Cir. 2012) (citation omitted). Both prongs and all related factors favor dismissal.

## I.     THE UNSTAYED PLAN HAS BEEN SUBSTANTIALLY CONSUMMATED

The Plan has been substantially consummated, and Attestor's failure to seek a stay to prevent that result weighs in favor of dismissal.

### A.     Substantial Consummation

Substantial consummation occurs upon the (A) "transfer of all or substantially all of the property proposed by the plan to be transferred"; (B) "assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan"; and (C) "commencement of distribution under the plan." 11 U.S.C. §§ 1101(2)(A)-(C); *see In re Semcrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013). Those requirements have been met. Plan distributions have been made, new obligations have been incurred, and New Mallinckrodt has emerged from chapter 11 as a reorganized enterprise. *See* Decl. ¶¶ 16-31, *supra* at 8-10.

### B.     Failure To Seek A Stay

The equitable mootness doctrine prevents courts from being placed in the position of "'unscrambling complex bankruptcy reorganizations,'" particularly

"'when the appealing party should have acted before the plan became extremely difficult to retract.'"  *In re Zenith Elecs. Corp.*, 329 F.3d 338, 340 (3d Cir. 2003) (citation omitted).  Accordingly, an appellant's failure to seek a stay pending appeal weighs heavily against granting relief.  *See Tribune*, 799 F.3d at 281-82; *see also Nordhoff Inv.'s Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 191 (3d Cir. 2001) (Alito, J., concurring that appeal was equitably moot, "primarily influenced by the appellants' failure to seek a stay").

Attestor sought a limited stay in connection with its now-dismissed appeal of the Confirmation Order.  But it never sought a stay in connection with this appeal. Attestor's stay motions sought *only* to prevent "distributions to Class 6 claimants," based on an argument that the Plan unfairly discriminated among its subclasses. Case No. 1:22-cv-215-TLA, Dkt. 18 at 15-19; *see* Bankr. D.I. 6722 at 3, 9-14.  And Attestor went out of its way to emphasize that it was "*not* [requesting] that the Plan otherwise not be consummated or that any other distributions be withheld." *Id.*, Dkt. 18 at 19.  A narrow stay of distributions to certain prepetition creditors would have had no impact on the equities of granting relief in this appeal, which relates to administrative expense liability and has nothing to do with Class 6 distributions.  Nor did Attestor's stay motions even mention this appeal or Attestor's administrative claims.  *See supra* note 4.

Attestor's failure to seek a stay in connection with this appeal is striking given its repeated assertions that the hundreds of millions of dollars it sought would threaten the Plan's feasibility. *See* Bankr. D.I. 2657 at 8 ¶ 18 (arguing that the claims (if allowed) would "threaten[] the feasibility of the Plan"); Bankr. D.I. 2752 at 13:2-10 (asserting that, if Attestor's administrative expenses are allowed, "there's no way that the court can conclude that the debtors' plan is feasible"). Attestor told this Court that "[t]he antitrust claim at issue here is momentous . . . financially." D.I. 12 at 19. And the Confirmation Order memorialized and relied on the administrative expense ruling at issue in this appeal. Bankr. D.I. 6660 at 55. Yet Attestor made no attempt to seek a stay to ensure it could receive relief after the Plan went effective.

The delay that resulted from Attestor's other litigation conduct provides further support for dismissal. Even though Attestor filed this appeal in December 2021, there has been no merits briefing to date. That is Attestor's fault. The Debtors promptly proposed a schedule in January 2022. *See* D.I. 8 at 2. Two weeks later, and well over a month after filing its appeal, Attestor filed a certification motion and opposed setting any schedule for merits briefing until its certification motion was resolved. D.I. 8, 12. Under any normal briefing schedule, this appeal would have been fully briefed (and potentially decided) by now. That Attestor could have had its appeal heard before consummation should weigh heavily against granting relief.

## II.   GRANTING RELIEF WOULD SIGNIFICANTLY HARM THIRD PARTIES AND SCRAMBLE THE PLAN

The effect of imposing over $600 million in new, immediately payable liability on New Mallinckrodt would strain the newly emerged enterprise's finances and undermine the fresh start the bankruptcy afforded it.  That amount far exceeds the Company's current equity market capitalization and liquidity.  And while New Mallinckrodt strongly believes that Attestor is not entitled to $600 million (or any other relief), that is beside the point for current purposes.  When it comes to assessing equitable mootness, the Court should assume Attestor will ultimately obtain the full $600 million it seeks.  *See Continental*, 91 F.3d at 656 (counseling against asking whether investors' "reliance [on the finality of the confirmed plan] was 'reasonable' or based on a 30%, 60%, or 100% probability" that an appellant is correct).  The critical point is that, if granted, the relief Attestor seeks would significantly harm third-party investors and other creditors, and would scramble the Plan.

