No. 21-cv-01780-TLA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

In re MALLINCKRODT, PLC, et al., *Debtors*.[*]

ATTESTOR LIMITED and HUMANA INC., *Appellants*,

v.

MALLINCKRODT, PLC, et al., *Appellees*.

On Appeal from the United States Bankruptcy Court
for the District of Delaware, No. 20-12522 (JTD)

# DECLARATION OF BRYAN REASONS IN SUPPORT OF NEW MALLINCKRODT'S MOTION TO DISMISS APPEAL

---

[*] A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.ra.kroll.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

I, Bryan Reasons, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that, to the best of my knowledge, information, and belief, and after reasonable inquiry, the following is true and correct[1]:

1. I am the Chief Financial Officer of the reorganized Mallinckrodt plc ("New Mallinckrodt") and served in the same role for Mallinckrodt plc and affiliated chapter 11 debtors (the "Debtors") prior to and throughout the chapter 11 cases.

2. I served as the Chief Financial Officer at Mallinckrodt plc since March 2019. Prior to that, I served as the Chief Financial Officer at Amneal Pharmaceuticals, and before that, as Chief Financial Officer of Impax Laboratories. I hold a B.S. in accounting from Pennsylvania State University and a Masters of Business Administration from Widener University.

3. I submit this declaration in support of the *Reorganized Debtors' Motion to Dismiss Appeal as Equitably Moot* (the "Motion"). I have reviewed the Motion and am generally familiar with the appeal filed by Attestor Limited, Avon Holdings I, LLC, and Humana Inc. (collectively, "Attestor"). I am over the age of 18, competent to testify, and authorized to submit this declaration on behalf of New Mallinckrodt.

---

[1] Capitalized terms not defined have the meanings ascribed to them in the Fourth Amended Joint Plan of Reorganization (the "Plan") [Bankr. D.I. 6510] or the Confirmation Order [Bankr. D.I. 6660].

4.  I understand that the relief Attestor seeks is allowance of an administrative claim for damages relating to alleged violations of federal antitrust laws, the RICO act, and other state and federal laws, which Attestor valued at over $300 million in November 2021. Additionally, I understand through conversations with counsel that if Attestor's asserted damages amounts are extrapolated to the Effective Date, the administrative expense claim Attestor believes it is entitled to may total over $600 million today. I further understand that if Attestor were to prevail, New Mallinckrodt may be required to pay the full amount of any allowed administrative claim immediately.

5.  As a result of my tenure with the Debtors and New Mallinckrodt, my review of relevant documents, and my discussions with other members of New Mallinckrodt's management team, I am familiar with New Mallinckrodt's operations and financial condition. Additionally, I participated in the Debtors' chapter 11 cases and the negotiations and discussions between the Debtors and their creditor constituencies leading to the Restructuring Support Agreement (the "RSA") and the Plan. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**A.  Events leading up to the Chapter 11 filing and negotiation of the Restructuring Support Agreement**

6.  Mallinckrodt is a global specialty biopharmaceutical company that produces and sells generic and branded products. Among other things, Mallinckrodt

is the sole supplier of a key medicine for treating infantile spasms in children and a key vasodilator for hypoxic respiratory failure in newborns. Further, Mallinckrodt is the sole U.S. manufacturer of acetaminophen, among other generic pharmaceutical products. Mallinckrodt plc, the lead Debtor, is an Irish public limited company and the publicly traded, ultimate parent of the Mallinckrodt global enterprise, headquartered in Dublin, Ireland.

7. In the years leading up to the commencement of its bankruptcy cases, certain Mallinckrodt entities were named in thousands of lawsuits stemming from the production and sale of generic opioid medications. Mallinckrodt entities also separately faced litigations and government investigations relating to other lines of business.

8. Ultimately, it became clear that case-by-case litigation on the scale that the Debtors were facing was untenable. In February 2020, after many months of negotiation, the Mallinckrodt entities agreed on the principal terms of a comprehensive settlement of opioid claims with more than forty Attorneys General and the Plaintiffs' Executive Committee. The Mallinckrodt entities also engaged in negotiations with the Guaranteed Unsecured Notes Ad Hoc Group prior to the Petition Date, which ultimately resulted in the Noteholder Restructuring Agreement. The terms of these two agreements were finalized and memorialized in the RSA, signed by the Debtors, holders of more than 84% of the Debtors' fulcrum Guaranteed

Unsecured Notes, 50 attorneys general of states, Washington D.C. and U.S. territories, and an executive committee of plaintiff representatives. The RSA contemplated that the Debtors would create and fund the Opioid Creditor Trusts for the benefit of opioid claimants with deferred cash payments, warrants to acquire 19.99% of New Mallinckrodt Common Stock, and certain other assets of the Debtors. The Debtors would also issue new secured second lien notes and equity interests in New Mallinckrodt to holders of the Debtors' fulcrum class of Guaranteed Unsecured Notes.