### A.   Effect Of Granting Relief On New Mallinckrodt's Finances

According to the valuations presented at the confirmation hearing and relied on by the Bankruptcy Court, New Mallinckrodt's total enterprise value was approximately $5 billion.  Bankr. D.I. 2917 at 830 (Disclosure Statement valuation with mid-point of $5.45 billion); Bankr. D.I. 5000 at ¶ 10 (declaration indicating 7% reduction of valuation prior to confirmation hearing).  After giving effect to the Plan transactions, New Mallinckrodt has approximately $3.6 billion in funded debt

outstanding, in addition to $1.52 billion of deferred settlement obligations to the opioid creditors and on account of the Federal/State Acthar Settlement.  Decl. ¶¶ 17(i)-(k), 26, 28.

Based on trading prices for New Mallinckrodt's equity on the over-the-counter market, New Mallinckrodt's implied total equity value is approximately $325 million.  Decl. ¶ 20.  Reducing New Mallinckrodt's equity market capitalization by over $600 million would, of course, substantially affect the value of equity in New Mallinckrodt that is actively trading in the market.  Indeed, the potential liability here exceeds New Mallinckrodt's entire equity market capitalization.

Subjecting New Mallinckrodt to hundreds of millions of dollars in new administrative expense claims would also dramatically impact the Company's liquidity position.  As reflected in the Confirmation Opinion, New Mallinckrodt is expected to have adequate liquidity to finance current operations and maintain adequate cash reserves for a business of its size under the Plan as confirmed.  *See* Bankr. D.I. 6378 at 74-75.  The Company believes that its "minimum liquidity" needed to operate the business is approximately $250 million.  Decl. ¶ 34.  Needless to say, then, a $600 million immediate cash payment (which is more than the Company's $300 million in current working capital) would negatively impact liquidity.  *See id.* ¶¶ 32, 34 (explaining that to properly fund such a large claim, New

Mallinckrodt would likely need to use cash from operations and seek additional financing). The strain on New Mallinckrodt's liquidity position could have wide-ranging effects on the business. *See id.* ¶¶ 32-36.

### B.   Harm To Third Parties

Among the most important considerations in evaluating equitable mootness is harm to "third parties," especially parties that have invested new money or credit in the enterprise. *See, e.g.*, *Millennium*, 945 F.3d at 142 (citing harm to new lenders and equity holders); *Tribune*, 799 F.3d at 281 (new equity); *Nordhoff*, 258 F.3d at 188 (holders of publicly traded bonds). Granting the relief sought in this appeal would harm the major constituencies that have relied on the Confirmation Order, including new equity owners and new bondholders that provided the financing necessary for the Plan to go effective.

*New Stockholders*. New Mallinckrodt's shares are now heavily traded. Decl. ¶ 20. Purchasers in the securities markets are paradigmatic "third parties" with no apparent prior connection to the Debtors or the bankruptcy. *Nordhoff*, 258 F.3d at 188 (secondary market purchasers of bonds are "third part[ies]" with "reliance interests"); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (Easterbrook, J.) (dismissing appeal because shareholders who bought on public markets "purchased on the assumption that all asbestos payments would be borne by the Trust" rather than the reorganized entity). Granting the $600 million in relief sought

in this appeal would result in a corresponding decrease in the Company's equity market capitalization and share price, inflicting a substantial loss on new equity investors. *See* Decl. ¶ 21. That the asserted liability exceeds New Mallinckrodt's entire equity market capitalization only underscores the potential severity of those effects.

*New Bondholders and Lenders*. After entry of the Confirmation Order, outside investors also agreed to provide financing by purchasing new debt securities from New Mallinckrodt in the amount of $650 million. Decl. ¶ 22. Although some of those purchasers were also prepetition lenders, they had no obligation to invest additional money, and thus are considered third parties. *See Nordhoff*, 258 F.3d at 188. The financing was crucial, as it was principally used to refinance the Debtors' revolving loans—a requirement for Plan consummation.

In addition, the Guaranteed Unsecured Noteholders' and Second Lien Noteholders' prepetition claims were satisfied in part through the New Second Lien Notes, and the claims of the Term Loan Lenders were exchanged for New Term Loans. Decl. ¶¶ 17, 23. The New Second Lien Notes trade in the bond market, and the New Term Loans trade in the term loan markets. *Id.* ¶ 24. The open-market purchasers of those new notes and term loans are prototypical third parties. *See Nordhoff*, 258 F.3d at 188. Adding a $600 million liability to New Mallinckrodt's

17

balance sheet would undoubtedly have impacted their investment decisions as well as the pricing of the loans they purchased.