9. The RSA parties agreed that, if the Debtors failed to meet certain milestones, the Guaranteed Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee would each have the right to terminate the RSA. Specifically, the RSA parties agreed to milestones requiring, among other things, (i) that the Debtors confirm a plan of reorganization on or prior to the date that was eleven months after the Petition Date and (ii) that the Effective Date occur no later than fifteen months after the Petition Date.

**B.     Filing of the Chapter 11 Cases and Further Settlement Agreements**

10. On October 12, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") commencing cases for relief under chapter 11 of the Bankruptcy Code.

11. Throughout the chapter 11 cases, the Debtors continued negotiating with creditor constituencies. Those negotiations resulted in multiple additional settlements. On March 10, 2021, the Debtors reached a settlement with the Ad Hoc First Lien Lender Group, which held approximately $1.3 billion of the Debtors' First Lien Term Loans. That settlement, which resolved significant disputed issues relating to the appropriate rate of post-petition interest (among other things), provided that the Debtors would have the option upon emergence to either (i) refinance their First Lien Term Loans on specified terms, including an extension of the maturities on those loans, or (ii) seek alternative financing and repay those claims in cash. Pursuant to that settlement, the Ad Hoc First Lien Lender Group signed a joinder to an amended restructuring support agreement (the "Amended RSA"). This option was crucial to the Debtors in working toward a post-bankruptcy capital structure. The Amended RSA gave the Ad Hoc First Lien Lender Group, in addition to the Guaranteed Unsecured Noteholders and the Governmental Plaintiff Ad Hoc Committee, the right to terminate the Amended RSA unless a Plan was confirmed on or prior to August 15, 2021, and unless the Plan Effective Date occurred on or prior to November 15, 2021. It also contemplated that the First Lien Notes Claims would be reinstated at existing rates and maturities. Subsequently, the Debtors reached an additional consensual resolution with their Revolving Lenders.

12. Following continued negotiations, on September 3, 2021, the Debtors reached settlements with the Official Committee of Opioid Related Creditors (the "OCC"), the Official Committee of Unsecured Creditors (the "UCC"), and second lien noteholders holding a majority of the outstanding second lien notes. Pursuant to those settlements, the Debtors agreed to increase their distributions to the Opioid Trust and to general unsecured creditors. The Debtors also agreed to issue new second lien notes to the Second Lien Noteholders, with improved covenants, while the Second Lien Noteholders agreed to drop any objections to confirmation, including any claim for payment of a make-whole.

13. On September 29, 2021, the Debtors filed the First Amended Joint Plan of Reorganization (the "First Amended Plan"), which incorporated these settlement agreements. Pursuant to the First Amended Plan, the Guaranteed Unsecured Noteholders would receive 100% of the equity of the reorganized enterprise (before dilution for certain plan transactions). The Opioid Claimants would receive cash payments totaling $1.725 billion and certain other assets, along with warrants to purchase 19.99% of the equity of the reorganized enterprise at an agreed strike-price.

14. Following a lengthy confirmation hearing, the Bankruptcy Court issued an opinion confirming the Debtors' Plan on February 3, 2022 (Bankr. D.I. 6347).

C. **Confirmation and Emergence**

15. On March 2, 2022, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming Fourth Amended Joint Plan of Reorganization (with Technical Modifications) of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (Bankr. D.I. 6660) (the "Confirmation Order").

16. On June 16, 2022 (the "Effective Date"), each of the conditions precedent to the effectiveness of the Plan was satisfied or waived. Upon the occurrence of the Effective Date, New Mallinckrodt proceeded to implement and consummate the confirmed Plan. Consistent with the Plan, New Mallinckrodt has since undertaken and completed an array of distributions or other transactions.