*Opioid Stakeholders, Employees, Counterparties, and Other Stakeholders*. New Mallinckrodt is a critical supplier in the pharmaceutical industry.  It also has major obligations to the opioid stakeholders, including cash payments.  Imposing material additional obligations would negatively impact those creditors and third parties.   Among  other  things,  imposing  a  $600  million  obligation  on  New Mallinckrodt would decrease the value of the New Opioid Warrants contributed to the Opioid MDT II.  Decl. ¶ 21.  Because the company's market capitalization would be diminished as a result of that obligation, so too would the value of the New Opioid Warrants,  as  decreased  equity  value  would  lead  the  Opioid  MDT  II  to  sell  the warrants  at  a  lower  price  than  their  expected  future  value,  or  hold  the  warrants without  exercising  them.   *Id.*   This  would  reduce  the  future  distributable  value available to individual Opioid Claimants and countless programs across the country established to abate the opioid crisis.  *Id.*

### C.   Scrambling Effects

Beyond the unfairness to new investors and other stakeholders, granting the relief Attestor seeks would have a scrambling effect on the Plan that cannot be undone.  The impact is self-evident:  imposing an immediately payable $600 million liability  would  absorb  a  very  significant  portion  of  the  Company's  liquidity  and

potentially all of its equity value.  Granting the relief sought in this appeal would be exponentially more substantial than cases in which equitable mootness arguments have been rejected.  *See, e.g.*, *Tribune*, 799 F.3d at 283 (claim involving "whether one of two classes of creditors is entitled to $30 million in the context of a $7.5 billion reorganization"); *id.* at 282 n.4 (discussing cases involving "lower . . . potential recovery," citing *Phila. Newspapers*, 690 F.3d at 170 (claim worth 1.7% of the price of debtor's assets) and *In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993) (claim worth up to 10% of a reorganized debtor's working capital)); *In re Semcrude, L.P.*, 728 F.3d 314, 324 (3d Cir. 2013) (claim worth $207,300.62 in context of over $2 billion reorganization).

The frustration of parties' settled expectations would likewise have a scrambling effect here.  Each of the RSA parties bargained for a restructuring under which a Plan had to be completed on agreed financial terms *and* on the agreed schedule, or they would be entitled to revisit their settlement or investments.  *See supra* at 4.  Because the Plan was not confirmed by November 15, 2021, those parties had a right to terminate the RSA, but they chose not to do so.  It is impossible to know whether any of the RSA parties *would have* exercised that right—or sought to renegotiate their economic deals—if the Bankruptcy Court or this Court had required payment of the administrative claims at issue.  But it is certain that, if this appeal

were successful, those settling creditors will have lost their bargained-for option to renegotiate or walk away from the Plan.

*Millennium* stands for the proposition that revising a plan to the detriment of settling parties, while not returning those parties to the *status quo ante*, is a kind of "scrambling" that supports equitable mootness. 945 F.3d at 143-44. *Continental* applied a similar principle to affirm dismissal of a claim for $117 million in administrative expenses as equitably moot. 91 F.3d at 652, 654-65 (citing investor's "reli[ance] on . . . unstayed Confirmation Order in making the decision to proceed to close" their investment in the plan and noting that "[b]y the time the district court ruled on the appeal, it was no longer possible to restore the parties to their earlier positions"). As in those cases, it would be "profoundly inequitable" here to reallocate hundreds of millions of dollars to administrative expenses without allowing other stakeholders to renegotiate their deal points, as they could have done. *Millennium*, 945 F.3d at 144; *see generally Continental*, 91 F.3d at 564-65 (claim is equitably moot "when its acceptance 'would amount to imposing a different plan of reorganization on the parties'" (quoting *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1048 (7th Cir. 1993)).

One final point bears mention. This appeal standing alone is equitably moot; but it does not stand alone. New Mallinckrodt has concurrently filed motions to

dismiss three other appeals on similar equitable mootness grounds.[5]  None is the kind of "low-value appeal" that would involve only "minor changes to a plan of reorganization."  *Tribune*, 799 F.3d at 282 n.4.  And none of the appellants have equity on their side.  Each appeal independently impacts third-party reliance interests and scrambles the Plan.  Taken together, the effect of granting the relief sought in these appeals would be truly extraordinary and unmanageable—amounting to roughly $900 million in new liability for the Company.  *See generally Continental*, 91 F.3d at 555 (affirming dismissal for equitable mootness of three appeals).