D. **Summary of Post-Confirmation Transactions**

17. In connection with the effectiveness of the Plan, New Mallinckrodt undertook various major transactions, made numerous distributions, and issued significant debt obligations. A summary of the distributions, issuance of new obligations and other transactions—categorized based on class treatment under the Plan—follows:

   a. Class 1 – Other Secured Claims:  Other Secured Claims have been satisfied through payment in full in cash, in the amount of $1,280,069.

   b. Class 2(a) – First Lien Revolving Credit Facility Claims:  The First Lien Revolving Credit Facility Claims have been satisfied through payment in full in cash, in the amount of $900 million.

c. Classes 2(b) & 2(c) – 2024 First Lien Term Loan Claims & 2025 First Lien Term Loan Claims: The First Lien Term Loan Claims have been satisfied through (i) the payment in full in cash of (*x*) the First Lien Term Loans Accrued and Unpaid Interest, in the amount of $5,002,580 and (*y*) the Term Loan Exit Payment, in the amount of $17,626,349, and (ii) New Mallinckrodt entering into the New Takeback Term Loans, in the principal amount of $1,762,634,900.41.

d. Class 3 – First Lien Note Claims: The First Lien Term Notes Claims have been satisfied through New Mallinckrodt reinstating the First Lien Notes, in the principal amount of $495,032,000.

e. Class 4 – Second Lien Note Claims: The Second Lien Notes Claims have been satisfied through New Mallinckrodt entering into the New Second Lien Notes, in the principal amount of $322,868,000.

f. Class 5 – Guaranteed Unsecured Notes Claims: The Guaranteed Unsecured Notes Claims have been satisfied through (i) New Mallinckrodt entering into the Takeback Second Lien Notes, in a principal amount of $375 million, and (ii) the distribution of 100% of New Mallinckrodt Ordinary Shares to holders of these Claims, subject to dilution on account of the New Opioid Warrants and the Management Incentive Plan.

g. Class 6 – General Unsecured Claims: The General Unsecured Claims in Classes 6(a)-(g)—which consist of the Acthar Claims, Generics Price Fixing Claims, Asbestos Claims, Legacy Unsecured Notes Claims, Environmental Claims, Other General Unsecured Nots Claims, and 4.75% Unsecured Notes Claims—have been satisfied through the payment or assignment to the General Unsecured Claims Trust of (i) $135 million in cash on the Effective Date, (ii) the GUC Assigned Preference Claims, (iii) the GUC Terlivaz CVR, (iv) the Assigned Sucampo Avoidance Claims, (v) the GUC Share Repurchase Proceeds, (vi) the GUC VTS PRV Share, and (vii) the GUC StrataGraft PRV Share.

h. Class 7 – Trade Claims: The Trade Claims have been satisfied through payment in cash of $1,368,300.

i. Class 8 – Governmental Opioid Claims: The Governmental Opioid Claims in Classes 8(a) to 8(d)—which consist of the State Opioid Claims, Municipal Opioid Claims, Tribe Opioid Claims, and U.S. Government Opioid Claims—have been satisfied through New Mallinckrodt creating

and funding the NOAT II. The New Mallinckrodt has funded the NOAT II through (i) payment in cash of $450 million to the Opioid MDT II on the Effective Date, (ii) assuming of the Opioid Deferred Cash Payments, pursuant to which the Reorganized Debtors will contribute $1.275 billion in cash over the next eight years to the Opioid MDT II, subject to a prepayment option, (iii) issuance of the New Opioid Warrants to the Opioid MDT II, and (iv) the assignment to the Opioid MDT II of the Assigned Third-Party Claims, Share Repurchase Claims, and Assigned Insurance Rights.

j. <u>Class 9 – Non-Governmental Opioid Claims</u>: The Non-Governmental Opioid Claims in Classes 9(a)-(j)—which consist of the Third Party Payor Opioid Claims, PI Opioid Claims, NAS PI Opioid Claims, Hospital Opioid Claims, Ratepayer Opioid Claims, NAS Monitoring Opioid Claims, Emergency Room Physicians Opioid Claims, Other Opioid Claims, No Recovery Opioid Claims, and Released Co-Defendant Claims—have been satisfied through the creation of the Third-Party Payor Trust, the PI Trust, the Hospital Trust, the Ratepayer Account, the NAS Monitoring Trust, the Emergency Room Physicians Trust, each of which is funded by the Opioid MDT II.

k. <u>Class 10 – Settled Federal/State Acthar Claims</u>: The Settled Federal/State Acthar Claims have been satisfied through (i) payment in cash of $15 million plus accrued interest on the Effective Date and (ii) assumption of the Federal/State Acthar Deferred Cash Payments, pursuant to which New Mallinckrodt will contribute $245 million in cash over the next eight years to holders of Settled Federal/State Acthar Claims.

l. <u>Class 11 – Intercompany Claims</u>: Intercompany Claims have been either Reinstated or canceled.

m. <u>Class 12 – Intercompany Interests</u>: Intercompany Interests have been either Reinstated or canceled.