## III.  PUBLIC POLICY FAVORS DISMISSAL

Subjecting New Mallinckrodt to the relief Attestor seeks, notwithstanding its failure to seek a meaningful stay or promptly pursue its appeal, would harm creditors and reorganizing debtors in this case and future cases by creating a "bankruptcy discount."  That result would be contrary to the purpose of the equitable mootness doctrine.  The doctrine allows debtors to avoid "protracted litigation based on arguable blemishes in a reorganization plan," and "'assures [stakeholders] that . . . they may make financial decisions based on a reorganized entity's exit from Chapter

---

[5] Case No. 21-cv-01636-TLA (appeal of claim appellant asserts has present value of $190 million); Case Nos. 22-cv-00330-TLA, 22-cv-00331-TLA (consolidated appeals regarding make-whole obligation of at least $110 million).  New Mallinckrodt has filed a motion to dismiss two additional appeals for equitable mootness as well.  *See* Case Nos. 21-cv-01271-TLA, 22-cv-00222-TLA (appeals challenging Plan valuation and treatment of opioid claims).

11 without fear that an appellate court will wipe out or interfere with their deal.'" *Millennium*, 945 F.3d at 140 & n.16 (citation omitted); *see Continental*, 91 F.3d at 565 (equitable mootness inquiry asks "whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders").

This bankruptcy—and the appeals on which New Mallinckrodt seeks dismissal for equitable mootness—illustrate the importance of this issue.  A core settlement involved the allocation of equity interests in the reorganized enterprise between the Guaranteed Unsecured Noteholders and the opioid claimants.  Decl. ¶¶ 8, 13.  That kind of settlement cannot happen without high confidence in the finality of confirmation orders and the resulting marketability of equity securities.  If creditors negotiating an equity split have to bear the risk that long-running appeals could crush the value of their equity, they would need to discount that equity value during negotiations, or decline to accept equity at all.  "[U]ndermin[ing] public confidence in the finality of bankruptcy confirmation orders" and discouraging investment in reorganized enterprises would "make successful completion of large reorganizations like this more difficult."  *Continental*, 91 F.3d at 565.

## CONCLUSION

For the foregoing reasons, Attestor's appeal should be dismissed as equitably moot.

July 1, 2022                                    Respectfully submitted,
Wilmington, Delaware


*/s/ Michael J. Merchant*                       Melissa Arbus Sherry
Mark D. Collins (No. 2981)                      James A. Tomberlin
Michael J. Merchant (No. 3854)                  Andrew Sorkin
Amanda R. Steele (No. 5530)                     **LATHAM & WATKINS LLP**
Brendan J. Schlauch (No. 6115)                  555 Eleventh Street, NW, Suite 1000
**RICHARDS, LAYTON**                            Washington, D.C. 20004
**& FINGER, P.A.**                              (202) 637-2200
One Rodney Square                               melissa.sherry@lw.com
920 N. King Street                              james.tomberlin@lw.com
Wilmington, Delaware 19801                      andrew.sorkin@lw.com
(302) 651-7700
collins@rlf.com                                 George A. Davis
merchant@rlf.com                                George Klidonas
steele@rlf.com                                  Anupama Yerramalli
schlauch@rlf.com                                1271 Avenue of the Americas
                                                New York, New York 10020
                                                (212) 906-1200
                                                george.davis@lw.com
                                                george.klidonas@lw.com
                                                anu.yerramalli@lw.com

                                                Jeffrey E. Bjork
                                                355 South Grand Avenue, Suite 100
                                                Los Angeles, California 90071
                                                (213) 485-1234
                                                jeff.bjork@lw.com

                                                Jason B. Gott
                                                330 North Wabash Avenue, Suite 2800
                                                Chicago, Illinois 60611
                                                (312) 876-7700
                                                jason.gott@lw.com

*Counsel for Reorganized Debtors-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document contains 5139 words, excluding the parts exempted by Federal Rule of Bankruptcy Procedure 8015(g), as counted by Microsoft Word.

I hereby certify that this document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Michael J. Merchant*
Michael J. Merchant

## CERTIFICATE OF SERVICE

I certify that on July 1, 2022, I caused to be served the foregoing *Reorganized Debtors' Motion to Dismiss Appeal as Equitably Moot* via the CM/ECF Electronic Filing system.

*/s/ Michael J. Merchant*
Michael J. Merchant