**E.     New Mallinckrodt Common Stock Issuance**

18.     Pursuant to the Plan, on the Effective Date, New Mallinckrodt issued the New Mallinckrodt Ordinary Shares and distributed 100% of those shares to the Guaranteed Unsecured Noteholders. Also on the Effective Date, New Mallinckrodt

entered into the New Opioid Warrant Agreement and issued the New Opioid Warrants to the Opioid MDT II.

19. On the Effective Date, New Mallinckrodt Ordinary Shares were listed for over-the-counter trading. Since the Effective Date, creditors that received New Mallinckrodt Ordinary Shares, as well as their immediate and mediate transferees, have been able to sell or otherwise dispose of those securities.

20. As of June 30, 2022, approximately 1.2 million New Mallinckrodt Ordinary Shares have traded on the over-the-counter market. The opening price of New Mallinckrodt's shares as of that date was $24.50 per share. Since there are approximately 13.2 million New Mallinckrodt Ordinary Shares outstanding, the implied equity market capitalization of the company — based on current trading prices — is approximately $325 million.

21. Reflected in the stock price is an assumption by the Guaranteed Unsecured Noteholders who received the New Mallinckrodt Ordinary Shares and investors who have purchased the New Mallinckrodt Ordinary Shares since the Effective Date that New Mallinckrodt is not liable to Attestor for the damages it has alleged. However, if Attestor prevails in this appeal, New Mallinckrodt could incur over $600 million in unplanned liability. That additional liability would weigh on the company's balance sheet and result in a corresponding decrease in New Mallinckrodt's equity market capitalization and stock price. A similar decrease

would negatively impact the value of the New Opioid Warrants contributed to the Opioid MDT II as decreased equity value would lead the Opioid MDT II to sell the warrants at a lower price than their expected future value, or hold the warrants without exercising them. This would reduce the future recovery available to individual Opioid Claimants and countless programs across the country established to abate the opioid crisis.

### F. Financing Transactions

22. On the Effective Date, as contemplated by the Plan, New Mallinckrodt issued new first lien notes (the "New First Lien Notes") in the aggregate principal amount of $650 million. The financing markets have been severely impacted in recent months by macroeconomic events, which made it particularly challenging to secure that $650 million in new financing. Subject to certain limited restrictions, the New First Lien Notes are now trading freely in the bond market, and holders of those notes may change on a regular basis.

23. Additionally, on the Effective Date, pursuant to the Plan, New Mallinckrodt issued or entered into the: (i) New Takeback Term Loans, in the principal amount of $1,762,634,900.41; (ii) New Second Lien Notes, in the principal amount of $322,868,000.00; and (iii) Takeback Second Lien Notes, in the principal amount of $375,000,000.00.

24. The New Takeback Term Loans now trade in the syndicated loan markets. The New Second Lien Notes and Takeback Second Lien Notes trade in the bond markets. Therefore, the holders of those debt instruments may change on a daily basis.

25. In addition, on the Effective Date, pursuant to the Plan, the First Lien Notes were reinstated in the principal amount of $495,032,000.00.

26. Through all of the financing transactions and implementation of the Plan, including the reinstatement of the New First Lien Notes, New Mallinckrodt has approximately $3.6 billion of funded debt on or after the Effective Date. New Mallinckrodt continues to make interest payments as they come due on all of its funded debt, as the Debtors did throughout the chapter 11 cases.

### G. Trust Transactions and Distributions

27. On the Effective Date, New Mallinckrodt caused the Opioid MDT II, the master disbursement trust for opioid distributions, to be established. New Mallinckrodt also caused the creation of a number of additional trusts which will be funded by distributions from the Opioid MDT II, including the NOAT II, the TAFT II, the Third Party Payor Trust, the PI Trust, the Hospital Trust, the Ratepayer Account, the NAS Monitoring Trust, and the Emergency Room Physicians Trust.

28. Also on the Effective Date, New Mallinckrodt made a payment of $450 million in cash to the Opioid MDT II. New Mallinckrodt is additionally obligated

to make payments totaling $1.275 billion in cash over the next eight years to Opioid MDT II. New Mallinckrodt has also assigned the Assigned Third-Party Claims, Share Repurchase Claims, and Assigned Insurance Rights to the Opioid MDT II.

29. Additionally, on the Effective Date, New Mallinckrodt issued the New Opioid Warrants and distributed them to the Opioid MDT II. If exercised, the New Opioid Warrants would enable the Opioid MDT II to acquire New Mallinckrodt Ordinary Shares in an amount equal to 19.99% of all New Mallinckrodt Ordinary Shares after giving effect to the exercise of the New Opioid Warrants. The New Opioid Warrants may be exercised for up to six years after the Effective Date.

30. On the Effective Date, New Mallinckrodt also caused the General Unsecured Claims Trust (the "GUC Trust") to be established. The Reorganized Debtors contributed $135 million in cash to the GUC Trust on the Effective Date. The Reorganized Debtors also contributed the GUC Assigned Preference Claims, the GUC Terlivaz CVR, the GUC Assigned Sucampo Avoidance Claims, the GUC Share Repurchase Proceeds, the GUC VTS PRV Share, and the GUC StrataGraft PRV Share to the GUC Trust.

**H.    New Board of Directors and Corporate Leadership**

31. On June 16, 2022, New Mallinckrodt issued a press release, announcing changes to the board or directors and management, including that Sigurdur Olafsson, who most recently served as CEO of Hikma Pharmaceuticals, had been appointed as

President and Chief Executive Officer, effective June 25, 2022. Additionally, New Mallinckrodt's board will include six independent directors.

I. **Post-Emergence Operations and Liquidity Needs**

32. After making distributions and completing other transactions on or soon after the Effective Date, New Mallinckrodt (including subsidiaries) had approximately $300 million in cash on its balance sheet. Additionally, New Mallinckrodt (including subsidiaries) has access to an accounts receivable facility through which it could draw up to an additional $200 million, subject to availability under the borrowing base, to satisfy temporary liquidity needs.

33. The amount of cash on New Mallinckrodt's balance sheet fluctuates in the ordinary course of business as the company collects on receivables and satisfies its vendor and debt obligations. It is essential that New Mallinckrodt has sufficient cash on hand to pay its operating expenses, as well as to service its debts and satisfy its deferred settlement obligations as they come due.

34. In order to operate the business efficiently and address ongoing obligations, the company's management and advisors concluded that New Mallinckrodt should have a minimum of $250 million of cash-on-hand. Accordingly, if New Mallinckrodt were now required to make an additional payment of over $600 million, it would likely need to use cash from operations, draw on its accounts receivable facility, and seek additional financing. Diverting cash from

supporting the go-forward business operations, exhausting its accounts receivable facility and potentially operating with less than $250 million in liquidity would impair New Mallinckrodt's ability to make timely payments to its vendors and to invest in the business, including research and development.  The ability to invest in research and development is particularly important for New Mallinckrodt because, as a pharmaceutical company, it must continuously develop and launch drugs from its pipeline to grow revenue.  If New Mallinckrodt were required to make an additional payment of over $600 million, it is likely that the company would have to delay investment in new product offerings and delay planned product launches, which require significant upfront investments in product marketing and launch preparations, thus delaying or imperiling crucial future revenue streams.

35. Even if New Mallinckrodt were to draw on its accounts receivable facility to fund the claim, the availability under that facility would not be sufficient to pay an additional $600 million obligation in full.  In such case, New Mallinckrodt may need to seek additional financing sources at a time when obtaining financing has already proven to be difficult.  Additionally, using the accounts receivable facility as an ongoing source of liquidity rather than as a backstop (on a temporary as-needed basis) and incurring additional debt would create additional challenges.  If new borrowings were incurred, New Mallinckrodt would incur additional interest expense and need to regularly refresh the underlying collateral on the accounts

receivable facility to support the borrowing base. In addition, New Mallinckrodt would be left without a revolving facility to address other working capital or temporary funding needs going forward.

36. In addition to requiring sufficient cash to maintain optimal liquidity in the ordinary course of its operations, New Mallinckrodt may also elect to use cash to partially repay the principal amounts of its funded debt upon maturity. New Mallinckrodt has over $800 million in funded debt obligations that are scheduled to mature in 2025, consisting of $322,868,000 in Second Lien Notes and $495,032,000 in First Lien Notes. Due in part to covenants in New Mallinckrodt's New First Lien Notes, New Mallinckrodt may elect to use cash on hand to repay some portion of those obligations upon their maturity. Accordingly, significantly reducing New Mallinckrodt's liquidity will impact its flexibility in addressing these scheduled maturities and may force it to incur more onerous terms as a condition for a refinancing.

Dated: July 1, 2022

*/s/ Bryan Reasons*
Bryan Reasons
Chief Financial Officer
Mallinckrodt plc